1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LUCY ATAYDE, individually and as          No. 1:16-cv-00398-DAD-SAB
     successor in interest of decedent
12   RICHARD MICHAEL RAMIREZ

13                 Plaintiff,                   ORDER GRANTING IN PART AND
                                                DENYING IN PART DEFENDANTS'
14        v.                                    MOTIONS TO DISMISS

15   NAPA STATE HOSPITAL, et al.,               (Doc. Nos. 76, 78)

16                 Defendants.

17

18        This matter came before the court on December 6, 2016, for hearing of defendants'

19   motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. Nos.

20   76, 78.) Attorney Michael Haddad appeared on behalf of plaintiff Lucy Atayde, successor in

21   interest of decedent Richard Michael Ramirez. Deputy Attorney General Krista Dunzweiler

22   appeared on behalf of defendants Napa State Hospital ("NSH"), Dolly Matteucci, and Dana

23   White (the "state defendants"). Attorney Jerome Varanini appeared on behalf of defendant

24   Merced County. Attorney Jemma Saunders appeared on behalf of California Forensic Medical

25   Group Inc. ("CFMG"), Taylor Fithian, Deborah Mandujano, Corina Denning, Sean Ryan, Tom

26   Cavallero, Jason Goins, and Heather Goode (the "county defendants"). Following oral argument,

27   defendants' motions were taken under submission. For the reasons stated below, the court will

28   grant in part and denies in part defendants' motions to dismiss.

                                               1

FACTUAL BACKGROUND

2          On January 5, 2016, plaintiff Lucy Atayde, the mother of decedent Richard Michael

3   Ramirez, filed suit in the U.S. District Court for the Northern District of California against

4   defendants.  (Doc. No. 1.)  On March 21, 2016, the case was transferred to this district.  (Doc. No.

5   40.)  On September 16, 2016, this court granted the state defendants' motion to dismiss and

6   granted in part the county defendants' motion to dismiss.  (Doc. No. 63.)

7          This action now proceeds on plaintiff's First Amended Complaint ("FAC"), filed October

8   7, 2016.  (Doc. No. 68.)  In her FAC, plaintiff raises claims against two major groups of

9   defendants, those affiliated with the Napa State Hospital ("state defendants"), and those affiliated

10  with the Merced County jail ("county defendants").  (Doc. No. 68.)  Plaintiff alleges seven causes

11  of action: (i) claims under 42 U.S.C. § 1983 against defendants Fithian, Goode, Ryan, Denning,

12  Cavallaro, Goins, Mandujano, and White for violation of decedent's Fourth and Fourteenth

13  Amendment rights to adequate mental health treatment, and for violation of plaintiff's First

14  Amendment right to familial association; (ii) claims under § 1983 against defendants Matteucci,

15  Merced County, CFMG, and policy-making officials of each organization, for supervisory and

16  municipal liability; (iii) claims under the California Bane Act, codified at California Civil Code

17  § 52.1; (iv) claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act

18  of 1973 ("RA") against defendants Merced County, NSH, and CFMG; (v) claims under

19  California Government Code § 845.6 against defendants White, NSH, the County, and Goins;

20  (vi) negligence claims against defendants Cavallero, Goins, and Merced County; and

21  (vii) negligence per se claims against defendants Cavallero, Goins, and Merced County.  (*Id.*)

22         In her FAC, plaintiff alleges the following facts.  On December 15, 2014, decedent—a

23  twenty seven year-old man suffering from severe psychosis—committed suicide while in the

24  custody of the Merced County Sheriff's Department.  (Doc. No. 68 at 29, ¶ 102.)  Decedent

25  committed suicide after being held in pre-trial detention for nearly four months.  (*Id.*)  The

26  following events led to decedent's suicide.

27         Decedent was arrested and booked into Merced County Jail on August 23, 2014.  (*Id.* at

28  10, ¶ 26.)  On August 29, 2014, the Merced County Superior Court suspended the criminal

proceedings against decedent due to concerns that he was not mentally competent to stand trial and referred him to Dr. Phillip Hamm, Ph.D., for an evaluation pursuant to California Penal Code § 1368. (*Id.* at 10, ¶ 28.)

Decedent exhibited signs of mental illness while held at Merced County jail, reportedly hearing voices and experiencing major mood changes. (*Id.* at 11–13, ¶¶ 34–38.) On two separate occasions in early September of 2014, decedent was placed in safety cells because of his behavior. (*Id.* at 13–14, ¶¶ 39–44.) After each of these instances, decedent was released without the initiation of a treatment plan or other follow-up action. (*Id.*) Decedent was given only two telepsychiatric consultations while incarcerated at the Merced County jail. (*Id.* at 12–13, ¶ 38.) On September 5, 2014, defendant Heather Goode, M.D., met with decedent and wrote him a prescription for an antipsychotic medication. (*Id.* at 12–13, ¶ 38.) However, defendant Goode did not draft a treatment plan or diagnose decedent as suffering from psychosis. (*Id.*) On September 15, 2014, defendant Cora Denning, R.N., conducted a separate assessment of decedent, and found him to have a clear and normal thought process. (*Id.* at 14–15, ¶ 48.) Decedent was scheduled for another consultation on September 22, 2014, but this appointment was canceled due to a scheduling conflict and was never rescheduled. (*Id.* at 15, ¶ 49.)

Decedent refused to take his prescribed medications during his time at the jail. (*Id.* at 16, ¶ 56.) In response to his refusal, county employees and agents merely signed release of liability forms on decedent's behalf. (*Id.* at 16, ¶ 56.) Decedent never signed these release forms himself. (*Id.*)

On September 22, 2014, Dr. Hamm issued his court-ordered report on decedent. (*Id.* at 15–16, ¶¶ 51–53.) The report stated that decedent likely suffered from Psychotic Disorder NOS (not otherwise specified) and was not able to understand the nature and purpose of the proceedings against him. (*Id.*) On September 26, 2014, Merced County Superior Court adopted Dr. Hamm's report and declared decedent incompetent to stand trial. (*Id.* at 15–17, ¶¶ 51–60.) The court also ordered a placement report to be submitted by October 15, 2014 and scheduled a report hearing for October 17, 2014. (*Id.* at 17, ¶ 60.)

/////

During the period of time leading up to the report hearing, decedent engaged in a series of self-harming behaviors. (*Id.* at 18–21, ¶¶ 61–76.) On September 27, 2014, while housed in segregated lockdown, decedent began to strike the walls and door of his cell, causing his hand to swell and bruise. (*Id.* at 18, ¶ 61.) On September 29, 2014, decedent attempted to commit suicide by hanging himself with a t-shirt. (*Id.* at 18, ¶ 64.) On October 5, 2014, decedent again attempted suicide by choking himself with his own hands. (*Id.* at 19, ¶ 70.) In response to each suicide attempt, decedent was placed in a safety cell—generally for a period of two days—and given an updated prescription. (*Id.* at 19–20, ¶¶ 67, 69, 73, 75.) However, decedent continued to refuse his medications, and county staff continued to fail to develop a treatment plan. (*Id.* at 16–21, ¶¶ 56, 63, 69, 75–76.)

On October 24, 2014, the Merced County Superior Court ordered decedent to be committed to the trial competency program at defendant NSH, or another appropriate facility, pursuant to California Penal Code § 1370. (*Id.* at 22, ¶ 79.) In its order, the court specifically noted that if decedent's mental disorder "is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the patient will result." (*Id.*) Both county and state defendants were given notice of this order. (*Id.*)

NSH completed a pre-admission evaluation of decedent and approved him for admission. (*Id.* at 20, ¶ 74.) On October 9, 2014, defendant White, a nurse employed by defendant NSH, wrote a letter stating that decedent would be admitted upon receipt of seven specific court documents. (*Id.*) Defendant NSH received these documents before October 31, 2014. (*Id.* at 24, ¶ 86.) However, decedent was never transferred to NSH. (*Id.* at 20, 24–26, ¶¶ 74, 86.) Plaintiff alleges that decedent was not transferred either because the state defendants actively denied decedent's admission to NSH, or because the county defendants failed to transport and deliver decedent to NSH as ordered. (*Id.*)

Between October and December of 2014, decedent continued to engage in self-harming behavior. He was placed in a safety cell on three separate occasions during this period—on November 28, 2014, December 5, 2014, and December 14, 2014—and each time was released after a period of observation. (*Id.* at 26–29, ¶¶ 91, 94, 101.) On December 15, 2014, after being

4

placed in a segregated cell, decedent committed suicide by hanging himself. (*Id.* at 29, ¶ 102.)

Defendants Merced County, Cavallero, and Goins filed a motion to dismiss plaintiff's FAC on October 21, 2016. (Doc. No. 76.) State defendants filed a separate motion to dismiss on the same date. (Doc. No. 78.) On November 22, 2016, plaintiff filed oppositions to defendants' motions to dismiss, one of which was amended on November 30, 2016. (Doc. Nos. 80, 81, 84.) County defendants filed their reply on November 26, 2016, and state defendants filed their reply on November 30, 2016. (Doc. Nos. 82, 83.)

LEGAL STANDARD

The purpose of a motion to dismiss brought pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though Rule 8(a) does not require detailed factual allegations, a plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). It is inappropriate to assume that the plaintiff "can prove facts which it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

/////

/////

In their motions to dismiss, both the state and county defendants argue that plaintiff's FAC does not cure the defects of the original complaint, and should be dismissed for the same reasons the court previously articulated in its September 16, 2016 order. (*See* Doc. No. 63.) Defendants collectively make four arguments: (i) plaintiff's § 1983 claims are inadequately pled with respect to both the state and county defendants; (ii) plaintiff's § 1983 claim for municipal liability against Merced County fails under federal pleading standards; (iii) plaintiff's ADA and RA claims fail because the FAC does not allege that defendants discriminated against decedent on the basis of disability; and (iv) plaintiff's claims against the state defendants under California Government Code §§ 845.6 and 815 fail because decedent was not in custody of NSH at the time of his death, and because the state defendants are immune from suit under state law and the Eleventh Amendment. (Doc. Nos. 76, 78.)

The court considers each of defendants' arguments in turn below.

## I. Claims under 42 U.S.C. § 1983

Both state and county defendants first move to dismiss plaintiff's § 1983 claims for violation of the Fourteenth Amendment, arguing that the factual allegations of plaintiff's FAC are insufficient to state a claim for a violation of the decedent's constitutional rights, and are inadequate to support claims against defendants White, Matteucci, or Goins.

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To make out a valid claim under § 1983, a plaintiff must allege and eventually prove that: (i) the conduct complained of was committed by a person acting under color of state law; (ii) this conduct deprived a person of constitutional rights; and (iii) there is an actual connection or link between the actions of the defendants and the deprivation allegedly suffered by decedent. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–695 (1978); *Rizzo v. Goode*, 423 U.S. 362, 370–371 (1976). "A person 'subjects'

another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Lacey v. Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

Supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of *respondeat superior* and, therefore, when a named defendant holds a supervisorial position, the causal link between him or her and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978). Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient. *See Ivey v. Board of Regents*, 673 F.2d 266, 268 (9th Cir. 1982).

A.    Deliberate Indifference Claims

Defendants argue that plaintiff has not adequately pled a § 1983 claim based on deliberate indifference against either the state or county defendants. (Doc. No. 78-1 at 17–18.)

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. 14 § 1. Fourteenth Amendment protections cover a procedural as well as a substantive sphere, such that they bar certain government actions regardless of the fairness of the procedures used to implement them. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998). Here, because Mr. Ramirez was a pretrial detainee at the time of the alleged incidents, his right to be free from cruel and unusual punishment is derived from the due process clause of the Fourteenth Amendment rather than the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067–68 (9th Cir. 2016)*, cert. denied sub nom. Los Angeles County, Cal. v. Castro*, ___U.S.___, 137 S. Ct. 831 (2017). The duty to protect detainees from suicide is

/////

/////

/////

grounded in the substantive liberty interest to adequate medical care.[1]  *See Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1018 (9th Cir. 2010); *Johnson v. Meltzer*, 134 F.3d 1393, 1397 (9th Cir. 1998); *Schwartz v. Lassen Cty. ex rel. Lassen Cty. Jail (Detention Facility)*, 838 F. Supp. 2d 1045, 1052 (E.D. Cal. 2012).  In particular, "persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs.'"  *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (quoting *Carnell v. Grim*, 74 F.3d 977, 979 (9th Cir. 1996)), *overruled on other grounds by Castro*, 833 F.3d at 1076.  Moreover, "[i]ncapacitated criminal defendants have liberty interests in freedom from incarceration and in restorative treatment."  *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003).  When determining whether failure to provide timely restorative treatment constitutes a violation of the Fourteenth Amendment, courts must balance the detainee's liberty interests against the legitimate interests of the state.  *Id.* (citing *Youngberg*, 457 U.S. at 321).

/////

/////

/////

/////

/////

/////

/////

/////

/////

---

[1]  Some federal courts have suggested that this duty is also rooted in personal security rights.  *See Soto v. City of Sacramento*, 567 F. Supp. 662, 673 (E.D. Cal. 1983) (explaining, in the context of a suit arising out of a detainee suicide, that an inmate's Fourteenth Amendment liberty interest in "unjustified intrusions on personal security" required a "minimally safe cell"); *see generally Ingraham v. Wright*, 430 U.S. 651, 673 (1977) (recognizing the constitutional right to personal security, and discussing the "historic liberty interest" traceable to the Magna Carta in being "free from . . . unjustified intrusions on personal security").  *But see* James E. Robertson, *Fatal Custody:  A Reassessment of § 1983 Liability for Custodial Suicide*, 24 U. Tol. L. Rev. 807, 813 (1993) ("The most common approach" is to "addres[s] suicide as a mental health problem that implicates inmates' right to medical care").

Plaintiffs may claim deliberate indifference under the Fourteenth Amendment[2] by alleging: (i) defendant made an intentional decision with respect to the conditions of plaintiff's confinement; (ii) those conditions exposed plaintiff to a "substantial risk of serious harm"; (iii) defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved; and (iv) by not taking those measures, defendant caused plaintiff's injuries. *See Castro v. Los Angeles*, 833 F.3d 1060, 1068–71 (9th Cir. 2016), *cert. denied sub nom. Los Angeles County, Cal. v. Castro*, ___U.S.___, 137 S. Ct. 831 (2017). Accordingly, when considering a motion to dismiss such a claim, a district court must consider whether the plaintiff has pled sufficient facts to permit the court to infer the plaintiff had a "serious medical need" and a defendant was "deliberately indifferent" to that need. *See Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see also Simmons*, 609 F.3d at 1018 ("[W]e have previously recognized that a heightened suicide risk can present a serious medical need."). In particular, deliberate indifference may be shown where prison officials or practitioners "deny, delay, or intentionally interfere with medical treatment." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988); *see also Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976) (finding that delays in providing medical care may show

_____

[2] Until recently, the Ninth Circuit analyzed claims that corrections officials failed to protect inmates under the same "deliberate indifference" standard, regardless of whether the plaintiff was a convicted inmate or a pretrial detainee. *See Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1242 (9th Cir. 2010), *overruled on other grounds by Castro v. City of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (stating that "[b]ecause pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment . . . we apply the same standards"); *see also* Catherine T. Struve, *The Conditions of Pre-Trial Detention*, 161 U. Penn. L. Rev. 1009, 1023 (2013) (noting that the Supreme Court has not clearly spoken, and circuit courts have equivocated, as to whether pre-trial detainees have greater protections under the Fourteenth Amendment than convicted prisoners have under the Eighth Amendment). However, the Ninth Circuit has now clarified that a less stringent formulation of the "deliberate indifference" standard, outlined above, applies to pretrial detainees. *See Castro*, 833 F.3d at 1068–71 (citing *Kingsley v. Hendrickson*, ___U.S.___, ___, 135 S. Ct. 2466, 2470 (2015)), *cert. denied sub nom. Los Angeles County v. Castro*, ___U.S.___, 137 S. Ct. 831 (2017). Thus, while a plaintiff bringing a deliberate indifference under the Eighth Amendment must allege an objectively serious deprivation and a subjectively culpable state of mind on the part of the defendant, a plaintiff asserting deliberate indifference under the Fourteenth Amendment "need not prove those subjective elements about the [defendant's] actual awareness of the level of risk." *Castro*, 833 F.3d at 1070–71.

deliberate indifference).  Courts "need not defer to the judgment of prison doctors or

administrators" in deciding whether there has been deliberate indifference to an inmate's serious

medical needs.  *Snow v. McDaniel*, 681 F.3d 978, 985–86 (9th Cir. 2012) (quoting *Hunt v. Dental

Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).  However, mere negligence in diagnosing or treating a

medical condition, without more, does not constitute deliberate indifference.  *See Hunt,* 865 F.2d

at 200; *see also Toguchi v. Chung*, 391 F.3d 1051, 1058–60 (9th Cir. 2004).

### i.  *State defendants White and Matteucci*

The state defendants move to dismiss plaintiff's § 1983 claims against defendants White

and Matteucci for deliberate indifference in the provision of medical care in violation of

decedent's Fourteenth Amendment rights.  (Doc. No. 78-1 at 15–21.)  They assert three

arguments in this regard.  (*Id.*)  First, they argue that defendants White and Matteucci cannot be

held liable for their omissions when they were not subject to a duty to transfer decedent from

county jail to NSH.  (*Id.* at 15–16.)  Second, defendants argue that plaintiff's § 1983 deliberate

indifference claim against defendants White and Matteucci is inadequately pled.  (*Id.* at 16–19.)

Finally, defendants contend that plaintiff's § 1983 claim against defendants White and Matteucci

is barred by qualified immunity.  (Doc. No. 78 at 15–18, 20–21.)[3]

In her opposition, plaintiff argues that defendants White and Matteucci were under a duty

to carry out decedent's transfer; that the deliberate indifference claim is adequately alleged under

federal pleading standards; and that qualified immunity does not preclude suit against state

defendants. (Doc. No. 84 at 16–17.)

### 1.  Duty of care

The court first considers whether defendants White and Matteucci had a duty to effect

decedent's transfer from county jail to NSH, such that they may be held liable under § 1983 for

their omissions in this regard.

/////

---

[3]  However, defendants do not contest that defendants White and Matteucci are employees of
NSH who acted under color of state law; that failure to transfer the decedent, a suicide-prone
detainee, to NSH represented a substantial risk of serious harm; or that the failure to transfer
decedent to NSH had a causal connection with decedent's suicide.

Plaintiff alleges in the FAC that the failure of defendants White and Matteucci to act resulted in violation of decedent's substantive due process right to adequate medical care. (Doc. No. 68 at 32–38, ¶¶ 115–134.) Specifically, plaintiff alleges that defendants were aware of the court order of October 24, 2014 committing decedent to NSH, and failed to heed requests by Merced County officials for decedent's admission to NSH for treatment. (*Id.* at 4, 25, 30, 33, ¶¶ 5 n.1, 86–87, 109, 117.)

As stated above, it is well-established that a person can only be held liable under § 1983 for subjecting another to the deprivation of a constitutional right "if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson*, 588 F.2d at 743. Plaintiff here brings § 1983 claims against the state defendants based on their omissions or failure to act. As such, plaintiff may only proceed with her claims if defendants White and Matteucci were subject to a duty of care that ran to decedent, and failed to perform in keeping with that duty.

In general, the Ninth Circuit has stated that the duty to protect substantive due process rights attaches when a state "takes a person into its custody and holds him there against his will." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 198–202 (1989); *see also Patel v. Kent School Dist.*, 648 F.3d 965, 971 (9th Cir. 2011) ("The types of custody triggering [this duty] are 'incarceration, institutionalization, or other similar restraint of personal liberty'") (citing *DeShaney*, 489 U.S. at 200). The rationale behind this duty is that "[w]hen the state puts a person in danger, the Due Process Clause requires the state to protect him to the extent of ameliorating the incremental risk."[4] *Archie v. City of Racine*, 847 F.2s 1211, 1222 (7th Cir. 1988)

---

[4] The heightened risks experienced by mentally ill persons entering the criminal justice system are well-recognized. The Supreme Court has long held that legally incompetent persons are incapable of adequately defending themselves against criminal charges, and cannot be tried and convicted of criminal charges. *See Pate v. Robinson*, 383 U.S. 375, 378 (1966); *Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010). At the same time, the lengthy detention of mentally incompetent persons with pending criminal charges can pose a risk to the due process rights of such persons. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972); *United States v. Strong*, 489 F.3d 1055, 1061 (9th Cir. 2007); *see also Craft v. Superior Court*, 140 Cal. App. 4th 1533, 1545 (2006) ("[W]here there is no commitment and no treatment, the time an incompetent defendant spends in jail is unnecessary and implicates not only due process but also counts toward a finding of prolonged incarceration under the state constitutional speedy trial guarantee."). Criminal

(emphasizing that "[w]hen a state cuts off sources of private aid, it must provide replacement

protection."). As such, correctional facilities have an obligation to protect the substantive liberty

interests of prisoners, including the liberty interest to adequate healthcare. *See Clouthier v.*

*County of Contra Costa*, 591 F.3d 1232, 1242 (9th Cir. 2010) ("[T]he 'deliberate indifference'

standard applies to claims that correction facility officials failed to address the medical needs of

pretrial detainees."), *overruled on other grounds by Castro v. City of Los Angeles*, 833 F.3d 1060

(9th Cir. 2016); *see also Simmons*, 609 F.3d at 1018 (recognizing that correctional facilities and

their employees may be liable for failing to address the medical needs of detainees, including

suicide prevention); *Estate of Prasad ex rel. Prasad v. County of Sutter*, 958 F. Supp. 2d 1101,

1112 (E.D. Cal. 2013) ("Deliberate indifference to a pretrial detainee's serious medical needs

violates the Fourteenth Amendment, whether the indifference is manifested by doctors, guards, or

other personnel.").

There is no clear guidance as to whether detainees committed by court order to an external

treatment facility, but not yet transferred, can bring § 1983 deliberate indifference claims against

employees of the treatment facility.[5] In considering this issue, the court turns to the state law

rules governing treatment of defendants deemed mentally incompetent to stand trial. *See* Cal.

courts and correctional facilities are poorly-equipped to handle the mentally ill and to protect
against these risks. *See Trueblood v. Washington State Dep't of Social and Health Services*, 101
F. Supp. 3d 1010, 1013 (W.D. Wash. 2015) ("Jails are not hospitals, they are not designed as
therapeutic environments, and they are not equipped to manage mental illness or keep those with
mental illness from being victimized by the general population of inmates."), *overruled on other
grounds*, 822 F.3d 1037 (9th Cir. 2016); *see also* Darrell Steinberg et al., *When did prisons
become acceptable mental healthcare facilities?*, Stanford Law School Three Strikes Project
(2015) (discussing the history of deinstitutionalization in California, the corresponding increase in
incarceration of mentally-ill persons, and the difficulties faced by incarcerated persons with
mental illness).

[5] This issue is especially pressing in light of the significant delays that can occur between a state
court order committing an incompetent defendant, and the actual physical transfer of the
defendant to the designated treatment facility. *See* Hal Wortzel et al., *Crisis in the Treatment of
Incompetence to Proceed to Trial: Harbinger of a Systemic Illness*, J. Am. Academy of
Psychiatry & L., 257–263 (2007) ("Across the nation, a growing number of defendants judged
incompetent to proceed (ITP) to trial are unable to access needed mental health care because of
critical shortages of state hospital psychiatric beds and funding. Many of these patients languish
in jails and prisons that lack the resources to provide adequate care during their prolonged wait
for treatment.").

Penal Code § 1370; *In re Loveton*, 244 Cal. App. 4th 1025, 1029–30 (2016) (describing statutory scheme); *People v. Brewer*, 235 Cal. App. 4th 122, 129–32 (2015) (same); *see also DeMontiney v. Desert Manor Convalescent Ctr., Inc.*, 144 Ariz. 6, 9 (1986) (turning to the state statute governing contracts between county jails and healthcare providers to determine the scope of the duty to provide adequate medical care to a detainee).

California Penal Code § 1370 requires that, upon a finding of mental incompetency, the state court "shall commit the patient to the State Department of State Hospitals." § 1370(a)(5). The statute specifies that the state court "shall order that the mentally incompetent defendant be delivered by the sheriff to a state hospital." § 1370(a)(1)(B). However, the statute also imposes responsibilities onto the state hospital to which the incompetent defendant is being committed. Under § 1370(a)(3), the state court is required to provide copies of certain documents pertaining to the detainee to the Department of State Hospitals, including copies of the detainee's commitment order and any existing psychiatric examinations or evaluation reports. *See* § 1370(a)(3). The statute requires the state hospital's medical director to make a written report regarding the detainee's progress toward recovery within ninety days of commitment. *See* § 1370(b)(1) (requiring thereafter that the state hospital medical director submit similar written reports to the court at six-month intervals). Together, these requirements establish that treatment facilities have certain custodial duties under the Fourteenth Amendment with respect to these detainees, which attach at the time the state court commitment order is issued. This court thus concludes that defendants White and Matteucci owed a duty of care to decedent for Fourteenth Amendment purposes, and are properly subject to suit under § 1983 for failing to take steps to effect decedent's transfer to NSH. *See Johnson*, 588 F.2d 743 (explaining that a person "subjects" another to the deprivation of a constitutional right under § 1983 "if he [or she] . . . omits to perform an act which he [or she] is legally required to do that causes the deprivation of which complaint is made").

## 2. Adequacy of Pleadings

In their motion to dismiss, the state defendants also argue that plaintiff has not adequately alleged the elements of a deliberate indifference claim against defendants White and Matteucci.

Defendants do not dispute that plaintiff has sufficiently alleged that defendants White and Matteucci made an intentional decision with respect to the conditions under which decedent was confined; or that those conditions put decedent at substantial risk of suffering serious harm. Rather, defendants appear to argue that plaintiff has not adequately alleged the final two elements of a Fourteenth Amendment deliberate indifference claim—whether defendants took reasonable available measures to abate risks to decedent, and whether failure to take those measures caused decedent's injuries.[6] (*Id.* at 16–19.)

The court finds these arguments to be unpersuasive with respect to defendant White. In the FAC, plaintiff alleges that defendant White was an NSH nurse "responsible for screening patients for admission to NSH," and was directly involved in decedent's pre-admission evaluation. (Doc. No. 68 at 4, ¶ 5.) In particular, the FAC alleges that defendant White was aware of the October 2014 court order committing decedent to NSH, and that she knew of the high degree of risk involved in decedent remaining at the county jail. (*Id.* at 4, 33, ¶¶ 5 n.1, 117–18.) In the FAC, plaintiff also alleges that defendant White wrote a letter on October 9, 2014, stating that decedent was "appropriate for admission to NSH" and would be scheduled for admission following receipt of a number of court documents. (*Id.* at 20, ¶ 74.) Plaintiff alleges that defendant White ultimately failed to heed requests by Merced County officials to finalize the admission, causing a delay in decedent's transfer to NSH and ultimately resulting in his suicide. (*Id.*) Taking plaintiff's allegations to be true, as this court is obliged to do at the motion to dismiss stage, the undersigned finds plaintiff has adequately alleged defendant White did not take reasonable available measures to abate the serious risks faced by decedent, and that this omission proximately caused decedent to suffer harm. *See Castro*, 833 F.3d at 1072 ("Kn[owledge] of the substantial risk of serious harm . . . necessarily implies that . . . a reasonable officer would have appreciated the risk."); *Love*, 915 F.2d at 1245; *see also Johnson*, 2015 WL 1549257, at *14–15

---

[6] In their motion the state defendants invoke the legal standard applicable to Eighth Amendment deliberate indifference claims, arguing that plaintiff has not alleged that defendants were subjectively aware of decedent's serious medical need and willfully disregarded this risk. (Doc. No. 78-1 at 16–20.) As noted above, however, the Ninth Circuit has now clarified that a different standard applies to deliberate indifference claims brought under the Fourteenth Amendment. *See* n.2, above.

14

(finding a triable issue of fact as to whether defendant doctor acted with deliberate indifference in failing to immediately send inmate to the ER after becoming aware of neurological injuries). As such, the court concludes that plaintiff's § 1983 deliberate indifference claim against defendant White is sufficient under federal pleading standards. The state defendants' motion to dismiss plaintiff's deliberate indifference claim on this ground will therefore be denied.

Defendants' arguments concerning the adequacy of plaintiff's allegations with respect to the § 1983 claims against defendant Matteucci present a closer question. The allegations of the FAC concerning defendant Matteucci's involvement in the admissions process with respect to the decedent are not as detailed as those relating to defendant White. However, the FAC does allege that defendant Matteucci was the Executive Director and highest policymaking official of NSH, responsible for supervising NSH employees and, most importantly, for ensuring "compliance with Court orders requiring placement of patients at NSH." (Doc. No. 68 at 4, ¶ 5.) The FAC also generally alleges that defendant Matteucci, and other defendants, knew of decedent's serious medical condition and his urgent need for medical/mental health care, and was aware of the state court order requiring that decedent be admitted to NSH and warning that failure to treat his condition would result in further harm or death, yet failed or refused to allow his admission to NSH despite having the power to do so. (*Id.* at 25, 30, 33 ¶¶ 86a, 109, 117–19.)[7] It is true that the FAC does not allege that defendant Matteucci was aware of any additional details regarding decedent's condition nor does it allege details of her personal involvement in the process of admitting decedent to NSH. Nonetheless, the court concludes that the FAC's allegations regarding defendant Matteucci's responsibility for compliance with court orders requiring admission of patients as well as her knowledge of decedent's condition, his need for treatment and of the court order requiring his admission, coupled with her alleged failure to exercise her admission authority, are sufficient to adequately state a supervisory liability claim against her

/////

---

[7] The FAC also alleges that state defendants White and Matteucci "have a well-known history and pattern of failing to allow timely admission of IST pretrial detainees to NSH, in violation of state court commitment orders and with deliberate indifference to the rights and safety of IST pretrial detainees." (Doc. No. 68 at 24, ¶ 85.)

based on the alleged deliberate indifference in the provision of medical care to the decedent.[8] *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his subordinates *if the supervisor participated in or directed the violations*, *or knew of the violations and failed to act to prevent them*." (emphasis added)); *see also Starr v. Baca,* 652 F.3d 1202, 1208 (9th Cir. 2011) (finding that plaintiff adequately alleged a § 1983 claim against a sheriff in his role as a supervisor where it was alleged that the sheriff had knowledge of constitutional violations in the jail and failed to act, amounting to acquiescence in the constitutional violations), *cert. denied* ___U.S.___, 132 S. Ct. 2101 (2012); *Hydrick v. Hunter*, 500 F.3d 978, 988 (9th Cir. 2007) (denying a motion to dismiss § 1983 claims against high policymaking officials at Atascadero State Hospital because plaintiff alleged "that the Defendants knew of these abuses" and "played an instrumental role in policymaking and enforcement," and noting that "we do not see how, prior to discovery, they *could* plead the individual roles of each state officer with any more specificity"), *overruled on other grounds by* 669 F.3d 937 (9th Cir. 2012); *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) ("A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others."); *Johnson v. Baca*, No. CV 13-04496 MMM (AJWx), 2014 WL 12588641, at *7–10 (C.D. Cal. Mar. 3, 2014) (finding that plaintiff had adequately pled supervisory liability claims against the then-Sheriff of Los Angeles County by alleging that the defendant knew of violence on inmates in the county jail, especially mentally ill inmates, and took inadequate steps to prevent it).

   For these reasons, the state defendants' motion to dismiss plaintiff's § 1983 claim against defendant Matteucci will also be denied.

/////

/////

---

[8] That is not to say, of course, that plaintiff will be able to present evidence supporting the allegations of the FAC with respect to defendant Matteucci. Rather, it is only to say that the allegations are sufficient to survive a motion to dismiss.

### 3. Qualified Immunity

The state defendants additionally argue that defendants White and Matteucci are entitled to qualified immunity from plaintiff's § 1983 deliberate indifference claims. (Doc. No. 78-1 at 20–21.)

Government officials enjoy qualified immunity from civil damages unless their conduct violates clearly established statutory or constitutional rights. *See Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When determining whether qualified immunity applies, the central questions for the court are: (i) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendants' conduct violated a statutory or constitutional right; and (ii) whether the right at issue was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that this two-part analysis is "often beneficial" but not mandatory).

"A government official's conduct violate[s] clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 ((2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In this regard, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*; *see also Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (quoting *Saucier*, 533 U.S. at 202). The inquiry must be undertaken in light of the specific context of the particular case. *Saucier*, 533 U.S. at 201.

Plaintiffs bear the burden of proving the existence of a "clearly established" right at the time of the allegedly impermissible conduct. *Maraziti v. First Interstate Bank*, 953 F.2d 520, 523 (9th Cir. 1992). If this burden is met by plaintiff, then defendants bear the burden of establishing that their actions were reasonable, even if they might have violated federally-protected rights. *See Doe v. Petaluma City Sch. Dist.*, 54 F.3d 1447, 1450 (9th Cir. 1995). "[R]egardless of whether the constitutional violation occurred, the [officials] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [officials] could have reasonably believed that [their] particular conduct was lawful." *Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991).

As noted above, on motion to dismiss, the court must accept as true allegations in the complaint, and construe these allegations in the light most favorable to plaintiff. *See Hishon*, 467 U.S. at 73; *Love*, 915 F.2d at 1245. Here, plaintiff alleges that defendants White and Matteucci delayed addressing decedent's serious medical needs in violation of his Fourteenth Amendment rights. Decedent's right to be free from violations of this constitutional right was well-established by 2014, the time of the alleged constitutional violation in this case. *See Clement v. Gomez*, 298 F.3d 878, 906 (9th Cir. 2002) (finding that "the general law regarding the medical treatment of prisoners was clearly established," and "it was also clearly established that [prison staff] could not intentionally deny or delay access to medical care").

Accordingly, defendants' motion to dismiss plaintiff's § 1983 claims against defendants White and Matteucci on qualified immunity grounds will be denied.

### ii. *County defendants*

#### 1. Goins

In their motion to dismiss, the county defendants argue that plaintiff's § 1983 claims for direct and supervisory liability against defendant Goins are insufficiently pled, because the FAC fails to allege specific acts or omissions carried out by defendant Goins. (Doc. No. 76-1 at 1–3.)

As discussed above, "a defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr*, 652 F.3d at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

In the FAC, plaintiff alleges that defendant Goins was a Lieutenant and Commander in charge of the jail where decedent was being held, and was a policy-making official with authority delegated from the county sheriff. (Doc. No. 68 at 7, ¶ 15.) The FAC alleges that defendant Goins "had direct knowledge of the fact that [decedent] was unlawfully denied necessary care." (Doc. No. 68 at 38, ¶ 132.) In particular, plaintiff alleges that NSH communicated to defendant Goins that decedent had been approved for hospital admission, but defendant Goins "failed to provide the necessary documentation and complete the pre-conditions required for [decedent's]

admission," and failed to transport and deliver decedent to NSH or to refer him to another state hospital or inpatient psychiatric hospital. (*Id.* at 25–26, ¶¶ 86, 87.) Plaintiff pleads a number of alternative theories explaining this failure to transfer, alleging that defendant Goins:

> "either directed his or her subordinates in conduct that violated Decedent's rights, OR set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive Decedent of rights, OR knew his or her subordinates were engaging in acts likely to deprive Decedent of rights and failed to act to prevent his or her subordinate from engaging in such conduct, OR disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate Decedent's rights."

(*Id.* at 35, ¶ 127.)

The court finds that these allegations are sufficient to state a claim under § 1983 for deliberate indifference. Defendants do not dispute that defendant Goins, an employee of the county jail where defendant was being held, had a duty to prevent his suicide. *See Clouthier*, 591 F.3d at 1242 ("[T]he 'deliberate indifference' standard applies to claims that correction facility officials failed to address the medical needs of pretrial detainees."); *Bock v. County of Sutter*, No. 2:11–cv–00536–MCE–GGH, 2012 WL 3778953, at *8 (E.D. Cal. Aug. 31, 2012) (finding that plaintiff adequately alleged a § 1983 deliberate indifference claim against defendant county jail officers who failed to timely transfer decedent from the jail to the state hospital). Plaintiff has also pled facts supporting the inference that defendant Goins, by failing to provide the necessary paperwork for decedent's admission to NSH, did not take reasonable available measures to abate the risk of serious harm faced by decedent. (Doc. No. 68 at 25, ¶ 86.) The county defendants correctly note that supervisory defendants are not subject to § 1983 liability under a theory of *respondeat superior*. *See Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) ("Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability.") (internal quotations omitted). However, plaintiff has pled facts in the FAC that, if proven, would establish defendant Goins had direct involvement in the failure to transfer decedent. Therefore, the court finds that plaintiff has stated a cognizable § 1983 claim for deliberate indifference against defendant Goins. *See Starr*, 652 F.3d at 1207; *Hansen*, 885 F.2d at 646.

1   Accordingly, the county defendants' motion to dismiss this claim will be denied.

2       B. *Monell* Claims

3       The county defendants argue that plaintiff's *Monell* claims should be dismissed, because

4   plaintiff has not sufficiently alleged that defendant Cavallero ratified the unconstitutional conduct

5   of his subordinates.  (Doc. No. 76-1 at 4–5.)

6       Municipalities and local government units may be sued under § 1983 for constitutional

7   rights violations.  *Monell*, 436 U.S. at 690 (stating that "[mu]nicipalities and other local

8   government units . . . [are] among those persons to whom § 1983 applies").  However, a

9   municipal entity or its departments is liable under § 1983 only if a plaintiff can show that the

10  constitutional injury was caused by employees acting pursuant to the municipality's policy or

11  custom.  *Id.* at 690–694; *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 964 (9th Cir.

12  2008).  A plaintiff can demonstrate the existence of an unlawful municipal policy by alleging and

13  presenting evidence of:  (i) a facially unconstitutional government policy, or an unconstitutional

14  "longstanding practice or custom which constitutes the standard operating procedure of the local

15  government entity"; (ii) a violation caused by an individual with final policy-making authority;

16  (iii) an individual with final policy-making authority ratifying a subordinate's unconstitutional

17  action and the basis for it.  *Gillette v. Delmore*, 979 F.2d 1342, 1346–7 (9th Cir. 1992).  After

18  alleging and proving that one of these three circumstances exists, a plaintiff must also identify

19  evidence of direct and proximate causation.  *City of Canton v. Harris* 489 U.S. 378, 389 (1989);

20  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

21      Here, the FAC alleges that defendant Cavallero was employed by defendant Merced

22  County as a sheriff, and was the final policy-making official for the Merced County jail.  (Doc.

23  No. 68 at 7, ¶ 14.)  The FAC also alleges that defendant Cavallero was notified of the state court

24  order committing decedent to NSH, and nonetheless approved his subordinates' decision not to

25  timely transfer decedent to NSH or to another state hospital as required by the court's order.  (*Id.*

26  at 37, ¶¶ 132–134.)  Additionally, defendant Cavallero allegedly failed to provide to NSH the

27  paperwork necessary for decedent's hospital admission.  (*Id.* at 25–26, ¶¶ 86–87.)  The FAC

28  asserts that defendant's acts were the proximate cause of decedent's injuries.  (*Id.* at 37, ¶ 130.)

Based on these allegations, the court concludes that plaintiff has stated a cognizable claim for *Monell* liability premised on ratification. Plaintiff has alleged that defendant Cavallero was a final policymaker for Merced County. *See Gillette*, 979 F.2d at 1346–7 ("Municipal liability does not attach, however, unless 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'") (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 n.12 (1986)). Plaintiff has also alleged that defendant Cavallero engaged in affirmative conduct that prevented decedent from being transferred from the county jail to NSH, both by personally withholding documents required for decedent's admission, and by approving his subordinates' failure to heed the court order of commitment. *See Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (explaining that ratification requires "knowledge of the alleged constitutional violation"); *Gillette*, 979 F.2d at 1342 ("[A] single decision by a municipal policymaker may be sufficient to trigger section 1983 liability under Monell . . . [if there is] evidence of a conscious, affirmative choice."); *Neuroth v. Mendocino Cty.*, No. 15-cv-03226-NJV, 2016 WL 379806, at *5 (N.D. Cal. Jan. 29, 2016) (finding that plaintiff had adequately pled a claim against Mendocino County for *Monell* liability premised on ratification by alleging that defendant Deputy Sheriff "ratif[ied] . . . deliberate indifference to the serious medical/psychiatric needs of inmates."); *cf. Weisbuch v. County of Los Angeles*, 119 F.3d 778, 781 (9th Cir. 1997) (observing that a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval); *Franson v. City and Cty. of Honolulu*, No. NO. 16-00096 DKW-KSC, 2016 WL 4007549, at *7 (D. Haw. July 26, 2016) (dismissing plaintiff's ratification claim because "the allegations in the Complaint contain no facts demonstrating that [the police chief] expressly endorsed or approved of the alleged conduct").

Accordingly, the county defendants' motion to dismiss plaintiff's *Monell* claim will be denied.

### C. Failure to provide timely restorative treatment

The state defendants also move to dismiss plaintiff's § 1983 claims based on the alleged failure to provide decedent with timely restorative treatment in violation of the Fourteenth Amendment, arguing plaintiff's FAC does not allege sufficient facts to support this claim.

"Incapacitated criminal defendants have liberty interests in freedom from incarceration and in restorative treatment." *Mink*, 322 F.3d at 1121; *see generally Bell*, 441 U.S. at 535 ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"). In particular, such persons "must be provided with mental health treatment that gives them a realistic opportunity to be cured or improve the mental condition for which they were confined." *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000) (citations omitted). In determining whether the failure to provide timely restorative treatment constitutes a violation of the Fourteenth Amendment, courts must balance the detainee's liberty interests in restorative treatment against the legitimate interests of the state. *Mink*, 322 F.3d at 1121 (citing *Youngberg*, 457 U.S. at 321); *see also Clouthier*, 591 F.3d at 1243; *Cunningham v. Kramer*, 178 F. Supp. 3d 999, 1007–08 (E.D. Cal. 2016).

The state defendants argue that plaintiff has not adequately pled a substantive due process claim for failure to provide timely restorative treatment. (Doc. No. 78-1 at 17–18.) Specifically, defendants argue that the Fourteenth Amendment does not require state mental hospitals to guarantee timely transfer of pretrial detainees by the county jail in which they are held, because the transfer of these detainees is the responsibility of county officials. (*Id.*) Further, defendants contend that plaintiff has not pled facts supporting the inference that state defendants actively denied decedent admission to NSH. (*Id.*)

In the FAC, plaintiff alleges that decedent was medically evaluated on September 2014 pursuant to state court order and was determined to be suffering from psychosis. (Doc. No. 68 at 15–16, ¶¶ 51–53.) The state court's October 2014 commitment order specifically warned "it is probable that serious harm to the physical or mental health of the patient will result" in the absence of proper medical treatment for decedent. (*Id.* at 22, ¶ 79.) Plaintiff alleges that the state defendants were aware of this order but nonetheless failed to admit plaintiff to NSH for restorative treatment. (*Id.* at 25, 30-31, 33, ¶¶ 86a, 109, 117–119.) In particular, plaintiff alleges that defendant White was the NSH nurse responsible for screening patients for admission to NSH, was aware of and responsible for the processing decedent's particular admission into the hospital, and failed to take the required steps necessary for processing his admission to the hospital. (*Id.* at

4, 20 33, ¶¶ 5 n.1, 74, 117–18.)  Plaintiff alleges that defendant Matteucci was responsible for compliance with court orders requiring placement of patients at NSH and had knowledge of decedent's condition, need for treatment and the court order of commitment.  (*Id.* at 4, 30, 33, ¶¶ 5, 109, 117–18.)

The court finds plaintiff's allegations sufficient to state a cognizable Fourteenth Amendment due process claim against defendants White and Matteucci.  Contrary to defendants' assertions, the Ninth Circuit has held that a treatment facility can violate the substantive due process right of pre-trial detainees by delaying admittance of these detainees following an order of commitment.[9]  *See, e.g.*, *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 822 F.3d 1037 (9th Cir. 2016) (finding that the Fourteenth Amendment was the proper framework for evaluating § 1983 claims against Washington State Hospital for delays in transfer of incompetent detainees), *overruled on other grounds by* 822 F.3d 1037 (9th Cir. 2016); *Mink*, 322 F.3d at 1122 (upholding an injunction requiring a state hospital to admit criminal defendants within seven days of the order of commitment, in light of the "significant, ongoing" violations of substantive and procedural due process" presented by delayed admittance); *Willis v. Wash. State Dep't of Social & Health Servs.*, No. C16-5113 RBL, 2017 WL 1064390, at *6 (W.D. Wash. Mar. 21, 2017) ("Although *Mink* did not establish a bright line rule, it held that 'weeks or months' was too long where the plaintiffs were detained for an average of one month. The nature and duration of [plaintiff's] ninety-one day detention . . . bears no reasonable relation to the evaluative and restorative purpose for which he was committed."); *Disability Law Center v. Utah*, 180 F. Supp. 3d 998, 1012 (D. Utah 2016) (finding that the plaintiff stated a cognizable substantive due process claim against a state hospital for detaining incompetent pretrial detainees in jails for extended

---

[9]  Such extended detention implicates due process rights because "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982); *see also Advocacy Ctr. for Elderly and Disabled v. Louisiana Dep't of Health and Hosp.*, 731 F. Supp. 2d 603, 623–24 (E.D. La. Aug. 9, 2010) ("That the Incompetent Detainees might have the hope that they will at some unidentifiable point in the future be transferred from jail to a mental-health facility in compliance with court order does not mean that their continued, lengthy imprisonment is non-punitive.").

periods after a court order of commitment); *Cooper v. Kliebert*, NOS.: 14-507-SDD-EWD, 15-751-SDD-RLB, 2016 WL 3892445, at *5 (M.D. La. July 18, 2016) (same).

Here, plaintiff has alleged that defendant White had responsibility for screening decedent into NSH and had knowledge of decedent's particular, urgent situation. Plaintiff also alleges that defendant Matteucci was responsible for compliance with court orders requiring placement of patients at NSH and had knowledge of decedent's court order of commitment. The FAC asserts that defendants White and Matteucci "actively denied admission of [decedent] to NSH for restorative treatment," causing decedent to be detained in county jail for an extended period of time. (*Id.* at 25, ¶ 86.); *see generally Twombly*, 550 U.S. at 570 (2007) (emphasizing that Federal Civil procedure Rule 8 does not require detailed factual allegations). The length of decedent's detention following the issuance of the court order of commitment—two months—is comparable to the length of detention in other cases where Fourteenth Amendment violations have been identified. *See Mink*, 322 F.3d at 1105 (finding that due process rights of pre-trial detainees were violated when they were incarcerated in county jails for an average of one month while awaiting transfer to a state hospital); *see also Disability Law Center*, 180 F. Supp. 3d at 1012 (denying defendants' motion to dismiss claims against the State of Utah based on the detention of detainees declared incompetent and waiting four to six months for transfer to a hospital).

Therefore, the court concludes that plaintiff has adequately pled her § 1983 claim against state defendants White and Matteucci for failure to provide timely restorative treatment in violation of the Fourteenth Amendment. The state defendants' motion to dismiss will be denied with respect to this claim.

## II.     ADA and RA Claims

The state defendants also move to dismiss plaintiff's ADA and RA claims against NSH, Merced County, and CFMG, arguing that the allegations of plaintiff's FAC fail to state a cognizable claim under federal pleading standards.

Title II of the ADA requires public entities to refrain from both discriminating against qualified individuals with a disability, and from excluding such individuals from benefiting from or participating in a public program because of their disability. 42 U.S.C. § 12132. The ADA

also requires public entities to make reasonable accommodation to disabled individuals. Section 504 of the RA extends these protections to "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794; *see also Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1045 (9th Cir. 1999) (observing that Title II of the ADA was expressly modeled after § 504 of the RA, and that there is "no significant difference in analysis of the rights and obligations created by the ADA and the [RA]").

"To establish a violation of Title II of the ADA, a plaintiff must show that (1) [he] is a qualified individual with a disability; (2) [he] was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities; and (3) such exclusion or discrimination was by reason of [his] disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). "To establish a violation of § 504 of the RA, a plaintiff must show that (1) [he] is handicapped within the meaning of the RA; (2) [he] is otherwise qualified for the benefit or services sought; (3) [he] was denied the benefit or services solely by reason of [his] handicap; and (4) the program providing the benefit or services receives federal financial assistance." *Id.*

Both the ADA and the RA apply in the context of correctional facilities, and prohibit disabled inmates from being excluded from participation in inmate services, programs, or activities, including medical programs. *See Pierce v. County of Orange*, 526 F.3d 1190, 1214 (9th Cir. 2008) (explaining that the ADA and RA apply in the context of correctional facilities); *see also Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (explaining that the phrase "services, programs, or activities" as used in 42 U.S.C. § 12132 includes medical programs in prison). A plaintiff can allege disability discrimination in the provision of inmate services, programs, or activities under the ADA or the RA by pleading either (i) discrimination based on disparate treatment or impact, or (ii) denial of reasonable modifications or accommodations.[10] *See Fortyune v. Am. Multi–Cinema, Inc.*, 364 F.3d 1075, 1086 (9th Cir.

---

[10] A public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see also Pierce*, 526 F.3d at 1215.

2004); *Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F. Supp. 962, 965 (N.D. Cal. 1998) ("[T]he ADA not only protects against disparate treatment, it also creates an affirmative duty in some circumstances to provide special, preferred treatment, or 'reasonable accommodation.'"); *see also McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004) ("A plaintiff need not allege either disparate treatment or disparate impact in order to state a reasonable accommodation claim.").

To plead disparate treatment under the ADA or RA, a plaintiff must allege that other non-disabled individuals without plaintiff's disability were treated more favorably. *See McGary*, 386 F.3d at 1265–66 (distinguishing between disparate treatment, disparate impact, and reasonable accommodation claims under the ADA). To plead disparate impact, a plaintiff must allege that a facially neutral policy has a significantly adverse or disproportionate impact on disabled persons. *See Lawman v. City and County of San Francisco*, 159 F.Supp.3d 1130, 1148 n.11 (N.D. Cal. 2016); *see also Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996) ("Congress intended to protect disabled persons from discrimination arising out of both discriminatory animus and 'thoughtlessness,' 'indifference,' or 'benign neglect.'").

Finally, to plead a failure to accommodate under the ADA or RA, a plaintiff must allege that a public entity knew of plaintiff's disability but failed to provide reasonable accommodations. *See Robertson v. Las Animas Cty. Sherriff's Dep't*, 500 F.3d 1185, 1196 (9th Cir. 2007). A correctional facility's "deliberate refusal" to accommodate plaintiff's disability-related needs violates the ADA and the RA. *See United States v. Georgia*, 546 U.S. 151, 157 (2006) ("[T]he alleged deliberate refusal of prison officials to accommodate [plaintiff's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted [an ADA violation]." (internal quotation omitted)); *see also Pierce*, 526 F.3d at 1221 ("[A]n inmate cannot be categorically excluded from a beneficial prison program."). However, inadequate or negligent medical treatment alone does not constitute an unlawful failure to accommodate under the ADA or RA. *Simmons*, 609 F.3d at 1022.

There is no clear guidance as to whether a plaintiff may ever state a failure to accommodate claim under the ADA or RA based on a correctional facility's failure to provide

medical treatment for a disability.[11]  Circuit courts have identified ADA or RA violations in cases where the denial of medical care is so extreme as to suggest discriminatory refusal to accommodate a disability-related need, such as when a disabled detainee is denied a broad range of medical services beyond those necessary for treating his underlying disability.  *See Lonergan v. Florida Dep't of Corr.*, 623 F. Appx. 990, 994 (11th Cir. 2015) (finding that plaintiff adequately stated an ADA discrimination claim by alleging "failure of the prison to give the Plaintiff the treatment prescribed by his dermatologist," because plaintiff pled "more than the mere disagreement with his medical treatment"); *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 285–87 (1st Cir. 2006) (finding a triable issue of fact as to whether the defendant prison violated the ADA by failing to give the plaintiff access to his medications, because this "outright denial of medical services" was "so unreasonable as to demonstrate that they were discriminating against him because of his disability"); *see also Mitchell v. Williams*, No. 6:15-cv-93, 2016 WL 723038, at *3–4 (S.D. Ga. Feb. 22, 2016) ("Plaintiff alleges more than mere disagreement with his medical treatment.  Rather, he states that the Department of Corrections has refused to provide him treatment for his Hepatitis C."); *Anderson v. County of Siskiyou*, No. C 10–01428 SBA, 2010 WL 3619821, at *5 (N.D. Cal. Sept.13, 2010) (finding that the plaintiff stated a cognizable ADA claim by alleging "that Defendants failed to provide [plaintiff] with any access to mental health

---

[11]  It has been suggested that there is a circuit split as to whether plaintiffs can bring a failure to accommodate claim under the ADA or RA based merely on the failure to provide medical treatment for a disability.  *See Bilal v. New York City Dep't of Corr.*, No. 08 Civ. 6664(DLC), 2010 WL 1875731 (S.D.N.Y. May 10, 2010) (comparing the approach of the First Circuit with that of the Seventh and Tenth Circuits on this issue, and concluding that "[t]here appears to be a split in authority on this question").  Some federal courts have suggested that plaintiffs can never state a cognizable ADA or RA claim under these circumstances.  *See, e.g.*, *United States v. Univ. Hosp.*, 729 F.2d 144, 157 (2d Cir. 1984) ("Where the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say . . . that a particular decision was 'discriminatory.'"); *Rosado v. Alameida*, No. Civ. 03CV1110J (LSP), 2005 WL 892120, at *3 (S.D. Cal. Feb. 8, 2005) ("The benefits and services Plaintiff wishes to receive are for his disability; it is illogical to say that he is being denied medical services because he has a disability.").  However, no circuit court has held that a cognizable ADA or RA claim cannot be stated based on the total denial of medical services to a disabled detainee.  Here, as discussed below, plaintiff has alleged that decedent was denied access to a broad range of mental health services on the basis of his disability.  As such, the court does not now reach the question of whether, or under what conditions, a plaintiff may state a cognizable ADA or RA claim premised solely on denial of medical services aimed at treating an underlying disability.

programs and services," because plaintiff had alleged an "outright denial of medical services"); *Payne v. Arizona*, No. CV–09–1195–PHX–NVW, 2010 WL 1728929, at *4 (D. Ariz. April 26, 2010) ("[W]here a plaintiff's factual allegations paint a picture of mere negligence in the provision of medical services, a Title II ADA claim cannot lie. On the other hand, where they indicate an outright and deliberate denial or refusal of access to medical care for a qualifying disability, a plaintiff may proceed under Title II."); *McKissick v. County of York*, No. 1:09–CV–01840, 2010 WL 1930132, at *6 (M.D. Penn. Mar. 19, 2010) (finding plaintiff stated a cognizable discrimination claim under the ADA by alleging that defendants denied a decedent his prescribed medications, distinguishing the allegations from those involving medical negligence); *Hughes v. Colorado Dep't of Corr.*, 594 F. Supp. 2d 1226, 1241–42 (D. Colo. 2009) (finding plaintiff stated a cognizable ADA claim by alleging that defendants "completely denied him access to medical treatment for his mental disability," because plaintiff was "precluded from access to medical treatment altogether").

Similarly, other circuit courts have declined to find cognizable ADA or RA claims where there is the alleged denial only of those services necessary for addressing a disability, and where the surrounding circumstances do not otherwise suggest a deliberate refusal to accommodate. *See Grzan v. Charter Hosp.*, 104 F.3d 116, 121–22 (7th Cir. 1997) (finding that plaintiff did not state a valid ADA claim for denial of psychiatric treatment because "absent her handicap, she would not have been eligible for treatment in the first place"); *Johnson v. Thompson*, 971 F.2d 1487, 1493–94 (10th Cir. 1992) (stating that plaintiff could not make out an RA claim where he "would not need the medical treatment" in the absence of the disability); *see also O'Guinn v. Nevada Dep't of Corr.*, 468 Fed. Appx. 651, 653 (9th Cir. 2012)[12] (concluding that plaintiff's allegations of inadequate medical care did not state a cognizable ADA or RA claim after finding that plaintiff did not identify any evidence demonstrating "a total lack of treatment").

Here, the state defendants do not dispute that decedent qualified as disabled under the ADA and RA, or that defendants are public entities subject to ADA and RA requirements. (Doc.

---

[12] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36–3(b).

No. 78-1 at 22–23.)  Instead, the state defendants argue that plaintiff cannot state a cognizable ADA or RA claim for failure to provide medical treatment when the decedent's handicapping condition related to the condition for which he sought treatment.  (*Id.*)  That is, plaintiff cannot allege decedent was excluded from participation in a medical treatment program for which he was otherwise qualified, or that this exclusion was by reason of his disability, when decedent was not provided treatment that he only needed because he was disabled.  (*Id.*)

The FAC alleges that defendants NSH, Merced County, and CFMG were given notice of the court order committing decedent and warning against delays in the provision of treatment for him.  (Doc. No. 68 at 22, ¶ 79.)  Decedent was nonetheless allegedly detained at the Merced County jail for approximately two months after the issuance of the state court commitment order, either because the county defendants failed to transport and deliver decedent to NSH, or because the state defendants actively denied decedent's admission to NSH in a timely manner, or, perhaps, due to a combination of both.  (*Id.* at 10, 13, 24–26, 29, 31, 33, 43 ¶¶ 26, 38, 86, 101–102, 117, 149.)  The FAC also alleges that decedent was never provided mental health treatment while he was in county jail.  (*Id.* at 16, ¶ 56.)

However, plaintiff does not clearly state in the FAC whether her ADA and RA claims are based on a theory of disparate treatment, disparate impact, or failure to accommodate.  To the extent plaintiff seeks to allege disparate treatment or impact, her FAC is deficient.  Plaintiff has not pled facts supporting the inference that non-disabled detainees were treated more favorably than decedent while detained in county jail, or that the defendants maintained policies with significantly adverse or disproportionate impacts on mentally ill detainees.  *See McGary*, 386 F.3d at 1265–66; *Lawman*, 159 F.Supp.3d at 1148 n.11.

On the other hand, the court does find that plaintiff has adequately pled facts supporting a failure to accommodate claim under the ADA and RA.  Plaintiff has alleged that all of the defendants had knowledge of decedent's disability, and were aware of the state court order mandating decedent's transfer to NSH for restorative treatment.  *See Robertson*, 500 F.3d at 1196 (noting that "a public entity must have knowledge of the individual's disability" before they may be liable under the ADA for failure to accommodate).  Plaintiff has also alleged that, as a result of

defendants' failure to admit decedent to NSH, decedent was excluded from participating in NSH's mental health services and given no possibility of access to those programs. *See Pierce*, 526 F.3d 1190 (finding a county jail violated the ADA by failure to accommodate when it housed disabled inmates in a facility where there was "no possibility of access" to certain vocational and recreational programs). The court concludes that these allegations are sufficient to plead that decedent was excluded from participation in a public entity service or program, and that such exclusion was by reason of his disability. *Cf. O'Guinn*, 468 Fed. Appx. at 653 (concluding that plaintiff's allegations of inadequate medical care did not state a cognizable ADA or RA claim after finding that plaintiff did not identify any evidence demonstrating "a total lack of treatment").

Defendants' arguments to the contrary are unpersuasive. It is true, of course, that neither the ADA nor the RA provide a remedy for medical negligence alone. *See Simmons*, 609 F.3d at 1022 ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."), citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996); *see also Rosado v. Alameida*, No. Civ.03CV1110J (LSP), 2005 WL 892120, at *3 (S.D. Cal. Feb. 8, 2005) ("[T]he ADA does not create a federal cause of action for prisoners challenging the medical treatment provided for their underlying disabilities."). However, as noted above, "courts have distinguished between claims asserted under the ADA that allege that the medical treatment that a plaintiff received or had access to was inadequate, versus claims alleging that a plaintiff was discriminatorily precluded from access to medical treatment altogether." *Hughes*, 594 F. Supp. 2d at 1241.

Here, plaintiff does not challenge the adequacy of medical attention that decedent received while detained at the county jail. Neither does plaintiff allege that decedent was denied access only to treatment programs aimed at addressing the psychosis forming the basis of his mental disability. *Cf. O'Guinn*, 468 Fed. Appx. at 653 (concluding that plaintiff's allegations of inadequate medical care did not state a cognizable ADA or RA claim after finding that plaintiff did not identify any evidence demonstrating "a total lack of treatment"). Rather, plaintiff alleges that defendants' actions deprived decedent of all NSH mental health services, and that they did so
/////

despite his clear need for that treatment and in defiance of a state court order. These allegations suffice to state a failure to accommodate claim under the ADA and RA.

Accordingly, the state defendants' motion to dismiss will be denied as to these claims.

**III.** **Claims under California Government Code § 845.6 and § 815**

Finally, the state defendants move to dismiss plaintiff's fifth cause of action for violation of California Government Code §§ 845.6 and 815.2, arguing that it is inadequately pled. (Doc. No. 78-1 at 24–25.) Plaintiff does not contest dismissal of this fifth cause of action. (Doc. No. 84 at 32.)

Accordingly, plaintiff's fifth cause of action for violation of California Government Code §§ 845.6 and 815.2 will be dismissed without leave to amend.

CONCLUSION

For all of the reasons set forth above:

1. The state defendants' motion to dismiss (Doc. No. 78) is granted in part and denied in part, as follows:

    a. Defendants' motion to dismiss plaintiff's claims under California Government Code §§ 845.6 and 815.2 is granted, and this claim is dismissed without leave to amend; and

    b. Defendants' motion to dismiss is denied in all other respects.

2. The county defendants' motion to dismiss (Doc. No. 76) is denied both with respect to plaintiff's § 1983 claim for deliberate indifference against defendant Goins and plaintiff's *Monell* claim.

IT IS SO ORDERED.

Dated: __**May 25, 2017**__

_____
UNITED STATES DISTRICT JUDGE