**MICHAEL J. HADDAD (SBN 189114)**
**JULIA SHERWIN (SBN 189268)**
**MAYA RODRIGUEZ SORENSEN (SBN 250722)**
**TERESA ALLEN (SBN 264865)**
**HADDAD & SHERWIN LLP**
505 Seventeenth Street
Oakland, CA 94612
Telephone:     (510) 452-5500
Facsimile:      (510) 452-5510

**SANJAY S. SCHMIDT (SBN 247475)**
**LAW OFFICE OF SANJAY S. SCHMIDT**
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Telephone:     (415) 563-8583
Facsimile:      (415) 223-9717

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LUCY ATAYDE**, Individually and as Successor in Interest of Decedent **RICHARD MICHAEL RAMIREZ**,<br><br>            Plaintiff,<br>        vs.<br><br>**NAPA STATE HOSPITAL,STATE OF CALIFORNIA DEPARTMENT OF STATE HOSPITALS**, a public entity, **DOLLY MATTEUCCI, DANA WHITE, R.N., PATRICIA TYLER, M.D., CINDY BLACK, DIANE MOND, R.N., CALIFORNIA FORENSIC MEDICAL GROUP, INC., TAYLOR FITHIAN, M.D., HEATHER GOODE, M.D., SEAN RYAN, R.N., DEBORAH MANDUJANO, R.N.,CORINA DENNING, R.N., AMANDA GIBSON, R.N. COUNTY OF MERCED**, a public entity, former Sheriff **TOM CAVALLERO**, Undersheriff **JASON GOINS**, SERGEANT **CLIFFORD TILLY**, and **DOES 1 THROUGH 10**, Jointly and Severally,<br><br>            Defendants. | **Case No. 1:16-cv-00398-DAD-SAB**<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY & INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL**<br><br>1.  42 U.S.C. § 1983 – Civil Rights Violations<br>2.  42 U.S.C. § 1983 – Municipal and Supervisory Liability<br>3.  California Civil Code § 52.1 (b) – State Civil Rights Violations<br>4.  42 U.S.C. §12132, 28 C.F.R. §35, et seq., and 29 U.S.C. § 794, et seq. – A.D.A. and Rehabilitation Act Violations<br>5.  California Government Code § 845.6 – Failure to Summon Medical Care<br>6.  Negligence<br>7.  Negligence Per Se |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Plaintiff, by and through her undersigned attorneys, HADDAD & SHERWIN LLP and the LAW OFFICE OF SANJAY S. SCHMIDT, for her Second Amended Complaint against Defendants, states the following:

## JURISDICTION

1.    This is a civil rights, wrongful death/survival action, arising from Defendants' failure to provide for the pretrial detainee-Decedent's serious medical needs, failure to provide treatment and suicide precautions, and failure to comply with a Court Order requiring Decedent's transfer to Napa State Hospital or other inpatient psychiatric care facility, and other legal obligations concerning Decedent's serious medical needs, which occurred in Napa County, Monterey County, and Merced County, California, resulting in the death of RICHARD MICHAEL RAMIREZ by suicide, on December 15, 2014.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because it is being brought to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of citizens of the United States that are secured by the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988.  This action is brought pursuant to the First, Fourth, and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act ("ADA") – 42 U.S.C. § 12132 and 28 C.F.R. §35, et seq., the Rehabilitation Act ("RA") – 29 U.S.C. § 794, et seq., and the laws and Constitution of the State of California.  Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 (a), to hear and decide claims arising under state law.

2.    This case was originally filed in the Northern District of California pursuant to 28 U.S.C. § 1391(b), because Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC. and NAPA STATE HOSPITAL reside in the Northern District and a substantial part of the events and/or omissions giving rise to the claim occurred in the County of Napa and County of Monterey, California.  By order of the Northern District Court granting Defendants' motion to change venue (Doc. 40), venue over this case was changed to this judicial district, the Eastern District of California.

**AMENDMENTS BASED ON COURT ORDER**

3.      This First Amended Complaint was filed pursuant to the District Court's

"ORDER GRANTING STATE DEFENDANTS' MOTION TO DISMISS, AND ORDER

GRANTING IN PART AND DENYING IN PART COUNTY DEFENDANTS' MOTION TO

DISMISS" dated September 16, 2016, to reflect the rulings already made in that order.  (Doc.

63).

**PARTIES AND PROCEDURE**

4.      Plaintiff LUCY ATAYDE is a citizen of the United States, a competent adult,

and is the mother of RICHARD MICHAEL RAMIREZ (hereafter "RAMIREZ," "Ramirez" or

"Richard Ramirez"), Deceased. Plaintiff LUCY ATAYDE is a proper successor in interest to

RICHARD MICHAEL RAMIREZ, pursuant to California Code of Civil Procedure § 377.11.

Plaintiff LUCY ATAYDE brings these claims individually and as Successor in Interest for

RICHARD MICHAEL RAMIREZ, Deceased, and the claims are brought pursuant to

California Code of Civil Procedure sections 377.20, et seq. and 377.60, et seq., which provide

for survival and wrongful death actions. The claims set forth below are also brought by LUCY

ATAYDE individually and on behalf of Decedent RICHARD MICHAEL RAMIREZ on the

basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, the ADA and RA, and

federal and state civil rights law.

5.      At all times material herein, Defendant NAPA STATE HOSPITAL ("NSH")

was a public entity and a department of the Defendant STATE OF CALIFORNIA

DEPARTMENT OF STATE HOSPITALS ("STATE") and each was responsible for

supervising the NSH conduct, policies, and practices, as well as the hiring, retaining, and

training of employees and agents of the NSH, including Defendants DOLLY MATTEUCCI,

DANA WHITE, R.N., PATRICIA TYLER M.D., CINDY BLACK, DIANE MOND, R.N., and

certain DOE DEFENDANTS, and all of its members, agents and  employees. The entity

Defendants, NSH and STATE, are sued under the Americans with Disability Act ("ADA"),

Rehabilitation Act ("RA"), and state law. DOLLY MATTEUCCI, DANA WHITE, R.N.,

PATRICIA TYLER M.D., CINDY BLACK, DIANE MOND, R.N., and DOE DEFENDANTS are sued in their Individual Capacities. At all material times, these individual Defendants held titles and participated generally as follows in this matter:

a.   DANA WHITE, R.N., was responsible for screening patients for admission to NSH and arranging for their admission. She acted in a tortious and/or constitutionally violative fashion in her screening and, in general, her handling of the Court Order discussed below,[1] ordering the admittance and treatment of RICHARD RAMIREZ; and, she acted in concert with her co-Defendants MATTEUCCI, BLACK, MOND, TYLER and certain DOE DEFENDANTS, including in the failures in paragraph 5(b) below.

b.   DOLLY MATTEUCCI was at all relevant times the Executive Director and highest policymaking official of Napa State Hospital, responsible for the oversight, management, provision of mental health care services, compliance with Court orders requiring placement of patients at NSH, and supervision of all employees and agents at NSH.  She acted in a tortious and/or constitutionally violative fashion in her formulating and administering policies, procedures, practices, and customs within Napa State Hospital that are deliberately indifferent to the rights and safety of Incompetent to Stand Trial ("IST") inmates ordered transferred to Napa State Hospital, including for example, placing inmates on waiting lists requiring them to wait weeks and months before they are admitted for restorative treatment, not informing courts, District Attorneys, defense counsel, or the patient's next of kin of the delay in admitting the patient, doing no triage or psychiatric acuity review of patients before placing them on

---

[1] The Court issued an Order and Commitment of Person Determined to be Mentally Incompetent Under the Provisions of Section 1370 of the California Penal Code in Case No. CRL012151, **ordered that he be committed to and confined to Napa State Hospital, or other appropriate facility**, pursuant to Section 1370 (a)(2) of the California Penal Code …" The Order is attached as **Exhibit A**.

the waiting list, not informing courts or the patient's treatment team in jail of the delay the patient will be forced to endure before being admitted to the hospital, making no effort to place the patient at another hospital or residential mental health treatment facility or properly equipped jail with a legally compliant Lanterman-Petris-Short Act (LPS) treatment facility, providing no treatment in jail for patients it has been ordered to treat or involuntarily medicate, not informing jails or jail treatment teams that they can request a triage or psychiatric acuity review or priority admission for the patient, requiring the patient to languish in jail while the NSH Defendants, including this Defendant and her co-Defendants fail to admit him, not admitting patients until receiving an Order to Show Cause why Defendants should not be held in contempt, screening and decisions concerning Decedent, and her handling of the Court Order discussed below, that ordered and required her to admit RICHARD RAMIREZ to State Hospitals, including NSH, for restorative treatment; and, she acted in concert with Defendants WHITE, TYLER, BLACK, MOND and certain DOE DEFENDANTS.

c.  PATRICIA TYLER, M.D., was at all relevant times Chief Psychiatrist and the California Department of Corrections and Rehabilitation Safety and Medical Director at Napa State Hospital, responsible for administering the admission and discharge of patients, including those patients committed by court order as incompetent to stand trial under Penal Code 1370; and she acted in concert with Defendants WHITE, MATTEUCCI, BLACK and MOND, including in the failures in paragraph 5(b) above.  DEFENDANT TYLER is being substituted in for Defendant DOE 1.

d.  CINDY BLACK, was at all relevant times the NSH Clinical Administrator, responsible for making the initial determination that the patient referred to NSH is appropriate for hospitalization and can be admitted to NSH.  She acted in a

tortious and/or constitutionally violative fashion in her screening and decisions concerning Decedent, and her handling of the Court Order (Exhibit A), that ordered and required her to admit RICHARD RAMIREZ to NSH for restorative treatment; and, she acted in concert with Defendants WHITE, MATTEUCCI, TYLER, MOND, and certain DOE DEFENDANTS, including in the failures in paragraph 5(b) above.  Defendant BLACK is being substituted in for Defendant DOE 2.

e.   DIANE JOHNSTON MOND, R.N. was at all relevant times the Admissions Suite Supervisor at Napa State Hospital, responsible for overseeing the admission of criminal defendants declared incompetent to stand trial to Napa State Hospital.  She participated in, approved, and ratified the decision not to admit Richard Ramirez for treatment at NSH in violation of the court order; and she acted in concert with Defendants WHITE, MATTEUCCI, TYLER, BLACK, and certain DOE DEFENDANTS, including in the failures in paragraph 5(b) above.  DEFENDANT MOND is being substituted in for Defendant DOE 3.

f.   Certain DOE DEFENDANTS were also responsible for arranging the admission of RICHARD RAMIREZ to NAPA STATE HOSPITAL or another appropriate facility, and for providing care and treatment for his serious medical needs, including pursuant to Court Order, and failed to do so.

6.   The wrongful acts and omissions complained of herein against NSH, STATE OF CALIFORNIA, DOLLY MATTEUCCI, DANA WHITE, PATRICIA TYLER, M.D., CINDY BLACK, DIANE MOND, R.N., and certain DOE DEFENDANTS occurred in Napa County, California.

7.   Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. ("CFMG") was at all times herein mentioned a California Corporation, licensed to do business in California, with its corporate headquarters located in Monterey, California. Defendant CFMG

provided medical, mental health, and nursing care to pretrial and post-conviction detainees and prisoners in Merced County Jails, pursuant to a contract with the COUNTY OF MERCED. On information and belief, CFMG and its employees and agents are and were at all material times responsible for making and executing policies, procedures, and training related to the medical care and/or mental health care of detainees and prisoners in the COUNTY OF MERCED jails, including, but not limited to, properly assessing and classifying inmates, properly assessing and addressing the mental health needs of inmates, and properly assessing and treating the serious medical and mental health needs of inmates, including suicide prevention, observation of suicidal and potentially suicidal inmates, mental illness, and emotional disturbance. Defendants TAYLOR FITHIAN, M.D., HEATHER GOODE, M.D., SEAN RYAN, R.N., Psychiatric Nurse DEBORAH MANDUJANO, R.N., CORINA DENNING, R.N., CFMG Merced County Program Manager AMANDA GIBSON, R.N., as well as certain DOE DEFENDANTS include, but are not limited to, CFMG employees and agents, acting within the course and scope of their employment with CFMG (and within the course and scope of their employment by COUNTY by virtue of CFMG's contract with COUNTY) who were responsible for properly assessing and classifying inmates, properly assessing and addressing the medical needs of inmates, properly assessing and addressing the mental health needs of inmates, properly assessing and treating the serious medical needs of inmates, providing appropriate observation and a treatment plan for serious medical needs, including suicide prevention, care and treatment for mental illness and emotional disturbance, monitoring inmates, and summoning medical care when it was needed.

8.     Plaintiff is informed and believes and thereon alleges that both Defendants FITHIAN and GOODE, at all material times, lived and worked in Monterey County, and performed telepsychiatry services at COUNTY OF MERCED's jails remotely, from Monterey, California. In addition, Defendant FITHIAN oversees all statewide jail operations for CFMG, and sets policies and procedures for all operations, from Monterey County, California.

9.      On information and belief, CFMG and its President, officer, director, employee and managing agent Defendant TAYLOR FITHIAN, M.D., are responsible for making and enforcing policies, procedures, and training related to the medical and mental health care of prisoners and detainees in Defendant COUNTY OF MERCED's jail, including: assessing inmates for possible suicide risk; instituting appropriate suicide precautions; approving housing classification; instituting appropriate observation to prevent suicide; instituting appropriate treatment plans for the serious mental health needs of inmates; communicating about an inmate's suicide risk with custodial staff, health care professionals, and outside facilities; and, ensuring compliance with court orders requiring the transfer of the inmate.

10.     Defendant TAYLOR FITHIAN, M.D., ("FITHIAN") was at all times herein mentioned a physician licensed to practice medicine in the State of California, a Board certified psychiatrist, and an officer, director, managing agent, employee and/or agent of Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, overseeing the provision of medical and psychiatric care at Defendant COUNTY OF MERCED's jail.  Defendant FITHIAN was responsible for overseeing and providing medical and mental health care to prisoners and detainees, and for instituting appropriate policies, procedures, and training concerning suicide-risk assessment and prevention protocols, and was acting within the course and scope of that employment. On information and belief, Defendant FITHIAN was ultimately responsible for CFMG's provision of medical and mental health care to inmates at the jail, including assessing inmates for possible suicide risk, instituting appropriate suicide-prevention programs, and complying with court orders requiring the transfer of inmates to inpatient psychiatric facilities.  At all material times, Defendant FITHIAN was the highest policy-making official for Defendant CFMG.

11.     Furthermore, Defendant FITHIAN was at all times responsible for the medical and psychiatric care provided to RICHARD MICHAEL RAMIREZ at MERCED COUNTY jail, and for making sure that RICHARD MICHAEL RAMIREZ was placed on appropriate

suicide precautions and/or transferred for inpatient psychiatric care, including in compliance with a Court Order requiring his transfer.

12.    In addition, Defendant FITHIAN was at all times responsible for staffing the CFMG medical and psychiatric services at MERCED COUNTY jail, including but not limited to making sure that only properly licensed and credentialed health care providers provide care, and that no provider work outside his or her scope of practice or licensure.

13.    Defendant AMANDA GIBSON, R.N. was at all relevant times the CFMG Program Manager at Merced County Jail, responsible for supervising the medical and mental health nursing staff,  monitoring the appropriateness and quality of medical care provided by CFMG staff at Merced County jail, ensuring compliance with applicable state and local health services regulations, court orders, recruiting, hiring, scheduling, and supervision of health services staff, and coordinating with custody and probation staff to ensure timely access to and care of inmates.  Defendant GIBSON is being substituted in for Defendant DOE 4.  Defendants CFMG, FITHIAN and GIBSON provided CFMG staff with no policies, procedures, or training about how to determine whether, and what to do when, a patient is a danger to himself or others or gravely disabled due to mental illness under Cal. Welf. & Inst. Code § 5150 *et seq.*, how to determine when a patient needed inpatient psychiatric treatment outside the jail and what to do when a patient needed such treatment, and these Defendants provided no training to County deputies on these topics either.  Defendants CFMG, FITHIAN and GIBSON had no psychologists, licensed clinical social workers, marriage and family therapists, or psychiatrists working in the jail, only providing a few hours of remote telepsychiatry a week, as discussed below.  These Defendants only had one licensed psychiatric Registered Nurse working in the jail for 40 hours per week.  These Defendants also had no Suicide Prevention Plan at the jail, other than a short policy saying Defendants would create a Suicide Prevention Plan that was never created.

14.    Defendant COUNTY OF MERCED ("COUNTY") is a municipal corporation, duly organized and existing under the laws of the State of California, and is the employer of the

individual COUNTY defendants, as well as certain DOE DEFENDANTS. Under its authority, the COUNTY operates the Merced County Sheriff's Department (MCSD).

15. Defendant, former Sheriff TOM CAVALLERO ("CAVALLERO"), at all times mentioned herein – until on or about December 26, 2014 – was employed by Defendant COUNTY as Sheriff for the COUNTY, and was acting within the course and scope of that employment at such times. He is being sued in his individual capacity as Sheriff for the COUNTY. At all material times, SHERIFF CAVALLERO was the final policy making official for the COUNTY OF MERCED Sheriff's Department and Jail, ultimately responsible for all policies, procedures, supervision, and training for the MCSD and at the jail.

16. At all times mentioned herein, Defendant Undersheriff JASON GOINS was employed by COUNTY as a Lieutenant and the Commander in charge of the COUNTY Jail. At all material times, Jail Commander JASON GOINS was a policy making official for the COUNTY OF MERCED Jail, with authority delegated to him by the Sheriff, and responsible for all policies, procedures, supervision, and training at the jail. After this incident, JASON GOINS was promoted to Undersheriff of Merced County.

17. At all times mentioned herein, DEFENDANT SERGEANT CLIFFORD TILLY was employed by the Merced County Sheriff's Department and working at the Merced County Jail, and was responsible for properly classifying and assigning MR. RAMIREZ to appropriate housing and supervising jail deputies tasked with observing, monitoring, and protecting MR. RAMIREZ. At all material times, SERGEANT TILLY acted in the course and scope of his employment with the Merced County Sheriff's Department. Further, SERGEANT TILLY was an integral participant in many of the events described herein. SERGEANT TILLY is being substituted in for Defendant DOE 5.

18. Certain DOE DEFENDANTS, at all material times, were employees and agents of Defendant COUNTY OF MERCED responsible for the transfer of RICHARD MICHAEL RAMIREZ to NAPA STATE HOSPITAL, or another appropriate inpatient facility, including as required by an October 24, 2014 Court Order requiring such transfer, and failed or refused to

do so, and/or were responsible for assigning MR. RAMIREZ to appropriate housing and housing classification, with appropriate observation given his suicide risk. In doing the acts or omissions hereinafter described, certain DOE DEFENDANTS acted within the course and scope of their employment with Defendant COUNTY OF MERCED and acted under color of state law. The individually named Defendants and certain DOE DEFENDANTS were either Correctional Officers, Sheriff's Deputies, Sergeants, Captains, Lieutenants, or other Peace Officers, Doctors, Nurses, Social Workers, and/or civilian employees and/or agents who were responsible for the care, housing, observation, and safety of inmates, including RICHARD RAMIREZ, and/or the transfer of MR. RAMIREZ for inpatient psychiatric care, including pursuant to Court Order.

19.     The Defendants named above and certain DOE DEFENDANTS are sued in their individual capacities.

20.     The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES 6 through 10 are unknown to Plaintiff, who therefore sues said Defendants by said fictitious names. Plaintiff will amend this Complaint to show said Defendants' true names and capacities when the same have been ascertained. Plaintiff is informed, believes, and thereon alleges that all Defendants sued herein as DOES are in some manner responsible for the acts, omissions, and injuries alleged herein.

21.     Plaintiff alleges, on information and belief, that each of the Defendants sued herein was wrongfully, deliberately indifferently, negligently, and/or otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiff and/or Decedent.  Further, one or more DOE Defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including both the individually named and DOE Defendants.

22.     Plaintiff is informed, believes, and thereon alleges that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things hereinafter alleged, was

acting within the course and scope of that relationship. Plaintiff is further informed, believes, and thereon alleges that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may hereinafter be otherwise, specifically alleged. At all material times, each Defendant was an integral participant, jointly and fundamentally engaged in constitutionally violative, unlawful, and/or tortious activity, resulting in the deprivation of Plaintiff's and Decedent's constitutional rights and other actionable harm.

23.     The acts and omissions of all Defendants, except those directly employed by NAPA STATE HOSPITAL and/or THE STATE OF CALIFORNIA, were at all material times pursuant to the actual customs, policies, practices, and/or procedures of the COUNTY OF MERCED and/or CFMG.

24.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

25.     A proper and timely tort claim was presented to the COUNTY OF MERCED and the STATE OF CALIFORNIA on behalf of Plaintiff and Decedent, pursuant to Government Code § 910 et seq., and this action was thereafter timely filed within all applicable statutes of limitation.

26.     This complaint may be pled in the alternative, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

### GENERAL ALLEGATIONS

27.     RICHARD MICHAEL RAMIREZ was 27 years old (he was born on October 24, 1987) at the time of his death, on December 15, 2014.  He had previously been diagnosed with a personality disorder and with psychotic disorder, NOS ("not otherwise specified"), *inter alia*.  His history of mental illness was well known by Defendants CFMG, COUNTY, the individual Defendants working in COUNTY's Jail and others; indeed, he had been placed in the Safety Cell due to suicidal conduct and/or ideation on a number of occasions during previous incarcerations and had previously attempted suicide in the Merced County Jail,

including, but not limited to, an incident in 2011 in which MR. RAMIREZ attempted to choke himself with the safety smock while in the Safety Cell. However, with appropriate medication, MR. RAMIREZ enjoyed life's activities, including writing rhymes and creating music, and had relationships with his siblings, mother, and other family members.

28.    On or about August 23, 2014, MR. RAMIREZ was arrested, transported, and booked into Defendant COUNTY's Jail, in Los Banos, California, at approximately 4:04 p.m. Former Sheriff TOM CAVALLERO took custody of MR. RAMIREZ and he was held in the John Latorraca Correctional Facility ("JLCC" or "Sandy Mush"), at 2584 W. Sandy Mush Rd., in Merced, California. The incident that gave rise to MR. RAMIREZ's arrest indicated Ramirez was suffering from a serious mental illness.

29.    CFMG Defendant MANDUJANO, R.N. and Merced County jail Sergeant Defendant TILLY testified that they recognized MR. RAMIREZ from his past incarcerations and were aware of his mental illness, suicidal behavior, and suicidal ideations when he entered the jail in 2014.

30.    During his intake medical examination on August 23, 2014, due to his readily apparent serious mental illness, MR. RAMIREZ refused to answer any questions and stated, "I don't have to talk to you."  The CFMG employee, on information and belief Defendant SEAN RYAN, R.N., handling the intake planned only that he should be followed-up with as needed, and no appropriate intake medical or mental health assessment was therefore completed.

31.    On August 26, 2014, criminal charges were filed against MR. RAMIREZ by the Merced County District Attorney's Office in Case No. CRL012151 (hereafter "the case" or "the matter").  On August 29, 2014, Case No. CRL012151 was called and a doubt arose as to MR. RAMIREZ's competence; therefore, the **criminal proceedings against MR. RAMIREZ were suspended** and the case was referred by the Merced County Superior Court to Dr. Phillip Hamm, Ph.D., for a Penal Code § 1368 Evaluation Report ("§ 1368 Report") to be completed. Dr. Hamm was appointed by the Court on September 2, 2014.  The matter was continued to September 26, 2014 for receipt of the Penal Code § 1368 Report.

32.     On or about September 2, 2014, Defendant CFMG mental health nurse CORINA DENNING, RN, assessed MR. RAMIREZ.  Defendant DENNING noted that MR. RAMIREZ stated he has been having anger issues and thinks he needs medication.  MR. RAMIREZ stated, "I know for a fact people can hear my thoughts."  Defendant DENNING noted MR. RAMIREZ was tearful, and was paranoid.  Yet she noted no delusions and assessed Mr. RAMIREZ as suffering from "unknown/situational anxiety."  Defendant DENNING scheduled a telepsychiatry appointment for MR. RAMIREZ for September 5, 2014.

33.     On information and belief, Defendant DENNING was not a certified psychiatric nurse and was not qualified to make mental health assessments, yet CFMG and its program manager, Defendant GIBSON, consistently assigned and permitted her to do so.

34.     As set forth above, Defendant COUNTY contracts with Defendants CFMG and FITHIAN to provide medical and mental health care for all inmates in COUNTY jails. Defendant FITHIAN is a Board Certified psychiatrist, and oversees the delivery of all medical, dental, and psychiatric care in all facilities CFMG serves.  He also provides telepsychiatry services for Defendant COUNTY, as an employee, director, and managing agent of Defendant CFMG .

35.     Defendant HEATHER GOODE, M.D., also provides telepsychiatry services for Defendant COUNTY, as an employee and agent of Defendant CFMG.

36.     However, the COUNTY and CFMG contract for only 10 hours of telepsychiatry services per week for all COUNTY'S inmates combined. The JLCC/Sandy Mush facility houses 450 inmates and the Main Jail houses 160 inmates, so the 10 hours of telepsychiatry per week was intended to cover over 600 inmates, which is obviously, grossly inadequate for the medical needs of that many jail inmates, and constitutes a policy of the COUNTY and CFMG of deliberate indifference to serious medical/psychiatric needs of inmates at that facility.

37.     The United States Department of Justice has found that approximately 64% of jail inmates suffer from mental health problems. The COUNTY and CFMG knowingly, and

with deliberate indifference to the serious medical/psychiatric needs of inmates, contracted to provide inadequate psychiatric care to inmates within the COUNTY'S jails.

38.     During a pre-bid meeting between representatives of the COUNTY and potential medical contractors that occurred on or about February 3, 2014, the COUNTY admitted knowing that the current medical and mental health staffing that CFMG was providing was inadequate for the COUNTY's corrections program operations. Yet, Plaintiff is informed and believes and thereon alleges that neither the COUNTY nor CFMG took appropriate steps to rectify their inadequate medical and mental health staffing.

39.     CFMG is the largest private provider of correctional healthcare in the State of California, stating on its website that it currently has contracts covering 67 facilities with an average daily population of 16,000 inmates.

40.     CFMG has been criticized for its inadequate health care provided to inmates throughout the State of California. CFMG holds itself and its officers, directors, and managing agents out as experts in the field of correctional health care. Yet, jail facilities served by CFMG have a 50% higher rate of death by suicide or drug overdose than non-CFMG facilities. Plaintiff is informed and believes that, throughout California, CFMG and FITHIAN have a policy and/or practice of providing unqualified, incompetent, insufficiently licensed medical staff.  Plaintiff is informed and believes that in this case, CFMG and FITHIAN knew generally accepted standards required that their mental health services in the COUNTY jail facilities be staffed with psychiatrists, psychologists, licensed clinical social workers and other licensed therapists, and that if they staffed their mental health services with registered nurses, those registered nurses were required to have advanced postgraduate mental health education and work under the supervision of a higher level caregiver, such as a physician, at all times.  With deliberate indifference to the serious medical needs of patients, Defendants staffed their mental health services with insufficiently credentialed, unqualified caregivers.

41.     While in the custody of COUNTY and Sheriff CAVALLERO in their Jail, MR. RAMIREZ continued suffering from serious, but treatable, mental illnesses and manifesting

such illnesses with his words and conduct; in-custody, his condition worsened, he became

suicidal, and became a danger to himself.

42.     On September 5, 2014, MR. RAMIREZ was seen by Defendant HEATHER

GOODE, M.D., for the first of the only two telepsychiatric consultations – with DR. GOODE

speaking from Monterey, California, to MR. RAMIREZ in the MERCED COUNTY jail – he

received in the over three months he was in the COUNTY's jail.  MR. RAMIREZ told

Defendant GOODE, "I'm hearing voices and having major mood changes.  I think I need some

kind of medicine."  Defendant GOODE noted that, "[w]hen [MR. RAMIREZ] was in the safety

cell in 2011, he attempted to choke himself with the safety smock."  Defendant GOODE

prescribed Depakote 500 mg at bedtime, and Haldol, an antipsychotic medication, 5 mg at

bedtime.  Contrary to generally accepted standards and procedures for treatment of the mentally

ill in jail, Defendant GOODE did not create any treatment plan for MR. RAMIREZ, and

instead ordered merely that he could follow up for psychiatric care in 90 days, or sooner if

needed.  Despite MR. RAMIREZ's medical history of psychosis, and statement that he was

hearing voices, and Dr. GOODE's prescription of anti-psychotic medication for him, Defendant

GOODE stated there was no evidence of psychosis.

43.     On September 6, 2014, at around 3:10 p.m., MR. RAMIREZ reported that he

got some "not good news earlier," he did not know what do to, and requested to see a

psychiatrist or a doctor or to "talk to someone."  MR. RAMIREZ was placed in a Safety Cell,

with a Safety Garment. MR. RAMIREZ was "cleared" the next day by "Mental Health," on

September 7, 2014, at 8:30 a.m., and released from the Safety Cell.

44.     The signature of the CFMG employee who cleared MR. RAMIREZ from the

safety cell is illegible. However, that person noted that MR. RAMIREZ denied that he said he'd

received bad news or wanted to speak to a nurse, and he never endorsed suicide.

45.     On September 8, 2014, at about 11:30 p.m., MR. RAMIREZ reported feeling

depressed and was placed in the Safety Cell for the second time during this incarceration.

CFMG medical personnel were notified of MR. RAMIREZ's depression and interacted with

MR. RAMIREZ.  MR. RAMIREZ was "cleared" the next morning at around 8:20 a.m., on September 9, 2014, by the "Mental Health" nurse, Defendant DEBORAH MANDUJANO, R.N., and removed from the safety cell.

46.     However, when Defendants COUNTY and CFMG employees, under Defendant TILLY'S supervision, removed MR. RAMIREZ from the safety cell, they placed him in "lockdown" segregated housing with no increased supervision, contrary to generally accepted policies and procedures for handling mentally ill inmates. Defendants COUNTY and CFMG, their employees, and agents, also failed to institute any treatment plan for MR. RAMIREZ, with deliberate indifference to his serious medical needs.  It is well known within corrections and correctional medicine that being placed in segregated housing, alone in a cell, is deleterious to the mental health of seriously mentally ill inmates, and they are likely to decompensate.

47.     On or about September 9, 2014, Defendant DR. GOODE prescribed Benadryl 25 mg at bedtime for 90 days, and telepsychiatry as scheduled with Defendants DR. FITHIAN or MS. MANDUJANO, R.N.

48.     On September 10, 2014, and on September 12, 2014, Defendant MANDUJANO observed MR. RAMIREZ through the door window of his segregated cell and noted no problems.  She did not request or institute any increased observation of him, or any treatment plan for him.

49.     On September 14, 2014, MR. RAMIREZ refused to get out of bed and refused his medications. The CFMG LVN requested a mental health consult.

50.     On September 15, 2014, Court-appointed psychologist Phillip M. Hamm, Ph.D., ABPP, interviewed MR. RAMIREZ at the COUNTY's Sandy Mush jail. Defendant CFMG's medical records were provided to Dr. Hamm to review, and its employees and agents were aware that MR. RAMIREZ's competence was being questioned by the Court, which had ordered the psychological examination.

51.     On September 15, 2014, and September 17, 2014, Defendant DENNING observed MR. RAMIREZ through his lockdown segregated cell door, but did not request or

institute any increased supervision or treatment plan for him, with deliberate indifference to his serious medical needs.

52.     On September 15, 2014 – the same date that Dr. Hamm examined him and found him to be psychotic, as discussed below – Defendant DENNING assessed MR. RAMIREZ at the request of medical staff because he continued to refuse his medications.  MR. RAMIREZ told Defendant DENNING he did not need antipsychotic medication.  Defendant DENNING stated that MR. RAMIREZ's thought process was clear and normal, his affect was normal, and he denied delusions.  Defendant DENNING assessed MR. RAMIREZ as suffering from substance induced psychosis, and scheduled a telepsychiatry appointment for September 19, 2014, to discuss changing or discontinuing his medications.  Defendant DENNING's observations were directly contradicted by DR. HAMM's examination of the same date, as Dr. Hamm found MR. RAMIREZ to be suffering from obvious and serious psychosis, as discussed below.

53.     On September 19, 2014, MR. RAMIREZ was not seen for the telepsychiatry visit because he was seen by a dentist. He was supposed to be rescheduled for telepsychiatry the following week, and that telepsychiatry session never happened, with deliberate indifference to his serious medical needs.

54.     On September 22, 2014, Defendant MANDUJANO observed MR. RAMIREZ at the door of his segregated lockdown cell, noting no problems.  However, she did no assessment of MR. RAMIREZ, did not institute increased supervision, and never requested or instituted a treatment plan for him.

55.     On September 22, 2014, Dr. Hamm issued his report concerning MR. RAMIREZ.  Dr. Hamm found: "Intellectual processes are clearly impaired. He is unable to provide coherent explanations of the roles of the participants at trial. He is unable to state the essential similarities between an orange and a banana, an axe and a saw, or a table and a chair. He is unable to explain why certain foods need to be cooked."

56.     Dr. Hamm found MR. RAMIREZ to be "clearly confused, disoriented and delusional."  MR. RAMIREZ told Dr. Hamm, "I hear voices in my head. They tell me Barack Obama is making fun of me, that Russia is mad at me. They tell me Mayweather and Robert Guerrero (boxers) had a problem with me ... they tell me that I should be more careful. The Sinaloa is mad at me."

57.     Dr. Hamm's diagnostic impressions concerning MR. RAMIREZ were Psychotic Disorder NOS (not otherwise specified) and rule out schizophrenia, paranoid type.  Dr. Hamm concluded that MR. RAMIREZ was not able to understand the nature and purpose of the proceedings against him, not able to cooperate with counsel in a rational manner, not able to conduct his own defense in a rational manner, did not have the capacity to make decisions regarding anti-psychotic medication but antipsychotic medication was medically appropriate and likely to restore him to competence, and was a danger to himself and/or others.  Dr. Hamm further found that MR. RAMIREZ should be evaluated by a psychiatrist.

58.     A little more than two weeks after Defendant DR. GOODE's cursory September 5, 2014, telepsychiatry appointment with MR. RAMIREZ, Dr. Hamm reported to the Court that MR. RAMIREZ "is clearly psychotic. He presents with numerous paranoid delusions and acknowledges paranoid-like self-derogatory auditory hallucinations.  He is guarded, vague and defensive, especially as it becomes apparent that he is confused and disoriented.  He has a poor grasp of the charges against him.  He is unable to specify the roles of the participants at trial and has impaired intellectual abilities.  He can become tangential and is unable to maintain a focus or train of thought without the conversation degenerating into a tangential and confused commentary."

59.     Dr. Hamm further found, "Additionally, [MR. RAMIREZ] certainly is not able to make decisions regarding medication.  He has a poor understanding of the nature or severity of his psychotic illness.  He has been prescribed psychotropic medication at the jail but he refuses to take it.  He does not have the psychological capacity to make rational decisions regarding any form of treatment."

60.     MR. RAMIREZ, throughout his detention in the COUNTY's jail, repeatedly and persistently refused to take prescribed medications, including psychotropic and anti-psychotic medications.  With deliberate indifference to MR. RAMIREZ's serious medical needs, and under the supervision of Defendant FITHIAN and CFMG Merced County Program Manager AMANDA GIBSON, Defendant CFMG's employees and agents simply repeatedly completed release of liability forms for his refusal of medications, which the employees signed and MR. RAMIREZ did not sign.

61.     Defendants COUNTY, TILLY and CFMG continued to house MR. RAMIREZ, a mentally ill and psychotic man in serious need of immediate psychiatric treatment, in "Lockdown" segregated housing, and he continued to refuse medication, with CFMG's employees and agents, under the supervision of DEFENDANT GIBSON, simply completing forms attempting to release themselves and the COUNTY from liability, which MR. RAMIREZ did not sign. Indeed, MR. RAMIREZ had been determined incapable of making decisions about his psychiatric care, mental health, or need for medication.

62.     On September 25, 2014, Defendant DENNING saw MR. RAMIREZ at the request of a CFMG LVN, because he continued to refuse his medications.  MR. RAMIREZ stated he did not need psychiatric medication because his dreams were getting better. However, Defendant DENNING noted that MR. RAMIREZ had thrown his bedding out of his cell the previous night because of a dream he had had. MR. RAMIREZ had a scattered thought process and difficulty completing a sentence or thought. Defendant DENNING scheduled him for a telepsychiatry appointment for September 26, 2014, noting "keep as scheduled."

63.     On September 26, 2014, at 9:00 a.m., Defendant DENNING noted, "inmate in court.  Roll [telepsychiatry appointment] to 10/2/14."  However, at no point did DR. GOODE, DR. FITHIAN, Program Manager Defendant GIBSON or nurses MANDUJANO or DENNING ever create, request, or institute a treatment plan for MR. RAMIREZ, as required by generally accepted standards for care of the mentally ill in jails.

64.     On September 26, 2014, the matter was called as scheduled in Courtroom 13 of the Merced County Superior Court, with the Hon. Harry L. Jacobs presiding, and Dr. Hamm's Report was received. The Court adopted the findings and recommendations made in the ordered evaluation, which included the finding and conclusion in Dr. Hamm's September 22, 2014 report that "**Mr. Ramirez is a danger to himself, and/or others[,]**" and made it the **Order of the Court**, **finding that Richard Michael Ramirez (DOB: 10.24.87) was not competent to stand trial**. **The Court ordered** a placement report to be submitted by October 15, 2014, at 3:00 p.m., in Courtroom 13, and continued the matter to **October 17, 2014**, at 9:30 a.m., in Courtroom 13, for the "Con Rep Report."

65.     Still kept in a lockdown, segregated cell with no mental health treatment plan or care, MR. RAMIREZ's mental health continued to deteriorate.  On September 27, 2014, he was hitting the walls and doors of his lockdown cell, causing his right hand to become swollen and bruised.  The CFMG employees who responded did not transfer him to a hospital or call an ambulance, but rather conducted an on-site emergency response.

66.     Plaintiff is informed and believes and thereon alleges that the contract between CFMG and Defendant COUNTY required CFMG to pay for all off-site medical treatment and hospital care, with a $20,000 cap in CFMG's liability for hospital charges only (and no cap on its liability for off-site physician or prescription charges). This contract created an incentive for CFMG to refrain from sending MR. RAMIREZ and other inmates in need of inpatient hospitalization or other off-site care, off-site for the needed care.

67.     On September 29, 2014, at around 8:30 a.m., Defendant MANDUJANO observed MR. RAMIREZ through the window of his lockdown cell door, and noted no problems.  She did not examine or assess him, or request or institute any treatment plan for him.

68.     On September 29, 2014, around 10:43 p.m., MR. RAMIREZ was found to have attempted to commit suicide, for the first time during this incarceration, by hanging himself with a T-shirt. MR. RAMIREZ was discovered sitting on the top bunk, breathing very heavily,

eyes watering, with blood in the corner of his mouth. MR. RAMIREZ had a red mark on his neck and was very ashen in color.  MR. RAMIREZ was handcuffed and the noose was long enough that the deputies pulled it over MR. RAMIREZ's head. MR. RAMIREZ reported that: "I am just wanting to feel better." MR. RAMIREZ was taken to a Safety Cell and placed in a Safety Smock.

69.     On September 30, 2014, Defendant MANDUJANO saw MR. RAMIREZ in the Safety Cell.  Defendant MANDUJANO noted MR. RAMIREZ had loose, disorganized speech, and was delusional and appeared fearful, and she told him he was still unstable.  Defendant MANDUJANO encouraged MR. RAMIREZ to be medication compliant and said he should be re-evaluated by a mental health worker the next day.  However, she did not request that he be seen by a psychiatrist, or receive a treatment plan or any increased observation.

70.     On September 30, 2014, MR. RAMIREZ reported to a CFMG RN conducting a visual assessment that "the reason I choked myself [was] because I just want to send vibration to my brain."

71.     On October 1, 2014,around 8:15 a.m., MR. RAMIREZ was "cleared" by the CFMG "mental health" practitioner, Defendant MANDUJANO, R.N., and returned to a general population cell.  Defendant MANDUJANO scheduled a telepsychiatry session for October 3, 2014.

72.     The telepsychiatry session previously scheduled for October 2, 2014, and later for October 3, 2014, either never happened or was never charted.

73.     On or about October 3, 2014, an undated prescription written by Defendant DR. FITHIAN was faxed for Haldol 5 mg, Depakote 500 mg, and Benadryl 50 mg, all dispensed in the pm. It appears this prescription was written without DEFENDANT FITHIAN ever having examined MR. RAMIREZ even remotely via telepsychiatry.  At no time during MR. RAMIREZ's entire incarceration did Defendant DR. FITHIAN, DR. GOODE, or any other CFMG or COUNTY employee, ever create an appropriate treatment plan for MR. RAMIREZ,

or provide appropriate care, observation and housing for MR. RAMIREZ, all with deliberate indifference to MR. RAMIREZ's serious medical needs.

74.     On October 5, 2014, MR. RAMIREZ attempted to commit suicide for the second time, this time by choking himself with his own hands.  Around 6:56 p.m., MR. RAMIREZ's cellmate reported that MR. RAMIREZ was trying to kill himself; MR. RAMIREZ was also seen by CFMG employees choking himself and would not stop, so he was placed in a "restraint chair" around 6:59 p.m.

75.     MR. RAMIREZ was placed in a Safety Cell, with a train of thought that was "scattered" and "conversation [with him was] not making any sense." Less than an hour later, MR. RAMIREZ reportedly got himself out of the restraint chair, resulting in him being Tased twice on his right arm. About fifty minutes later, while still in the restraint chair, MR. RAMIREZ managed to get his head under the "arm restraints" and started choking himself in the presence of COUNTY and CFMG employees again. MR. RAMIREZ then forced himself to vomit and was screaming that he wanted to "be free." About fifteen minutes later, MR. RAMIREZ was given an injection of Ativan (1 mg) and was told that "medical would be back soon to check him" and that he should relax and stay calm and he will be allowed to come out of the restraint chair.  MR. RAMIREZ was released from the restraint chair about forty-five minutes after the administration of Ativan.

76.     Defendant MANDUJANO again saw MR. RAMIREZ in the Safety Cell on October 6, 2014, at around 8:20 a.m.  Consistent with his psychosis noted by Dr. Hamm, MR. RAMIREZ denied attempting to choke himself. He told Defendant MANDUJANO that he'd gotten a shot (Ativan) the previous night and it helped.  Defendant MANDUJANO determined MR. RAMIREZ's "behaviors are attention seeking."  She scheduled a telepsychiatry appointment for October 10, 2014, and kept MR. RAMIREZ in the Safety Cell.  At her deposition, Defendant MANDUJANO did not know why she had alleged that MR. RAMIREZ's behaviors were "attention seeking" as opposed to being the result of his serious mental illness, and her claim that his behaviors were "attention seeking" were in error.

77.     During one Safety Cell check, MR. RAMIREZ was seen placing his hands on his neck and, during another, he was placing his thumbs on his neck. Nonetheless, on October 7, 2014, at 8:00 a.m., MR. RAMIREZ was again "cleared by mental health" by Defendant CFMG nurse MANDUJANO, who noted MR. RAMIREZ had been medication compliant for 48 hours, a completely insufficient time for the medication to have sufficient therapeutic effect.

78.     On October 3, 2014, the Department of State Hospitals' Conditional Release Program ("CONREP") faxed a referral of MR. RAMIREZ for Direct Admission to Napa State Hospital.  According to the policies and procedures of NSH and the State, the admission of MR. RAMIREZ as a Direct Admission was only allowed to be delayed up to 72 hours. Therefore, according to the State's own policies, MR. RAMIREZ was required to be admitted no later than October 6, 2014.  Defendant DANA WHITE completed the Pre-Admission Evaluation for Defendant NAPA STATE HOSPITAL on October 9, 2014, and MR. RAMIREZ was approved for NSH Direct Admission. A letter from Defendant DANA WHITE, R.N., dated October 9, 2014, states that, "[a]s a result of his low security rating Richard Ramirez has been deemed appropriate for admission to Napa State Hospital."  The letter goes on to state that MR. RAMIREZ's admission would be scheduled upon receipt of a list of seven (7) court documents. For the reasons set forth in ¶ 98 below, the transfer and admission never happened.

79.     MR. RAMIREZ saw Defendant HEATHER GOODE, M.D., for his second and last telepsychiatry appointment on **October 10, 2014**. Defendant GOODE, M.D., noted that MR. RAMIREZ had "tried to kill himself twice this last week by hanging. He was laughing and smiling when talking about suicide.  He stated that he does not like the medications because 'they make me focus so hard. I need time to myself. I can't serve time and take medications.'" Defendant GOODE noted that MR. RAMIREZ does very well on his medications, but he has been intermittently noncompliant with his mediations.  She prescribed Haldol 5 mg every morning, Depakote 500 mg at bedtime, Benadryl 50 mg at bedtime.  Contrary to generally accepted procedures for the treatment of mentally ill people in jail, at no time did Defendant GOODE institute a treatment plan for MR. RAMIREZ or send him out for psychiatric care the

jail was incapable of providing. Instead, she stated only that he may return to the clinic in 90 days, or sooner if needed.

80.     During his entire incarceration by the COUNTY OF MERCED, neither the COUNTY nor CFMG, nor their employees or agents, ever provided the required treatment plan, or even a single in-person examination by a psychiatrist, despite MR. RAMIREZ's obvious and serious medical and mental health needs.

81.     Defendant MANDUJANO observed MR. RAMIREZ in his lockdown cell on October 10, 2014, and an illegible date in October thereafter, and noted no problems. Defendant MANDUJANO saw MR. RAMIREZ due to his refusal to take medications, and planned only that he would be monitored as needed.

82.     On October 17, 2014, the criminal case was called, receipt of the report was acknowledged, and the matter was submitted upon receipt of the report from Dr. Phillip Hamm, Ph.D., with a recommendation from the Central Valley Conditional Release Program.  Per the minute order of the proceedings: "The Court having previously found [Richard Ramirez] not competent to stand trial and the matter having been referred to the Central Valley Conditional Release Program[,]" **the Court ordered RAMIREZ to be committed to the trial competency program at Napa State Hospital or another appropriate facility**, pursuant to Penal Code section 1370.1.  Pursuant to Penal Code section 1370 (I), the Court found that: "**The defendant's condition would deteriorate without treatment with medication and serious harm to physical and mental health would result**. The defendant lacks the capacity to make a decision regarding antipsychotic medication. The Court orders the State Hospital treatment facility is authorized to involuntarily administer antipsychotic medication to the defendant[.]" Although the criminal proceedings remained suspended, MR. RAMIREZ was remanded to the custody of the Sheriff for the COUNTY OF MERCED, Defendant TOM CAVALLERO, for delivery to NAPA STATE HOSPITAL.  Now NSH had not only the referral for Direct Admission that required MR. RAMIREZ to be admitted to NSH no later than

October 6, 2014, it also had a Court Order that he be admitted.  It still refused to admit MR. RAMIREZ, violating its own policies and the Court's order.

83.      On October 24, 2014, the Court issued an Order and Commitment of Person Determined to be Mentally Incompetent Under the Provisions of Section 1370 of the California Penal Code in Case No. CRL012151 concerning the Decedent, RICHARD MICHAEL RAMIREZ; among other things, the Order provides that: "**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that RICHARD MICHAEL RAMIREZ is presently mentally incompetent within the contemplation of Section 1367 of the California Penal Code**, and **it is ordered that he be committed to and confined to Napa State Hospital**, *or other appropriate facility*, pursuant to Section 1370 (a)(2) of the California Penal Code …" The Court also found that RAMIREZ's mental disorder required medical treatment with antipsychotic medication, and that if his mental disorder "**is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the patient will result**." The Order provides that "IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the state hospital treatment facility is authorized to involuntarily administer antipsychotic medication to the defendant when and as prescribed by the defendant's treating psychiatrist."  The Order further provided that: "**IT IS FURTHER ORDERED AND DECREED that the Sheriff of Merced County take, convey and deliver the said RICHARD MICHAEL RAMIREZ to the custody of Napa State Hospital**, *or other appropriate facility,* **to be held and confined therein as a mentally incompetent person as hereinabove determined**…" (October 24, 2014 Order, hereafter "Order," attached hereto as **Exhibit A** (emphasis added)).  All Defendants herein, including from the COUNTY, from CFMG, and from NSH, had actual knowledge of this order, its contents and requirements.

84.      In the event that the COUNTY OF MERCED and NSH disobeyed the Court Order for RAMIREZ's admission, then pursuant to Due Process Clause of the Fourteenth Amendment to the U.S Constitution, California Penal Code § 1600, and other authorities, the COUNTY OF MERCED, Sheriff TOM CAVALLERO, CFMG, their employees and agents,

and the individually named Defendants herein, nonetheless, remained responsible for the care, treatment, and medical needs of their pretrial detainee, RICHARD RAMIREZ, to provide such necessary care and/or secure such care from any other available public or private treatment facility approved by the community program director that would promote MR. RAMIREZ's speedy restoration to mental competence, or have him placed on outpatient status, as specified in Penal Code § 1600.

85.     Both the Due Process Clause of the Fourteenth Amendment and California statutory law mandate that a criminal defendant who, because of a mental disorder or developmental disability, lacks the ability to assist counsel and to understand the nature of the criminal court proceedings cannot be tried or sentenced for a crime. *Indiana v. Edwards*, 554 U.S. 164, 169-170 (2008); Cal. Pen. Code § 1367(a). If, after a trial or by stipulation, a defendant is found mentally incompetent or developmentally disabled, the trial court must suspend criminal proceedings and either order that the defendant be admitted to a treatment facility to "promote the defendant's speedy attainment of mental competence," or place the defendant on outpatient status. Cal. Pen. Code §§ 1370(a)(1)(B), 1370.1(a)(1)(B).

86.     Criminal defendants who have been found incompetent to stand trial ("IST") have a Constitutional right to treatment to restore them to competency so that they may proceed to trial or otherwise have their charges adjudicated. Under the Due Process Clause of the Fourteenth Amendment, "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972); *Oregon Advocacy Center v. Mink,* 322 F.3d 1101, 1120(9th Cir. 2003) ("Incapacitated criminal defendants have a high risk of suicide, and the longer they are deprived of treatment, the greater the likelihood they will decompensate and suffer unduly.").

87.     It is widely known by government officials at both the local and state levels that IST "defendants usually get worse the longer they wait for admission to a Mental Health

hospital." Sen. Rules Com., Off. Of Sen. Floor Analyses, analysis of Sen. Bill No. 568 (2007-2008 Reg. Sess.). In a 2013 County of Napa position paper on legislation relating to NSH, Napa County explained that one of the most severe consequences of housing incompetent defendants in county jails is the "decompensation they exhibit when moved to the jail and the deterioration in their condition when they are kept in a segregated, non-clinical environment."

88.     It is widely recognized that providing an IST pretrial detainee with antipsychotic medication alone is not the equivalent of treatment in a state hospital, where each patient has a treatment team of a psychiatrist, psychologist, nurse, social worker, and psychiatric technician, and receives both pharmacological and nonpharmacological treatment.  And in MR. RAMIREZ's case, he was not even receiving medication because he refused to take it, due to his serious mental illness.

89.     On information and belief, Defendant NSH, through its Admissions Nurse, Defendant DANA WHITE, R.N., its Executive Director, Defendant DOLLY MATTEUCCI, its Medical Director, Defendant PATRICIA TYLER, M.D., its Clinical Administrator, Defendant CINDY BLACK, its Admissions Suite Supervisor, Defendant DIANE MOND, R.N., and possibly other DOE Defendants employed by NSH and/or the State of California, have a well-known history and pattern of failing to allow timely admission of IST pretrial detainees to NSH, in violation of state court commitment orders and with deliberate indifference to the rights and safety of IST pretrial detainees.  This history and pattern has been recognized in other civil rights cases against NSH and other State of California psychiatric hospitals, including but not limited to: *Anderson v. Siskiyou County and NSH, et al.*, N.D. Cal. No. C-10-1428-SBA, *Luong v. Alameda County, et al.*, N.D. Cal. No: 3:17-cv-06675-EMC, and *M.S. v. County of Ventura, et al.*, C.D. Cal. No. C-16-3084-BRO; as well as published court decisions, including but not limited to: *In re Mille*, 182 Cal.App.4th 635 (2010) and *In re Loveton*, 244 Cal.App.4th 1025 (2016).

90.     On information and belief, Defendant CALIFORNIA DEPARTMENT OF STATE HOSPITALS, Defendant NSH, through Executive Director MATTEUCCI, Medical

Director, Defendant TYLER, Clinical Administrator, Defendant BLACK, Admissions Suite Supervisor Defendant MOND, Admissions Nurse Dana WHITE, and possibly other DOE Defendants employed by NSH and/or the State of California Department of State Hospitals placed IST inmates on admissions waiting lists to State hospitals, if no beds were available, in the order of their commitment date, without any triage of the patient or assessment of the patient's psychiatric acuity, without informing the Court, District Attorney, defense counsel, IST inmate's next of kin, or IST inmate's jail medical or mental health treaters of the delay in admitting the inmate, that the delay will take several weeks to months, or that the County or its staff can request a psychiatric acuity review or priority admission for the inmate.

91.     When NSH received the conditional release program ("CONREP") referral on October 3, 2014, which contained Dr. Phillip Hamm's psychological evaluation, the criminal complaint, and other documents related to the criminal proceedings, Defendants MATTEUCCI, TYLER, BLACK, MOND, and WHITE, would have known that MR. RAMIREZ was clearly psychotic, was refusing to take antipsychotic medication, was a danger to himself or others, and had attempted to commit suicide.  By its own policies, NSH was required to admit MR. RAMIREZ no later than October 6, 2014.

92.     According to the sworn testimony of Defendant TILLY and County transportation clerk Marissa Enciso Torres, Defendant NSH admitted IST patients on a one-for-one exchange, meaning one inmate had to be returned to the jail before Defendant NSH would accept another inmate from the waitlist, despite the patient's psychiatric acuity, and County jail inmates have in some cases had to wait up to a year in jail before they would be admitted to NSH.

93.     Defendants CALIFORNIA DEPARTMENT OF STATE HOSPITALS, NSH, MATTEUCCI, TYLER, BLACK, MOND, and WHITE failed to inform the Court, prosecutor, or defense counsel of the delay in admitting IST detainees to State hospitals in compliance with

Court Orders, and instead simply placed them on a waiting list.  On average, Defendant NSH delays admission of IST inmates 60-90 days, according to the sworn testimony of Defendant WHITE, and up to a year according to Defendant TILLY.  On information and belief, NSH had a practice of not admitting inmates until the committing Court issued an Order to Show Cause why the Department of State Hospitals should not be held in contempt of court for failing to comply with a commitment order.

94.     On information and belief, had Defendant COUNTY notified NSH that MR. RAMIREZ needed priority admission based on his psychiatric acuity, MR. RAMIREZ could have been moved to the top of the waiting list and admitted to NSH within hours.  Priority admission had to be approved by NSH Medical Director, Defendant TYLER.  None of the COUNTY or CFMG Defendants nor jail staff ever requested a priority admission for MR. RAMIREZ despite their inability to properly treat him in the jail.  Also, the NSH Defendants never inform any Counties of the delay in admitting patients to NSH or the ability to request a priority admission or psychiatric acuity review.

95.     MR. RAMIREZ was committed to NSH, or other appropriate facility.  On information and belief, neither NSH nor the CFMG Defendants including Drs. GOODE and FITHIAN ever searched for an open bed at another State Hospital, a Lanterman-Petris-Short Act ("LPS") inpatient psychiatric health facility or certified jail, or a private psychiatric hospital, in deliberate indifference to MR. RAMIREZ'S serious medical needs.

96.     Had MR. RAMIREZ been timely admitted to NSH in accordance with the Commitment Order and the Direct Referral, an individual treatment plan would have been created for him, he could have been placed under appropriate observation, received involuntary medication, and had a team of physicians, psychiatrist, psychologist, and social workers caring for his medical needs, as well as non-pharmacological treatment, such as group activities. However, he was denied access to these treatment opportunities in deliberate indifference to his severe medical needs.

97.     NSH Defendant WHITE testified that a patient who has a history of previous suicide attempts is at an increased risk of a completed suicide and that patients not on any psychiatric medication are also at an increased risk of suicide.  Yet, knowing about MR. RAMIREZ'S suicidal history, Defendants MATEUCCI, TYLER, BLACK, MOND, and WHITE were deliberately indifferent to his psychiatric needs.

98.     On or about October 27, 2014, the complete CFMG medical and mental health records for MR. RAMIREZ from September 8, 2014, through October 27, 2014, were sent by Fed-Ex Overnight shipping to the Napa State Hospital, per COUNTY transportation clerk, Marissa Enciso Torres.  The NSH Defendants including Defendant WHITE claim they received the complete admissions packet on October 31, 2014, although Fed-Ex confirms NSH received the records on October 29, 2014.  Yet, MR. RAMIREZ was still never transported to Napa State Hospital or any other appropriate treatment facility, in direct violation of the Court's Order.  On information and belief, this transfer debacle was caused by one or both of these alternative reasons [pled in the alternative per Fed.R.Civ.P. Rule 8(d)(2)]:

   a.  Defendant NSH, through its Admissions Nurse, Defendant DANA WHITE, R.N., its Executive Director, Defendant DOLLY MATTEUCCI, its Medical Director, Defendant PATRICIA TYLER, its Clinical Administrator, Defendant CINDY BLACK, its Admissions Suite Supervisor, Defendant DIANE MOND, and possibly other DOE Defendants employed by NSH and/or the State of California, were empowered to make the decision to admit, or not admit, MR. RAMIREZ to NSH, and with deliberate indifference to the rights and safety of MR. RAMIREZ, those Defendants failed and refused to admit, and actively denied admission of, MR. RAMIREZ to NSH for restorative treatment in violation of the Court Order and their Constitutional duties, thereby setting in motion and directly causing MR. RAMIREZ to remain confined in custody of MERCED COUNTY, despite having all necessary paperwork, admissions documents, and other necessary pre-conditions for admission by no later than

October 31, 2014, and failing to heed multiple requests by MERCED COUNTY officials and employees to admit MR. RAMIREZ to NSH as ordered, such that COUNTY Defendants were not permitted to deliver, and could not deliver, MR. RAMIREZ to NSH; and/or,

b. Defendants COUNTY, CAVALLERO, GOINS, TILLY, CFMG, FITHIAN, GOODE, RYAN, MANDUJANO, DENNING, GIBSON, and DOE Defendants failed to transport and deliver MR. RAMIREZ to NSH as ordered, and in violation of Cal. Penal Code § 1370 and their Constitutional duties, and with deliberate indifference to MR. RAMIREZ's rights and safety, even after NSH had approved MR. RAMIREZ's admission to NSH and communicated that approval and readiness to admit MR. RAMIREZ to COUNTY and CFMG Defendants; and/or Defendants COUNTY, CAVALLERO, GOINS, TILLY, CFMG, FITHIAN, GOODE, RYAN, MANDUJANO, GIBSON, and DOE Defendants failed to provide the necessary documentation and complete the pre-conditions required for MR. RAMIREZ's admission to NSH.

c. The NSH and State of California Defendants never informed the Court, the County, the District Attorney, the CFMG Defendants, MR. RAMIREZ's defense counsel or next-of-kin that the admission of MR. RAMIREZ would be delayed by months, including its estimate that his admission would be delayed by four months, nor of the possibility to request a priority admission or psychiatric acuity review;

d. The CFMG Defendants, including Defendants FITHIAN and GOODE never requested priority admission or psychiatric acuity review by NSH.

99.     Despite the above-referenced Direct Referral and also Court Order that MR. RAMIREZ be delivered and admitted to NAPA STATE HOSPITAL or another appropriate inpatient treatment facility, MR. RAMIREZ remained incarcerated and confined in the Merced County Jail by the conduct and decisions of all Defendants herein.  Further, in violation of both

the commitment order and their Constitutional duties, and with deliberate indifference to MR. RAMIREZ's rights and safety, Defendants COUNTY, CAVALLERO, GOINS, TILLY, CFMG, FITHIAN, GOODE, RYAN, MANDUJANO, DENNING, GIBSON, NAPA STATE HOSPITAL, MATTEUCCI, WHITE, TYLER, BLACK, MOND, and DOE Defendants failed to refer MR. RAMIREZ to any other state hospital or inpatient psychiatric hospital for the care and treatment of the mentally disordered, and also failed to refer MR. RAMIREZ to any other available public or private treatment facility or inpatient psychiatric hospital approved by the community program director that would have treated MR. RAMIREZ and/or promoted MR. RAMIREZ's restoration to mental competence.

100.    MR. RAMIREZ continued to languish in MERCED COUNTY's jail, with no psychiatric treatment, no treatment plan, inadequate medication, continued refusal of medications, and no appropriate observation required by generally accepted standards for health care in jails, in blatant violation of the October 24, 2014, Court Order for his transfer.

101.    On November 2, 2014, MR. RAMIREZ reported to a CFMG nurse, "I think I need an ice pack. I hit the window." His right hand was again swollen.

102.    On November 10, 2014, Defendant MANDUJANO saw MR. RAMIREZ, who stated he was upset that the jail chaplain would not give him a Torah because he was going to be Jewish. She again decided simply to monitor him as needed, and did not request a treatment plan or any psychiatric care for MR. RAMIREZ.

103.    On November 28, 2014, MR. RAMIREZ told CFMG staff at the COUNTY Jail that he hears noises and stated, "**I want to hang myself**," requesting to leave lockdown. MR. RAMIREZ was placed in the Safety Cell again.

104.    On November 29, 2014, at about 2:20 a.m., MR. RAMIREZ stated: "**I sometimes want to cut off my air supply because I like the reaction I get but now I think it's people controlling me with a button**." During another Safety Cell check, MR. RAMIREZ was pacing around and **grabbing his throat**. About six hours later, at approximately 8:30 a.m. on November 29, 2014, MR. RAMIREZ was "cleared" by "mental health," by a DOE

Defendant employee of CFMG whose signature is illegible.  At that time, however, MR.
RAMIREZ only had "reduced" suicide risk. The writer stated, "follow-up per treatment plan."
However, with deliberate indifference to MR. RAMIREZ's serious medical needs, at no time
did any CFMG-employed Defendant, or anyone else, ever create an appropriate treatment plan
for MR. RAMIREZ.

105.    On or about December 3, 2014, around 9:05 a.m., MR. RAMIREZ again injured
himself, from banging his elbow on the glass of the cell door.

106.    On December 5, 2014, at around 5:38 a.m., MR. RAMIREZ had to be placed in
a Safety Cell again when he stated, "**I felt like hanging myself**, **I'm frustrated about being
locked up**."

107.    On or about December 5, 2014, at around 8:05 a.m., mental health nurse
Defendant DENNING saw MR. RAMIREZ in the safety cell with his hands around his neck,
**attempting to choke himself**. MR. RAMIREZ stated, "I was trying to stop the oxygen to my
brain so I could relax." Defendant DENNING told MR. RAMIREZ, he would have to be
placed in a restraint chair if he did not stop, and he stated that he would stop trying to choke
himself.  Defendant DENNING noted that MR. RAMIREZ was smiling and laughing one
minute, and serious and tearful the next.

108.    Defendant DENNING decided to continue the Safety Cell placement and stated
that she would consult with Defendant DR. GOODE concerning MR. RAMIREZ's situation.

109.    On December 5, 2014, Defendant DENNING noted that she had consulted with
DEFENDANT DR. GOODE, who simply ordered prescriptions for Ativan 2 mg twice a day
for 30 days, Risperdal 2 mg twice a day for 30 days, Depakote 1000 mg at bedtime for thirty
days, and Benadryl 50 mg at bedtime for 30 days, with all medications to be crushed and
floated and a return to the telepsychiatry clinic in 30 days. With deliberate indifference to MR.
RAMIREZ's serious medical needs, at no time did Defendant DR. GOODE or any of the other
Defendants in this matter create an appropriate treatment plan for MR. RAMIREZ, comply
with the Court Order requiring MR. RAMIREZ to be transferred to Napa State Hospital or

another appropriate inpatient psychiatric treatment facility, or otherwise provide competent and adequate care for MR. RAMIREZ's serious and life-threatening medical needs.

110.    Defendant DENNING cleared MR. RAMIREZ from the safety cell on December 6, 2014, at around 1:49 p.m., but he remained incarcerated in the COUNTY Jail, and, upon information and belief, still in a "lockdown" segregated cell with no appropriate, constant observation given his potential for suicide.

111.    MR. RAMIREZ continued to be incarcerated in the COUNTY Jail, despite the Order that he be transported to NSH or another appropriate inpatient psychiatric facility and, kept in-custody without appropriate continued antipsychotic medication and treatment, MR. RAMIREZ's mental health condition continued to worsen progressively. Defendants continued to refuse MR. RAMIREZ access to or provide appropriate mental health care, nor did Defendants provide him with appropriate precautions for his high risk of suicide, or with appropriate mental health care for his mental disabilities, all with deliberate indifference to his serious medical needs.

112.    Plaintiff is informed and believes and thereon alleges that at no time when MR. RAMIREZ was in a lockdown or segregated cell did any Defendant COUNTY or CFMG employee or agent ever provide him with the constant observation required by generally accepted procedures for the housing of a potentially suicidal inmate.

113.    On December 14, 2015, MR. RAMIREZ was placed in a Safety Cell again with handcuff restraints. At some point the restraints were removed and MR. RAMIREZ was moved back to a segregated cell in "lockdown." There, MR. RAMIREZ was alone and was provided access to materials he could use to commit suicide, such as a sweatshirt, and had direct access to bars on an upper bunk of a sufficient height from which he could hang himself.

114.    As a consequence of all Defendants' deliberate indifference, including actions and/or omissions and/or misconduct and/or willful refusal to comply with the Order (Ex. A), and as a result of his serious, but treatable, mental health conditions and mental illness, on December 15, 2014, MR. RAMIREZ committed suicide in his lockdown, segregated jail cell in

Defendant COUNTY'S JLCC/Sandy Mush jail by hanging.  At the time he committed suicide, MR. RAMIREZ continued to be housed in a cell alone and unsupervised, with access to a sweater and an upper bunk with which to hang himself. MR. RAMIREZ was found by COUNTY OF MERCED Jail staff hanging in his cell room at approximately6:12 p.m., on December 15, 2014.  MR. RAMIREZ was hanging from a sweater that was tied to the top bunk.  The sweater sleeves were tied together to form a knot.  Although MR. RAMIREZ had no pulse and was apneic after he was found hanging in his cell, he was officially pronounced dead by medical staff at Mercy Hospital at approximately 7:11 p.m. The cause of death was ruled asphyxia by hanging and the manner of death was ruled a suicide, with a duration of minutes. The bunk unit MR. RAMIREZ was hanging from measured approximately as follows: floor to top bunk = 68 inches, and floor to the top of the rail where the sweater was tied off = 79.5 inches.

115.    On or about December 16, 2014, Defendant CFMG made copies of MR. RAMIREZ'S medical records for the Coroner and Defendants DR. FITHIAN and LT. GOINS.

116.    Defendants' deliberate indifference to MR. RAMIREZ's serious medical needs and Defendants' other tortious, unconstitutional, and/or otherwise wrongful conduct caused MR. RAMIREZ's suicide in his jail cell.

117.    While MR. RAMIREZ was incarcerated as a pretrial detainee from August 23, 2014 to December 15, 2015, the individually named Defendants and DOES 6-10, including Defendant Sheriff CAVALLARO, Jail Commander GOINS, Sergeant TILLY, and deputies/Correctional Officers ("COs"), jail administrators, medical personnel, and/or other law enforcement officers and/or other COUNTY and/or CFMG employees knew and/or had reason to know that MR. RAMIREZ was a mentally ill and emotionally disturbed person, with immediate and serious medical needs. The individually named and DOE Defendants further knew and/or had reason to know that MR. RAMIREZ had both threatened to – and attempted to – commit suicide and, as such, knew MR. RAMIREZ was suicidal and/or at a serious risk for committing suicide. Despite knowing this, Defendants were deliberately indifferent to MR.

RAMIREZ's immediate and serious medical needs, including risk of suicide, suicidality, mental illness, and emotional disturbance.

118.     The individually named Defendants, other Jail and medical personnel, and DOES 6-10 failed to properly and appropriately assess and classify MR. RAMIREZ and failed to properly assess and classify his serious medical needs.

119.     Additionally, Defendant TILLY and the COUNTY Defendants failed to provide safe and adequate housing for MR. RAMIREZ, with deliberate indifference to his rights and serious medical needs, by housing him in an environment that was unsafe for a suicidal person, failing to provide him with a safety smock and safety bedding, as well as providing or failing to remove the sweater MR. RAMIREZ used to commit suicide, and failing to observe and check on MR. RAMIREZ's welfare as required by law and regulations. The jail and cells in which the COUNTY Defendants placed MR. RAMIREZ also constituted unreasonably dangerous conditions.

120.     Defendants failed to properly and adequately monitor and care for MR. RAMIREZ.

121.     In addition, Defendants DOLLY MATTEUCCI, DANA WHITE, R.N. PATRICIA TYLER, M.D., CINDY BLACK, DIANE MOND, and other DOE Defendants, with deliberate indifference to MR. RAMIREZ's serious medical needs, failed and/or refused to comply with the October 3, 2014, Direct Admission Referral by CONREP, and the October 24, 2014 Court Order for his transfer to NAPA STATE HOSPITAL, refusing to allow his admission to NSH without due cause, and setting in motion his continued confinement in the MERCED COUNTY Jail for over seven weeks after issuance of the Court Order that required his admission to NSH, until he committed suicide in the Jail where their conduct had caused him to remain.

122.     Further, the COUNTY, the STATE OF CALIFORNIA DEPARTMENT OF STATE HOSPITALS, NAPA STATE HOSPITAL, and CFMG failed to accommodate MR.

RAMIREZ's mental illness and disability and Defendants' wrongful conduct herein was done at least in part because of MR. RAMIREZ's disability and/or psychiatric condition.

123.    The Defendants' actions and omissions and the manner and duration in which MR. RAMIREZ was incarcerated was contrary to generally accepted practices and jail procedures, causing the wrongful death of MR. RAMIREZ.

124.    At all material times and, alternatively, the actions and omissions of each Defendant were intentional, and/or wanton and/or willful, and/or conscious shocking, and/or reckless, and/or callous, and/or malicious, and/or deliberately indifferent to Plaintiff's and Decedent's rights, and/or grossly negligent, and/or negligent.

125.    As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, Plaintiff LUCY ATAYDE, Individually, sustained the following injuries and damages, past and future, including, but not limited to:

    a.  Wrongful death of RICHARD MICHAEL RAMIREZ;

    b.  Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support;

    c.  Emotional distress from the violations of her personal Constitutional rights, including grief, sorrow, anxiety, sleeplessness, humiliation, and indignity;

    d.  Loss of enjoyment of life;

    e.  All other legally cognizable special and general damages;

    f.  Violations of state and federal constitutional rights; and,

    g.  All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, California Civil Code §§ 52 and 52.1, and as otherwise allowed under California and United States statutes, codes, and common law.

126.    As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, Plaintiff LUCY ATAYDE, as Successor in Interest of Decedent RICHARD MICHAEL RAMIREZ, sustained the following injuries and damages, past and future, including, but not limited to:

a.   Hospital and medical expenses incurred by RICHARD MICHAEL RAMIREZ;

b.   Coroner's fees, funeral, and burial expenses;

c.   RICHARD MICHAEL RAMIREZ's loss of life, pursuant to federal civil rights law;

d.   RICHARD MICHAEL RAMIREZ's conscious pain and suffering, pursuant to federal civil rights law; and,

e.   All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, California Civil Code § 52, and as otherwise allowed under California and United States statutes, codes, and common law.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983)
### PLAINTIFF AGAINST DEFENDANTS FITHIAN, GOODE, RYAN, MANDUJANO, DENNING, GIBSON, CAVALLARO, GOINS, TILLY, MATTEUCCI, WHITE, TYLER, BLACK, MOND, AND DOES 6-10

127.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in this complaint, as though fully set forth here.

128.   By the actions and omissions described above, Defendants TAYLOR FITHIAN, M.D., HEATHER GOODE, M.D., SEAN RYAN, R.N., CORINA DENNING, R.N., DEBORAH MANDUJANO, R.N.,  SHERIFF CAVALLARO, JAIL COMMANDER JASON GOINS, SERGEANT CLIFFORD TILLY, NSH Executive Director DOLLY MATTEUCCI, NSH ADMISSIONS NURSE DANA WHITE, R.N., Clinical Administrator, Defendant CINDY BLACK, Medical Director, DR. PATRICIA TYLER, Admissions Suite Supervisor, Defendant DIANE MOND, and DOES 6-10, acting under the color of state law in their individual capacities, deprived RAMIREZ of the right to be free from an unreasonable ongoing seizure as a pretrial detainee in the Merced County Jail, as secured by the Fourth and Fourteenth Amendments, and deprived RAMIREZ as a pretrial detainee of the rights, privileges, and immunities secured by the Fourteenth Amendment by subjecting him, or

through their deliberate indifference, allowing others to subject him, to delay and denial of access to medical or mental health care for a serious, but treatable, medical or mental health condition.

129.   The listed Defendants knew that RAMIREZ's medical condition was serious, but treatable, and knew or must have known that, pursuant to the Court Order, he required access and delivery to urgently needed medical/mental health care; Defendants further had a duty to provide RAMIREZ reasonable security and safe, appropriate housing and monitoring to accommodate his mental health condition.

130.   The listed Defendants knew or must have known that a Court of competent jurisdiction had ordered that RAMIREZ be delivered to – and admitted to – NSH for treatment and care for his serious, but treatable, medical and mental health conditions, which Defendants knew or must have known that, if not treated, would worsen and cause RAMIREZ harm or death.

131.   The listed Defendants ignored, delayed, or denied to RAMIREZ urgently needed medical and psychiatric care and treatment. As a result of the Defendants' deliberate indifference to both RAMIREZ's need for medical care and treatment and his mental condition, Plaintiff suffered damages and deprivation of constitutional rights, as described herein.

132.   By the actions and omissions described above, the individually named Defendants violated 42 U.S.C. § 1983, depriving Plaintiff and Decedent of the following well-settled constitutional rights that are protected by the First, Fourth, and Fourteenth Amendments to the U.S. Constitution:

     a.   The right to be free from an unreasonable ongoing seizure as a pretrial detainee, as secured by the Fourth and Fourteenth Amendments;

     b.   The right to be free from deliberate indifference to RAMIREZ's serious medical needs while in custody and confined in jail as a pretrial detainee, as secured by the Fourteenth Amendment;

c.  The rights and liberty interests, as an incapacitated criminal defendant, to freedom from incarceration and to timely, restorative treatment, as secured by the Fourteenth Amendment;

d.  The right to be free from wrongful government interference with familial relationships and Plaintiff's right to companionship, society, and support, as secured by the First and Fourteenth Amendments.

133.    The listed Defendants' failure to intervene, prevent, or stop the constitutional violations by others, when Defendants were in a position to so intervene when such violations were occurring, also renders such Defendant(s) liable for these violations.

134.    Defendants subjected Plaintiff to their wrongful conduct, depriving Plaintiff and Decedent of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiff (Individually and on behalf of RICHARD RAMIREZ) and others would be violated by their acts and/or omissions.

135.    As a proximate result of the foregoing wrongful acts and/or omissions, Plaintiff sustained injuries and damages, as set forth above, in ¶¶ 125-126. Plaintiff is therefore entitled to general and compensatory damages in an amount to be proven at trial.

136.    In committing the acts alleged above, the individually named Defendants and DOE Defendants acted maliciously and/or were guilty of a wanton and reckless disregard for the rights, safety, and emotional wellbeing of Plaintiff and Decedent, and by reason thereof, Plaintiff is entitled to punitive damages and penalties allowable under 42 U.S.C. § 1983, California Code of Civil Procedure §§ 377.20 et seq, and other state and federal law against these individual Defendants and Defendant CFMG; no punitive damages are sought directly against the municipal Defendants.

137.    Plaintiff is also entitled to reasonable costs and attorney's fees under 42 U.S.C. § 1988 and other applicable California codes and laws.

**SECOND CAUSE OF ACTION**
**(42 U.S.C. § 1983 – *Monell* and Supervisory Liability)**
**AGAINST DEFENDANTS COUNTY OF MERCED, CFMG, SHERIFF TOM
CAVALLERO, JAIL COMMANDER JASON GOINS, CFMG, MEDICAL DIRECTOR
TAYLOR FITHIAN, M.D., CFMG PROGRAM MANAGER AMANDA GIBSON, NSH
EXECUTIVE DIRECTOR DOLLY MATTEUCCI, NSH MEDICAL DIRECTOR
PATRICIA TYLER,  and DOES 6-10**

138.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in this complaint, as though fully set forth herein.

139.    As supervisors, Defendants SHERIFF TOM CAVALLERO, JAIL COMMANDER JASON GOINS, CFMG MEDICAL DIRECTOR TAYLOR FITHIAN, M.D., CFMG PROGRAM MANAGER AMANDA GIBSON, R.N., NSH EXECUTIVE DIRECTOR DOLLY MATTEUCCI, NSH MEDICAL DIRECTOR PATRICIA TYLER, and DOES 6-10, each permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control, and failed to properly supervise such individuals, with deliberate indifference to the rights and serious medical needs of MR. RAMIREZ.  Each of these supervising Defendants either directed his or her subordinates in conduct that violated Decedent's rights, OR set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive Decedent of rights, OR knew his or her subordinates were engaging in acts likely to deprive Decedent of rights and failed to act to prevent his or her subordinate from engaging in such conduct, OR disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate Decedent's rights, and in fact did cause the violation of Decedent's rights.  (See, Ninth Circuit Model Civil Jury Instruction 9.4). Furthermore, each of these supervising Defendants is liable in their failures to intervene in their subordinates' apparent violations of Decedents' rights.

140.    Plaintiff alleges, upon information and belief, the unconstitutional actions and/or omissions of the individually named COUNTY OF MERCED Defendants, the individually

named CFMG Defendants, and the personnel acting on behalf of Defendant CFMG were pursuant to the following customs, policies, practices and/or procedures of the COUNTY OF MERCED and/or CFMG, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policy making officials for the COUNTY and its Sheriff's Department, and/or CFMG, including, but not limited to, Defendants TOM CAVALLERO, JASON GOINS, TAYLOR FITHIAN, M.D., AMANDA GIBSON, R.N., and DOES 6-10:

    a. To deny inmates at the COUNTY'S jail access to appropriate, competent, and necessary care for serious medical and psychiatric needs, including, as described herein, by contracting to provide inadequate medical/psychiatric care for jail inmates (see ¶¶ 34-42), by contracting to create financial and other incentives for CFMG to deprive inmates of necessary emergency and hospital care (see ¶¶ 66, 99), and by failing to require that all medical/psychiatric staff and supervisors at the jail be properly trained, supervised, credentialed, and licensed as required by law (see ¶¶ 7, 12, 37-41);

    b. To fail to properly classify, house, and/or monitor inmates suffering from mental health disabilities, including placement on suicide watch with proper suicide precautions, including failing to consider in any way the clear and obvious danger of placing inmates at risk of suicide in cells with means to hang and injure themselves (including bunk beds, horizontal bars, clothing, and ligature materials) and without the frequent, logged observation required by law;

    c. To allow, encourage, and require unlicensed, inadequately trained, and inadequately supervised CFMG staff to make decisions to place jail inmates on, and remove inmates from, suicide watch in direct violation of applicable law and standards, including permitting and incentivising unlicensed and untrained CFMG staff to remove incompetent and severely mentally ill inmates from suicide watch without a reasonable, appropriate, and lawful basis for doing so;

    d. To fail to institute proper procedures and training to coordinate inmate assessment, placement, suicide watch decisions, transfers to NSH or other psychiatric facilities, and care with the CFMG staff, jail physician, jail psychiatrist, court, and jail corrections staff where there was an obvious need for such to prevent transfer debacles of the type that happened here;

    e. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures for handling, housing, and caring for mentally ill and/or emotionally disturbed inmates at the COUNTY Jail, including alternatives to placing such ill and disturbed inmates in need of treatment in solitary confinement segregation cells that are intended and used to punish inmates, with the obvious consequence that the mental health needs of

such inmates remain unaddressed and are in fact aggravated and increased by such punitive treatment;

f.  To fail to provide timely restorative treatment to incapacitated criminal defendants;

g.  To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (f) above, when the need for such was obvious, with deliberate indifference to the rights and safety of Plaintiff, Decedent, and the public, and in the face of an obvious need for such policies, procedures, and training programs.

141.  In the alternative, upon information and belief, Defendant COUNTY OF MERCED and/or CFMG may have instituted policies or training addressing some or all the topics listed above, but with deliberate indifference to citizens' rights, failed to properly oversee, enforce, and/or properly carry out such policies and/or training.

142.  The above-described customs, policies, practices, and/or procedures of the COUNTY and CFMG were a moving force and/or a proximate cause of the deprivations of Plaintiff's and Decedent's constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in Count 1.

143.  Defendants COUNTY and CFMG are also liable for the violations of Plaintiff's and Decedent's rights by their final policy makers, including SHERIFF CAVALLERO, JAIL COMMANDER GOINS, and CFMG MEDICAL DIRECTOR FITHIAN, as described above. (See, Ninth Circuit Model Civil Jury Instruction 9.6).

144.  On information and belief, both the COUNTY and CFMG conducted investigations and reviews of this matter leading to the death of MR. RAMIREZ, and Defendants CAVALLARO, GOINS, and FITHIAN directly and personally participated in such investigations and reviews.  The unconstitutional actions and/or omissions of the individually named Defendants, DOES 6-10, other Sheriff's Department and COUNTY personnel, and CFMG personnel as described above, were approved, tolerated, and/or ratified by policy making officers for the COUNTY OF MERCED, including, but not limited to, former Sheriff

TOM CAVALLERO, Undersheriff JASON GOINS, and by CFMG, TAYLOR FITHIAN, M.D.  Plaintiff is informed and believes, and thereupon alleges, the details of this incident have been revealed to the authorized policy makers within the COUNTY OF MERCED, the Merced County Sheriff's Department, and CFMG, and that such policymakers have direct knowledge of the fact that RICHARD MICHAEL RAMIREZ was unlawfully denied necessary care for his serious medical needs, and denied timely restorative treatment due to their and their subordinates' misconduct and violations of Decedents' rights. Notwithstanding this knowledge, the authorized policymakers within the COUNTY, its Sheriff's Department, and CFMG, have approved of the individually named Defendants' and DOES 1-10s' conduct and decisions in this matter to the extent such individuals were under their supervision and oversight, and have made a deliberate, conscious and affirmative choice to endorse and ratify such conduct and decisions, and the basis for them, which resulted in the death of RICHARD MICHAEL RAMIREZ.  By so doing, the authorized policymakers within the COUNTY and its Sheriff's Department, as well as those within CFMG, have shown affirmative agreement with the conduct of individual Defendants and other employees/agents under their supervision, and have ratified the unconstitutional acts of these individual Defendants, employees, and agents.

145.    The aforementioned customs, policies, practices, and procedures; the failure to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and, the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants COUNTY OF MERCED, CAVALLERO, GOINS, CFMG, FITHIAN, GIBSON, MATTEUCCI, TYLER, and DOES 6-10 were a moving force and/or a proximate cause of the deprivations of Plaintiff's and Decedent's clearly established and well-settled constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in ¶ 132.

146.    As a direct and proximate result of the foregoing unconstitutional actions, omissions, customs, polices, practices, and/or procedures of Defendants COUNTY OF MERCED, CAVALLERO, GOINS, CFMG, FITHIAN, GIBSON, MATTEUCCI, TYLER, and DOES 6-10, or the lack of inadequacy thereof, Plaintiff sustained serious and permanent

injuries and damages and is entitled to damages, penalties, costs, and attorneys' fees, as set

forth above, in ¶¶ 125-126, and punitive damages against Defendants CAVALLERO, GOINS,

CFMG, FITHIAN, GIBSON, MATTEUCCI, TYLER, and DOES 6-10, in their individual

capacities.

**THIRD CAUSE OF ACTION**
**(VIOLATION OF CIVIL CODE § 52.1 (b))**
**PLAINTIFF AGAINST DEFENDANTS MATTEUCCI, TYLER, BLACK, MOND,**
**WHITE, CFMG, FITHIAN, GOODE, RYAN, MANDUJANO, DENNING, GIBSON,**
**COUNTY, CAVALLERO, GOINS, TILLY and DOES 6-10**

147.    Plaintiff re-alleges and incorporates by reference the allegations contained in

this complaint, as though fully set forth herein.

148.    By their acts, omissions, customs, and policies, Defendants MATTEUCCI,

TYLER, BLACK, MOND,WHITE CFMG, FITHIAN, GOODE, RYAN, MANDUJANO,

DENNING, GIBSON, COUNTY, CAVALLERO, GOINS, TILLY and DOES 6-10 acting in

concert/conspiracy, as described above, and with threat, intimidation, and/or coercion, violated

Plaintiff's and Decedent's rights under California Civil Code § 52.1 and the following clearly

established rights under the United States Constitution and California Constitution and law:

> a.   Decedent's right to be free from an unreasonable ongoing seizure as a pretrial
> detainee, as secured by the Fourth and Fourteenth Amendments to the United
> States Constitution and the California Constitution, Article 1, Sections 7 and 13;

> b.   Decedent's right to be free from deliberate indifference to RAMIREZ's serious
> medical needs while in custody as a pretrial detainee, as secured by the
> Fourteenth Amendment to the United States Constitution and the California
> Constitution, Article 1, Section 7;

> c.   Decedent's rights and liberty interests, as an incapacitated criminal defendant, to
> freedom from incarceration and to timely, restorative treatment, as secured by
> the Fourteenth Amendment to the United States Constitution and the California
> Constitution, Article 1, Section 7;

> d.   Plaintiff's right to be free from wrongful government interference with familial
> relationships and Plaintiffs' right to companionship, society, and support of each
> other, as secured by the First and Fourteenth Amendments;

e. The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, Section 1;

f. The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43; and

g. Decedent's right to medical care as required by California Government Code § 845.6.

149. Separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of Plaintiff's and Decedent's rights, Defendants violated Plaintiff's and Decedent's rights by the following conduct, among other conduct, constituting threat, intimidation, or coercion:

a. Intentionally and with deliberate indifference, depriving and/or preventing RAMIREZ from receiving necessary, life-saving medical and/or psychiatric care and treatment;

b. Intentionally and with deliberate indifference, ordering and/or continuing RAMIREZ's punitive housing in a segregated and/or disciplinary cell, under conditions of solitary confinement for long stretches of time, without necessary, life-saving medical and/or psychiatric care and treatment;

c. Continuing RAMIREZ's incarceration after Court Orders requiring his transfer and treatment in an appropriate medical/psychiatric facility, with deliberate indifference to his serious psychiatric and medical needs, and while RAMIREZ was powerless to provide for such needs himself;

d. Intentionally and with deliberate indifference, causing RAMIREZ to languish in jail without necessary medical/psychiatric/pharmacological care, or even the required treatment plan, when he was obviously unable to care for his own needs, and after a court had determined he was unable to care for his own needs and was a serious threat to himself;

e. Intentionally and with deliberate indifference, doing and/or permitting subparagraphs (a) – (d) when it was also obvious that in doing so, Decedent's life was likely to end needlessly, and Plaintiff's rights as Decedent's mother also would be violated.

150. To the extent this claim is based on a violation of Decedent's rights, it is asserted as a survival claim. To the extent that the violations of rights were done to Plaintiff

ATAYDE, it is asserted as a wrongful death claim. To the extent the violations were done to both Decedent and Plaintiff, it is asserted as both survival and wrongful death.

151.    Defendant COUNTY is vicariously liable pursuant to Cal. Gov. Code section 815.2.

152.    As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Plaintiff's and Decedent's rights under the United States and California Constitutions and law, Plaintiff sustained injuries and damages, and against each Defendant named in this County is entitled to relief as set forth above, in ¶¶ 125-126, and punitive damages against all individual Defendants, including all damages and penalties allowed by California Civil Code §§ 52 and 52.1 and California law, three times actual damages, and attorneys' fees.

**FOURTH CAUSE OF ACTION**
**(VIOLATION OF ADA (Title II and III) and REHABILITATION ACT)**
**(42 U.S.C. § 12132 &29 U.S.C. § 794)**
**PLAINTIFF AGAINST DEFENDANTS**
**<u>COUNTY OF MERCED, STATE OF CALIFORNIA, NAPA STATE HOSPITAL</u>**
**<u>and CFMG</u>**

153.    Plaintiff re-alleges and incorporates by reference the allegations contained in this complaint, as though fully set forth herein.

154.    At all material times, including, but not limited to prior to – and between – August 24, 2014 and December 15, 2014, RAMIREZ was a "qualified individual" with a mental illness and disability and medical impairments that limited and/or substantially limited his ability to care for himself and control his mental, medical, or physical health condition as defined under the ADA, 42 U.S.C. § 12131 (2), and under Section 504 of the Rehabilitation Act ("RA") of 1973, 29 U.S.C. § 794, 28 C.F.R. 42.540 (k); as such, RAMIREZ qualified as an individual with a mental and physical disability under California law and RAMIREZ met the essential eligibility requirements of STATE and COUNTY programs to provide access to medical and mental health care services for its detainee/inmate patients in COUNTY's jails

while they are in custody.

155.    Defendants STATE, NSH, CFMG, and COUNTY's jail and mental health services are places of public accommodation and are covered entities for purposes of enforcement of the ADA, 42 U.S.C. §12181 (7)(F), and the Rehabilitation Act, 29 U.S.C. § 794, as explicated by the regulations promulgated under each of these laws. Further, on information and belief, Defendant STATE and Defendant COUNTY and its jail receive federal assistance and funds.

156.    Defendant STATE's NAPA STATE HOSPITAL and Defendant COUNTY's Jail, as a state, local government, and/or department or agency thereof, both fall within the definition of "program or activity" covered by the Rehabilitation Act, 29 U.S.C. Section 794(b). STATE and COUNTY are also within the mandate of the RA that no person with a disability may be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794.

157.    Under the ADA, Defendants STATE, COUNTY, and CFMG are mandated to "develop an effective, integrated, comprehensive system for the delivery of all services to persons with mental disabilities and developmental disabilities . . . " and to ensure "that the personal and civil rights" of persons who are receiving services under its aegis are protected.

158.    Congress enacted the ADA upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101 (a)(2).

159.    Defendants STATE, COUNTY, and CFMG are mandated under the ADA not to discriminate against any qualified individual "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182 (a).

160.    The ADA, 42 U.S.C. § 12182(b)(1)(A)(iii), provides in pertinent part that: "[i]t shall be discriminatory to afford an individual or class of individuals, on the basis of a

disability or disabilities of such individual or class, directly, or through contractual licensing, or other arrangements, with a good, service, facility, privilege, advantage, or accommodation *that is different or separate* from that provided to other individuals." *Id*. (emphasis added).

161.    Defendants STATE, COUNTY, and CFMG violated the ADA, RA, and discriminated against MR. RAMIREZ and Plaintiff, violating their ADA, RA, and state protected rights by: (a) creating and maintaining a number of programs and services to protect the mentally disabled that operate in conjunction with STATE's designated mental health hospitals such as NSH and facilities for persons who qualify under Penal Code § 1370 (a)(2) or Welfare and Institutions Code 5150; (b) failing to provide services or to accommodate RAMIREZ with access to the programs and services of NSH or State designated mental health hospitals and facilities for persons who qualify for access and services under Penal Code § 1370 (a)(2) or Welfare and Institutions Code 5150; (c) failing to provide services or accommodate MR. RAMIREZ as indicated and with appropriate classification, housing, and monitoring for a person in their sole and exclusive custody who they knew was mentally disabled, at risk for suicide, and was found by the Superior Court to be mentally incompetent; (d) failing to provide reasonable accommodations to people in custody with mental disabilities at their hospitals, clinics, and jails and, instead, providing a quality of care and service that is different, separate, inferior, and worse than the service provided to other individuals with the same disabilities; (e) denying MR. RAMIREZ, a qualified individual with a disability, the opportunity to participate in or benefit from the aid, benefit, or services of the STATE and COUNTY, in violation of 28 C.F.R. § 35.130(b)(1)(i); (f) by reason of Plaintiff's mental disabilities, Defendants did not afford Plaintiff an opportunity to participate in or benefit from the aid, benefits, and services that are equal to those afforded to other, non-disabled individuals by Defendants, in violation of 28 C.F.R. § 35.130(b)(1)(ii); (g) on the basis of Plaintiff's disability, the named Defendants failed to provide Plaintiff an aid, benefit, or service that was as effective in affording equal opportunity to obtain the same result, to gain the same benefit, and to reach the same level of achievement as provided to other individuals in the same

situation, in violation of 28 C.F.R. §35.130(b)(1)(iii); (g) limited MR. RAMIREZ, a qualified individual with a disability, in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving the aid, benefit, or service of which MR. RAMIREZ was denied, in violation of 28 C.F.R. §35.130(b)(1)(vii).

162.    MR. RAMIREZ was denied the benefits of the services, programs, and activities of the STATE and COUNTY, and was denied accommodation for his disabilities, which deprived him of safety, necessary care, and mental health and medical health programs and services, which would have provided planning and delivery of treatment, follow-up, and supervision. This denial of accommodation, programs, and services was the result of his disability in that he was discriminated against because he was mentally ill, at risk for suicide, and gravely disabled, in that he suffered from conditions in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter and is unable to advocate for himself; and, RAMIREZ had mental impairments that substantially limited one or more of his major life activities.

163.    As a result of the acts and misconduct of the Defendants STATE, COUNTY, and CFMG complained of herein, Plaintiff RAMIREZ died, and Plaintiff has suffered, is now suffering, and will continue to suffer damages and injuries as alleged above.  Plaintiff LUCY ATAYDE has suffered loss of love and society and claims damages for the wrongful death of her adult son in an amount not yet ascertained, but to be proven. Plaintiff sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees as set forth in the ADA and RA and above, in ¶¶ 135-137.

**FIFTH CAUSE OF ACTION**
**(VIOLATION OF CALIFORNIA GOVERNMENT CODE § 845.6)**
**PLAINTIFF AGAINST DEFENDANTS WHITE,STATE/NSH, COUNTY, GOINS,**
**TILLY and DOES 6-10**

164.    Plaintiff re-alleges and incorporates by reference the allegations contained in this complaint, as though fully set forth herein.

165.    DEFENDANTS WHITE, STATE/NSH, COUNTY, GOINS, TILLY, and DOES

6-10 knew or had reason to know that RICHARD MICHAEL RAMIREZ was in need of immediate and a higher level medical and psychiatric care, treatment, and observation and monitoring, that he required special housing and security – including being placed on suicide watch and on suicide precautions – for his own safety and well-being, and each Defendant failed to take reasonable action to summon and/or to provide him access to such medical care and treatment and/or provide him housing accommodations necessary for him under such circumstances. Each such individual Defendant, employed by and acting within the course and scope of his or her employment with Defendant COUNTY, NSH, and/or STATE, knowing and/or having reasons to know this, failed to take reasonable action to summon and/or provide RAMIREZ access to such care, treatment, and medically appropriate housing in violation of California Government Code § 845.6.

166.    As a proximate cause of the aforementioned acts and omissions of – and attributable under Government Code sections 845.6 and 815.2 to – all Defendants, Plaintiff was injured as set forth above and is entitled to all damages allowable under California law. Plaintiff sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees as set forth above, in ¶¶ 125-126 and 135-137.

### SIXTH CAUSE OF ACTION
### (NEGLIGENCE)
### PLAINTIFF AGAINST DEFENDANT CAVALLERO, GOINS, TILLY, DOES 6-10 AND COUNTY

167.    Plaintiff re-alleges and incorporates by reference the allegations contained in this complaint, as though fully set forth herein.

168.    At all material times, Defendants CAVALLERO, GOINS, TILLY, DOES 6-10, and COUNTY owed MR. RAMIREZ the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

169.    At all material times, each Defendant owed MR. RAMIREZ the duty to act with reasonable care.

170.    These general duties of reasonable care and due care owed to MR. RAMIREZ

by all Defendants include, but are not limited, to the following specific obligations:

    a.  To provide, or have provided, prompt and timely access to court ordered restorative treatment, including transportation and admission to NSH for RICHARD RAMIREZ;

    b.  To provide safe and appropriate jail custody for RICHARD RAMIREZ, including reasonable classification, monitoring, and housing, including placing him on suicide watch with proper suicide precautions, and preventing access to physical conditions and items that could foreseeably be used for suicide;

    c.  To obey and execute the Order of the Superior Court, issued on October 17, 2014, which ordered MR. RAMIREZ to be committed to the trial competency program at Napa, pursuant to Penal Code section 1370.1;

    d.  To obey and execute the Order and Commitment of Person Determined to be Mentally Incompetent Under the Provisions of Section 1370 of the California Penal Code in Case No. CRL012151, issued on October 24, 2014, which "ORDERED AND DECREED that the Sheriff of Merced County take, convey and deliver the said RICHARD MICHAEL RAMIREZ to the custody of Napa State Hospital, or other appropriate facility, to be held and confined therein as a mentally incompetent person as hereinabove determined …";

    e.  To obey Court Orders for the care and safety of inmates, such as RICHARD RAMIREZ;

    f.  To summon necessary and appropriate medical care for MR. RAMIREZ;

    g.  To use generally accepted law enforcement and jail procedures that are reasonable and appropriate for Plaintiff's status as a mentally ill and/or emotionally disturbed person;

    h.  To refrain from abusing their authority granted to them by law; and,

    i.  To refrain from violating Plaintiffs' rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

171. By the acts and omissions set forth more fully in the paragraphs above, Defendants acted negligently and breached their duty of due care owed to MR. RAMIREZ, which foreseeably resulted in the suffering of damages by MR. RAMIREZ and Plaintiff.

172. Defendants, through their acts and omissions, breached the aforementioned duties owed to MR. RAMIREZ and Plaintiff.

173.    Defendant COUNTY is vicariously liable pursuant to California Government Code section 815.2.

174.    As a proximate result of Defendants' negligence, Plaintiff sustained injuries and damages, and against each listed Defendant in this Count is entitled to the relief described above, in ¶¶ 135-137. Plaintiff also seeks punitive damages against such individual Defendants in their individual capacities. Plaintiff does not seek punitive damages against the municipal Defendants.

## SEVENTHCAUSE OF ACTION
### (NEGLIGENCE *PER SE*)
### PLAINTIFF AGAINST DEFENDANT CAVALLERO, GOINS, TILLY, DOES 6-10 AND COUNTY

175.    Plaintiff re-alleges and incorporates by reference the allegations contained in this complaint, as though fully set forth herein.

176.    On September 26, 2014, the Hon. Judge Harry L. Jacobs adopted the findings and recommendations made in the ordered evaluation by Dr. Hamm, which included the finding and conclusion in his September 22, 2014 report that "**Mr. Ramirez is a danger to himself**, and/or others." On October 24, 2014, the Court "**ORDERED AND DECREED that the Sheriff of Merced County take, convey and deliver the said RICHARD MICHAEL RAMIREZ to the custody of Napa State Hospital**, **or other appropriate facility**, **to be held and confined therein as a mentally incompetent person as hereinabove determined**…" (Ex. A.).

177.    Defendants violated the above-referenced Court Order because MR. RAMIREZ was not transported and, consequently, Defendants' violation of the order foreseeably led to MR. RAMIREZ's unnecessary death. As such, liability under the doctrine of negligence *per se* attaches.

178.    Defendants' disregard for the above-referenced judicial finding and the Court Order was a substantial factor in bringing about the harm Plaintiff suffered, including, but not limited to, the wrongful death of RICHARD MICHAEL RAMIREZ.

179.    Defendant COUNTY is vicariously liable pursuant to California Government Code section 815.2.

180.    As a proximate result of Defendants' negligence *per se*, Plaintiff sustained injuries and damages, and against each Defendant named in this Count is entitled to the relief described above, in ¶¶ 135-137.  Plaintiff also seeks punitive damages against such individual Defendants in their individual capacities.  Plaintiff does not seek punitive damages against the municipal Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief against each and every Defendant herein, jointly and severally:

1.    Compensatory damages in an amount according to proof, which is fair, just, and reasonable;

2.    Punitive damages under 42 U.S.C. § 1983, federal law, and California law, in an amount according to proof and which is fair, just, and reasonable against all Defendants except the municipal Defendants;

3.    All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; the ADA; the RA; California Civil Code §§ 52 et seq., 52.1; and as otherwise may be allowed by California and/or federal law;

4.    For such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby respectfully demands a jury trial in this action, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: June 11, 2019                    **HADDAD & SHERWIN LLP**
                                        **-and-**

                                        **LAW OFFICE OF SANJAY S. SCHMIDT**

                                        */s/ Michael J. Haddad*
                                        MICHAEL J. HADDAD
                                        Attorneys for Plaintiff

1

**EXHIBIT A:**
Order and Commitment of Person Determined to be Mentally Incompetent
Under the Provisions of Section 1370 of the California Penal Code
in Case No. CRL012151

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  LARRY D. MORSE, II
    District Attorney
2  2222 "M" Street
    Merced, CA 95340
3  (209) 385-7381

FILED
MERCED COUNTY

2014 OCT 24  AM 8: 29

CLERK OF THE SUPERIOR COURT

BY _____ DEPUTY

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF MERCED

PEOPLE OF THE STATE OF CALIFORNIA, )  No.  CRL012151
                              )
           Plaintiff,   )  ORDER AND COMMITMENT OF
                              )  PERSON DETERMINED TO BE
      vs.            )  MENTALLY INCOMPETENT
                              )  UNDER THE PROVISIONS OF
RICHARD MICHAEL RAMIREZ,   )  SECTION 1370 OF THE
                              )  CALIFORNIA PENAL CODE
          Defendant.  )
_____ )

A Criminal Complaint having been filed in the Merced County Superior Court against the above-named defendant, **RICHARD MICHAEL RAMIREZ**, charging defendant in Case Number **CRL012151** with a violation of Section 664/187(a) of the California Penal Code, Attempted, Willful, Deliberate and Premeditated Murder, a felony, with an enhancement pursuant to Section 12022.7(a) of the California Penal Code, Inflicting Great Bodily Injury; and an enhancement pursuant to Section 12022(b)(1) of the California Penal Code, Use of a Deadly Weapon; and with a violation of Section 203 of the California Penal Code, Mayhem, a felony, with an enhancement pursuant to Section 12022.7(a) of the California Penal Code, Inflicting Great Bodily Injury; and an enhancement pursuant to Section 12022(b)(1) of the California Penal Code, Use of a *Deadly*

This e-copy is the official court record (GC68150).

This e-copy is the official court record (GC68150).

1  Weapon; and with a violation of Section 245(a)(1) of the California

2  Penal Code, Assault with a Deadly Weapon, a felony, with an enhancement

3  pursuant to Section 12022.7(a) of the California Penal Code, Inflicting

4  Great Bodily Injury; and a violation of Section 245(a)(1) of the

5  California Penal Code, Assault with a Deadly Weapon, a felony, with an

6  enhancement pursuant to Section 12022.7(a) of the California Penal Code,

7  Inflicting Great Bodily Injury; and a doubt having arisen in the Court's

8  mind as to the present mental competence of the defendant, proceedings

9  were suspended to enable examination into the mental competence of this

10 said defendant in accordance with the provisions of section 1368 of the

11 California Penal Code.

12     The matter came on for a hearing on the 17th day of October,

13 2014, before the court without a jury, and the matter was submitted upon

14 the receipt of report from Dr. Phillip Hamm, Ph.D., with a

15 recommendation from the Central Valley Conditional Release Program.

16     The court having considered the reports, finds that the

17 defendant is presently mentally incompetent to such a degree that he is

18 unable to appreciate the nature of the charges against him and the legal

19 proceedings and is unable to assist his counsel in the preparation and

20 presentation of his defense.

21     IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that **RICHARD**

22 **MICHAEL RAMIREZ** is presently mentally incompetent within the

23 contemplation of Section 1367 of the California Penal Code, and it is

24 ordered that he be committed to and confined to Napa State Hospital, or

25 other appropriate facility, pursuant to Section 1370(a)(2) of the

26 California Penal Code, for a maximum period not to exceed three years.

27     The Court, having heard and determined the defendant lacks the

28 capacity to make decisions regarding antipsychotic medication, that the

This e-copy is the official court record (GC68150).

1   defendant's   mental   disorder   requires   medical   treatment   with
2   antipsychotic medication, and that if the defendant's mental disorder is
3   not treated with antipsychotic medication, it is probable that serious
4   harm to the physical or mental health of the patient will result.

5        IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the state
6   hospital treatment facility is authorized to involuntarily administer
7   antipsychotic medication to the defendant when and as prescribed by the
8   defendant's treating psychiatrist.

9        IT IS FURTHER ORDERED AND DECREED that the Sheriff of Merced
10  County take, convey and deliver the said **RICHARD MICHAEL RAMIREZ** to the
11  custody of Napa State Hospital, or other appropriate facility, to be
12  held and confined therein as a mentally incompetent person as
13  hereinabove determined, and upon it being determined that he has
14  recovered his mental competence, he shall be redelivered to the Sheriff
15  of Merced County, without delay, and without further order, and brought
16  before this court for further proceedings against the said **RICHARD**
17  **MICHAEL RAMIREZ.**

18

19  DATED: _____ **OCT 2 4 2014** _____

20                              JUDGE OF THE SUPERIOR COURT

21

22

23

24

25

26

27

28

3