1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LUCY ATAYDE, individually and as            No.  1:16-cv-00398-DAD-SAB
     successor in interest of decedent
12   RICHARD MICHAEL RAMIREZ,

13                 Plaintiff,                     ORDER GRANTING IN PART AND
                                                 DENYING IN PART DEFENDANTS'
14        v.                                     MOTION FOR SUMMARY JUDGMENT

15   NAPA STATE HOSPITAL, et al.,                (Doc. No. 194)

16                 Defendants.

17

18

19        Before the court is the motion for summary judgment filed by defendants Napa State

20   Hospital ("NSH"), Dolly Matteucci, Cindy Black, Dana White, Diana Mond, and Patricia Tyler

21   (collectively "state defendants") on May 1, 2020. [1]  (Doc. No. 194.)  Pursuant to General Order

22

23   [1]  The undersigned apologizes for the excessive delay in the issuance of this order.  This court's
     overwhelming caseload has been well publicized and the long-standing lack of judicial resources
24   in this district long-ago reached crisis proportion.  That situation has now been partially addressed
     by the U.S. Senate's confirmation of a district judge for one of this court's vacancies on
25   December 17, 2021.  Nonetheless, for over twenty-two months the undersigned was left presiding
     over approximately 1,300 civil cases and criminal matters involving 735 defendants.  That
26   situation resulted in the court not being able to issue orders in submitted civil matters within an
     acceptable period of time, even now as the undersigned continues to work on the predictable
27   backlog.  This has been frustrating to the court, which fully realizes how incredibly frustrating it
     is to the parties and their counsel.
28

                                                   1

No. 617 addressing the public health emergency posed by the COVID-19 pandemic, defendants' motion was taken under submission on the papers.  (Doc. No. 195.)  For the reasons explained below, the court will grant in part and deny in part defendants' motion for summary judgment.

### BACKGROUND

This action arises out of Richard Ramirez's (the "decedent") suicide on December 15, 2014 in the Merced County Jail, where he was awaiting transfer to a state psychiatric hospital after being found incompetent to stand trial on criminal charges brought against him in the Merced County Superior Court.

On January 5, 2016, plaintiff Lucy Atayde—the decedent's mother—filed suit in the U.S. District Court for the Northern District of California against defendants.  (Doc. No. 1.)  On March 21, 2016, the case was transferred to this district.  (Doc. No. 40.)  On September 16, 2016, this court granted the state defendants' motion to dismiss.  (Doc. No. 63.)  On May 25, 2017, the court granted in part and denied in part the state defendants' second motion to dismiss.  (Doc. No. 98.)  Subsequently, pursuant to stipulations of the parties, the court terminated Tom Cavallero, Jason Goins, Clifford Tilly, Taylor Fithian, Heather Goode, Sean Ryan, Deborah Mandujano, Amanda Gibson, Dorina Denning, California Forensic Medical Group Inc., and the County of Merced as defendants in this action.  (Doc. Nos. 233, 235.)  The case now proceeds on plaintiff's Second Amended Complaint ("SAC"), filed June 11, 2019.  (Doc. No. 148.)

With respect to the state defendants, plaintiff asserts the following causes of action in her SAC:  (1) claims under 42 U.S.C. § 1983 against defendants Matteucci, White, Tyler, Black, and Mond for violation of decedent's Fourth and Fourteenth Amendment rights to be free from an unreasonable ongoing seizure as a pretrial detainee and for violation of decedent's Fourteenth Amendment substantive due process rights by subjecting him to delay and denial of access to medical care; (2) claims under § 1983 against defendants Matteucci and Tyler for supervisory and municipal liability; (3) claims under the California Bane Act, California Civil Code § 52.1, against defendants Matteucci, Tyler, Black, Mond, and White; (4) claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("RA") against defendant

/////

1    NSH; and (5) claims under California Government Code § 845.6 against defendants White and

2    NSH.[2]  (SAC at 39–55.)

3         The factual background that follows is derived from the joint statement of undisputed

4    facts filed by defendants.  (Doc. No. 226 ("JUF").)  The facts below are undisputed unless

5    otherwise noted.  The decedent was arrested on August 23, 2014, and booked into Merced

6    County's John Latoracca Correctional Center.  (*Id.* at 16.)  The decedent had been diagnosed as

7    being schizophrenic and had a history of multiple suicide attempts and self-injurious actions

8    while previously jailed.  (*Id.*)  On August 29, 2014, the Merced County Superior Court questioned

9    the decedent's competence to stand trial, suspended the criminal proceedings against him, and

10   ordered an "alienist" psychological evaluation of the decedent by psychologist Phillip Hamm

11   pursuant to California Penal Code § 1368.  (*Id.* at 18.)  On September 6, 2014, the decedent

12   attempted suicide for the first of several times during his detention at the jail by choking himself

13   with his hands and then repeatedly tying his shirt tightly around his neck.  (*Id.* at 19.)  Decedent

14   was subsequently placed in a jail "safety cell" for three days.  (*Id.*)[3]  On September 15, 2014, Dr.

15   Hamm conducted the alienist psychological evaluation on decedent and found him to be

16   psychotic and as posing a danger to himself.  (*Id.* at 19–20.)  On September 26, 2014, the Merced

17   County Superior Court declared decedent incompetent to stand trial ("IST") and ordered the

18   Department of State Hospitals' Conditional Release Program ("CONREP") to issue a

19   recommendation for his placement.  (*Id.* at 20–21.)  On October 3, 2014, the CONREP program

20   faxed Dr. Hamm's report, along with a referral for direct admission pursuant to California Penal

21   Code § 1370, to defendant Dana White, NSH's direct admissions coordinator.  (*Id.* at 21.)

22        California Penal Code § 1370 provides that IST criminal defendants shall be committed to

23   a Department of State Hospitals ("DSH") facility "or to any other available public or private

24   treatment facility, including a community-based residential treatment system" so long as the

25   _____

26   [2]  Plaintiff has agreed to dismiss her claims brought pursuant to California Government Code
     § 845.6.  (Doc. No. 212 at 34.)

27
     [3]  The decedent attempted suicide multiple additional times between September 9, 2014 and his
28   death on December 15, 2014.  (*See generally* JUF.)

1   facility has a secured perimeter or is a locked and controlled facility.  (*Id.* at 23–24.)  The statute

2   specifically provides that the IST defendant shall be assigned to a facility "approved by the

3   community program director that will promote the defendant's speedy restoration to mental

4   competence."  (*Id.* at 24.)  Despite the statute, DSH has never allowed the community program

5   director for CONREP's services to refer an IST patient to any locked acute psychiatric care,

6   skilled nursing, or immediate care facilities.  (*Id.*)  Instead, DSH has instructed that CONREP

7   only recommend that IST criminal defendants be referred to NSH, which is the closest state

8   hospital to the CONREP headquarters in Sacramento.  (*Id.*)

9         Defendant Matteucci served as the NSH executive director from February 2010 until

10   March 2018.  (*Id.* at 30.)  In that role, she was the highest-ranking California official working at

11   NSH and was responsible for the admission of IST patients to NSH.  (*Id.*)  Defendants Tyler and

12   Black reported directly to defendant Matteucci.  (*Id.*)  Defendant Mond was the admissions

13   supervisor at NSH from 1994 until 2015, and the "Admissions Suite" that she supervised

14   collected the packets of medical and court records for IST patients before reviewing those records

15   to determine which NSH program was appropriate for a patient's needs.  (*Id.* at 31.)  In her role as

16   the direct admissions coordinator for NSH, defendant White did the initial review of IST

17   admissions packets, looking for any history of escape, violence, sex offender status, or specific

18   medical need, so that the patient in question could be placed with the appropriate state hospital.

19   (*Id.* at 32.)

20         On October 9, 2014, defendant White sent a letter to the DSH CONREP community

21   program director Rhonda Love stating, "As a result of his low security rating Richard Ramirez

22   has been deemed appropriate for admission to Napa State Hospital."  (*Id.* at 22.)  The decedent

23   was placed on a long waiting list upon which he was patient number 6007.  (*Id.*)  On October 17,

24   2014, the Merced County Superior Court issued a minute order requiring that the decedent be

25   committed for competency restoration at NSH and that he receive involuntary antipsychotic

26   medication.  (*Id.* at 28.)  Neither party disputes that DSH received this order from the Superior

27   Court.  (*Id.*)  Thereafter, on October 24, 2014, the Merced County Superior Court issued another

28   order, reiterating that decedent was incompetent to stand trial and ordering that he be committed

4

to and confined at NSH or another appropriate facility pursuant to § 1370(a)(2) of the California Penal Code.  (*Id.* at 33.)

Despite these court orders, the decedent could not be admitted on a priority basis unless he was found to be acutely psychotic.  (*Id.* at 42.)  Psychiatric acuity occurs when a person is currently at risk of serious injury or death from self-harm due to their mental illness.  (*Id.* at 46.)  NSH conducted no systematic pre-admission acuity review for IST patients, so a defendant would only receive an acuity review on specific request from the jail where they were being held.  (*Id.* at 41.)  Without decedent being found acutely psychotic, NSH did not plan to admit him until February or March 2015, an expected delay of four to five months due to the wait list for new patients.  (*Id.* at 47.)  The decedent did not receive an acuity review, and therefore he could not be officially found to be acutely psychotic, even if he otherwise exhibited all of the symptoms required to meet that designation.  (*Id.* at 46.)

For the next two months the decedent continued to engage in self-harm and undertook multiple suicide attempts.  (*Id.* at 52.)  Moreover, he reported auditory hallucinations and told multiple jail officials that his suicide attempts were meant to make him feel better.  (*Id.*)  On December 14, 2014, the decedent was placed in restraints, belly chains, and leg shackles after he became agitated.  (*Id.* at 52.)  The next day, on December 15, 2014, after nearly four months in jail and two months after he had been ordered committed to NSH, the decedent took his own life by using a sweatshirt to hang himself in his segregation cell.  (*Id.* at 54.)  The parties do not dispute that it is highly probable that a priority admission to NSH would have prevented decedent's death.  (*Id.* at 65.)

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial, as plaintiff does here, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The opposing party also must demonstrate

1   the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for

2   the non-moving party.  *See Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs. Inc.*, 818 F.2d

3   1433, 1436 (9th Cir. 1987).

4         In the endeavor to establish the existence of a factual dispute, the opposing party need not

5   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

6   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

7   trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

8   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

9   *Matsushita*, 475 U.S. at 587 (citations omitted).

10         "In evaluating the evidence to determine whether there is a genuine issue of fact," the

11   court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v.*

12   *Cent. Contra Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing

13   party's obligation to produce a factual predicate from which the inference may be drawn.  *See*

14   *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d

15   898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do

16   more than simply show that there is some metaphysical doubt as to the material facts . . . [w]here

17   the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

18   there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

19   **DISCUSSION**

20         Because plaintiff brings claims pursuant to 42 U.S.C. § 1983, the ADA and RA, and the

21   Bane Act, the court will address these three types of claims in turn below.

22   **A.      Claims Under 42 U.S.C. § 1983**

23         Plaintiff contends that the state defendants are liable under 42 U.S.C. § 1983 for two

24   reasons.  First, plaintiff asserts that the state defendants' actions and failures to act caused

25   violations of decedent's established rights to timely restorative treatment and freedom from

26   incarceration after being declared incompetent to stand trial.  (Doc. No. 212 at 11.)  Second,

27   plaintiff asserts that the state defendants were deliberately indifferent to decedent's serious

28   psychiatric and medical needs.  (*Id.*)  For the sake of clarity, the court addresses these two forms

of liability below as the "Deliberate Indifference Claims" and the "Failure to Provide Timely Restorative Treatment Claims."

In addition, although somewhat unclear, plaintiff appears to assert that the state defendants are liable under six other theories of liability, which encompass both plaintiff's deliberate indifference claims and failure to provide timely restorative treatment claims. (Doc. No. 212 at 13.) Those theories of liability are as follows:

1) Failing to open more NSH beds for IST patients by shortening the average length of commitment through community treatment after the patient has been stabilized at NSH;

2) Failing to provide a pre-admission acuity review for each IST patient ordered to NSH;

3) Failing to systematically inform courts, counties, jails, district attorneys' offices, [or] criminal defense counsel that they could request an acuity review for any patient-inmate who needed priority admission to NSH, and failing to systematically inform these stakeholders of the length of the waiting list and expected months-long delay in admission for the patient inmate;

4) Failing to require Ms. White and the Admissions Suite to inform Dr. Tyler and/or NSH whenever it was apparent from medical records, or otherwise, that an IST patient may be at risk of serious harm or death in jail due to mental illness while awaiting admission to NSH;

5) Treating pretrial detainees worse than convicted prisoners, when the Defendants triage all convicted prisoners and admit psychiatrically acute prisoners within ten days; and

6) Ignoring commitment orders for months, resulting in nearly 8,500 contempt Orders to Show Cause throughout California in just over five years, at significant financial cost to the State.

(Doc. No. 212 at 13–14.)

1.    Deliberate Indifference Claim

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. 14 § 1. Fourteenth Amendment protections cover a procedural as well as a substantive sphere, such that they bar certain government actions regardless of the fairness of the procedures used to implement them. *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998). Here, because the decedent was a pretrial detainee at the time of the incidents at issue, his right to be free from cruel and unusual

8

1   punishment is derived from the due process clause of the Fourteenth Amendment rather than the

2   Eighth Amendment.  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Castro v. County of Los Angeles*,

3   833 F.3d 1060, 1067–68 (9th Cir. 2016), *cert. denied sub nom. Los Angeles County, California v.*

4   *Castro*, ___ U.S. ___, 137 S. Ct. 831 (2017).  The duty to protect detainees from suicide is

5   grounded in the substantive liberty interest to adequate medical care.  *See Simmons v. Navajo*

6   *County, Ariz.*, 609 F.3d 1011, 1018 (9th Cir. 2010); *Johnson v. Meltzer*, 134 F.3d 1393, 1397 (9th

7   Cir. 1998); *Schwartz v. Lassen Cnty. ex rel. Lassen Cnty. Jail (Detention Facility)*, 838 F. Supp.

8   2d 1045, 1052 (E.D. Cal. 2012).  In particular, "'persons in custody ha[ve] the established right to

9   not have officials remain deliberately indifferent to their serious medical needs.'"  *Gibson v.*

10  *County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (quoting *Carnell v. Grim*, 74 F.3d 977,

11  979 (9th Cir. 1996)), *overruled on other grounds by Castro*, 833 F.3d at 1076.

12          To succeed on a deliberate indifference to serious medical need claim, plaintiff must show

13  that (1) the defendant made an intentional decision with respect to the conditions under which the

14  decedent was confined; (2) those conditions put the decedent at substantial risk of suffering

15  serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even

16  though a reasonable officer in the circumstances would have appreciated the high degree of risk

17  involved; and (4) by not taking such measures, the defendant caused the decedent's injuries.

18  *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).  "With respect to the third

19  element, the defendant's conduct must be objectively unreasonable, a test that will necessarily

20  'turn[] on the facts and circumstances of each particular case.'"  *Id.*

21          In particular, deliberate indifference may be shown where prison officials or practitioners

22  "deny, delay, or intentionally interfere with medical treatment."  *Hutchinson v. United States*, 838

23  F.2d 390, 394 (9th Cir. 1988); *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (finding

24  that delays in providing necessary medical care may show deliberate indifference).  However,

25  mere negligence in diagnosing or treating a medical condition, without more, does not constitute

26  deliberate indifference.  *See Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

27          The state defendants assert two primary arguments in support of their motion for summary

28  judgment as it pertains to plaintiff's § 1983 claims for alleged deliberate indifference.  (Doc. No.

9

194 at 10.)  First, defendants argue that plaintiff cannot establish that the individual state defendants violated the decedent's constitutional rights.  (*Id.* at 21.)  Defendants support this first argument by advancing that they never had custody of the decedent, that the decedent was given ongoing medical care at the Merced County Jail, that the state defendants were not aware of the alleged deprivation, that they did not have the ability to expand the capacity at NSH, and that they had no ability to control the conditions of the decedent's confinement in jail or the response to his medical and psychological needs by jail staff.  (*Id.* at 21–23.)  With regard to their argument that they did not have the ability to expand the capacity at NSH, defendants argue that they did "not have the ability to expand capacity because each state hospital had reached its maximum licensing, functional, or statutory capacity."  (*Id.* at 23.)  Specifically, defendants cite the Ninth Circuit's decision in *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (*en banc*), in which the court held that resource availability is highly relevant to a claim seeking damages against prison officials.  (*Id.*)[4]  Defendants also contend that if they had engaged in a triage system to screen patients (which they did not), the decedent would not have been granted priority admission in any event because his healthcare providers did not believe he was in imminent danger.  (*Id.* at 21–26; Doc. No. 225 at 5.)  Second, defendants argue that even if they did violate the decedent's constitutional rights, they are nevertheless entitled to summary judgment in their favor on qualified immunity grounds.  (*Id.* at 27.)[5]

                a.    *Constitutional Violation*

As an initial matter, with respect to defendants' arguments that they did not have custody of the decedent, this court previously rejected those arguments in denying defendants' motion to dismiss.  (Doc. No. 98 at 12) (finding that pursuant to California Penal Code § 1370 "treatment facilities have certain custodial duties under the Fourteenth Amendment with respect to these

---

[4]  The lack of resources defense outlined by the court in *Peralta* is known as the "cost defense," and the court will assess that defense below in light of the evidence presented on summary judgment in this case.  *See Peralta*, 744 F.3d at 1082.

[5]  Because the court concludes that defendants are entitled to summary judgment in their favor on the merits of plaintiff's deliberate indifference claim, it need not address defendants' qualified immunity arguments advanced in connection with that claim.

1   detainees, which attach at the time the state court commitment order is issued.").  Thus, even if

2   defendants did not have physical custody of the decedent, they still maintained custodial duties as

3   to him under the Constitution.

4          Defendants' arguments with regard to their lack of responsibility for the actions of jail

5   staff are similarly unpersuasive.  In support of this argument, defendants assert that "the evidence

6   shows that Mr. Ramirez was given ongoing medical care in the Merced County Jail."  (Doc. No.

7   194 at 23.)  Defendants also contend that there is no evidence on summary judgment that "Mr.

8   Ramirez' mental health condition was not being addressed, or that [] the individual State

9   Defendants were aware of the alleged depravation."  (*Id.* at 23–24.)  Lastly, defendants argue that

10  "Plaintiff has not shown that any of these State Defendants had any ability to control the

11  conditions of Mr. Ramirez's confinement in jail or the response to his medical and psychological

12  needs by the jail staff."  (Doc. No. 225 at 5.)  In sum, defendants argue that the jail staff's

13  treatment of the decedent absolves defendants of any liability.  (*Id.* at 6.)  These arguments are

14  unpersuasive because the Ninth Circuit has previously addressed and rejected nearly identical

15  arguments in *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1115 (9th Cir. 2003).  In *Mink*,

16  the Ninth Circuit upheld an injunction requiring a state hospital in Oregon to admit criminal

17  defendants within seven days of an order of commitment pursuant to the terms of an Oregon

18  statute.  *Id.* at 1122.  Like the Oregon statute at issue in *Mink*, California Penal Code § 1370 "is

19  aimed directly at keeping mentally incompetent defendants out of county jails, not at conferring

20  responsibility on those jails for interim treatment."  *Id.* at 1115.  Accordingly, "it is not the

21  counties but [NSH] that has the duty to accept and treat incapacitated defendants once they have

22  been certified as such by a circuit court."  *Id.* at 1116.  Defendants may not blame the county jails

23  for the decedent's injuries when the state court had ordered NSH to care for the decedent.

24         Nevertheless, the court concludes that defendants are entitled to summary judgment with

25  respect to the so-called "cost defense" they have asserted – a defense recognized by the Ninth

26  Circuit.  *See Peralta*, 744 F.3d at 1082.  In *Peralta*, the Ninth Circuit explained that prison

27  officials must "act wantonly" to meet the standard of deliberate indifference, and whether an

28  official acted wantonly depends on the "constraints" they faced.  *Id.*  Given the serious

11

1   understaffing and particular challenges of providing dental care in prison, the Ninth Circuit in

2   *Peralta* rejected the plaintiff's attempt to hold a prison dentist personally liable for failing to

3   provide care that was impossible to provide under the circumstances.  *Id.*  The court labeled this

4   reasoning a "cost defense."  *Id.*  "In short, [the dentist] was insulated from liability because he

5   responded reasonably given the inadequate funding available from the state."  H. Rutkowski,

6   Note, *Rethinking the Reasonable Response: Safeguarding the Promise of* Kingsley *for Conditions*

7   *of Confinement*, 119 MICH. L. REV. 829, 840 (2021).  As the Ninth Circuit explained in *Peralta*,

8   "[l]ack of resources is not a defense to a claim for prospective relief because prisoner officials

9   may be compelled to expand the pool of existing resources in order to remedy continuing

10  [constitutional] violations;" but "[w]hat resources were available is highly relevant" for a claim of

11  damages, which are retrospective in nature, because that "define[s] the spectrum of choices that

12  officials had at their disposal."  *Peralta*, 744 F.3d. at 1082–83.

13      Plaintiff in this case is seeking damages as opposed to equitable relief in the form of an

14  injunction.  Defendants argue that they did not have the ability or resources to expand capacity for

15  IST referrals at NSH and that they therefore could not have been deliberately indifferent to the

16  decedent's needs.  (Doc. No. 194 at 23.)  The court agrees with defendants that plaintiff has come

17  forward with no evidence on summary judgment suggesting that defendants in fact had such

18  power.  Indeed, the court has considered all six of plaintiff's theories of liability and has

19  determined that none of them are supported by the evidence presented on summary judgment in

20  light of the "cost defense" recognized by the Ninth Circuit in *Peralta*.

21      The district court in *Luong v. Napa State Hospital* considered nearly identical arguments

22  to those presented here and reached this same conclusion with respect to plaintiff's theories of

23  liability asserted in that case.  *See Luong v. Napa State Hospital*, 411 F. Supp. 3d 615 (N.D. Cal.

24  2019) (rejecting plaintiff's theories of liability that were based on the failure to expand capacity,

25  not performing acuity screenings, and failing to notify relevant actors that psychiatric acuity

26  reviews could be requested for IST defendants), *reversed on other grounds by Luong v. Napa*

27  *State Hospital*, 831 Fed. App'x 855 (9th Cir. 2020) (instructing the district court to grant

28  defendants motion for summary judgment on qualified immunity grounds as to all remaining

1    claims).  Accordingly, the undersigned is persuaded that the granting of defendants' motion for

2    summary judgment with respect to plaintiff's deliberate indifference claim is supported by the

3    case.

4           That said, the undersigned observes that this case reflects the significant impact that the

5    "cost defense" recognized by the Ninth Circuit in *Peralta* has upon the ability of prisoners, and in

6    this case their successors, to seek redress for constitutional violations.  The significant nature of

7    that impact comes as no surprise.  In her partial dissent in *Peralta*, Judge Christen observed that

8    the decision in that case

9                    will effectively prevent prisoners from bringing suits for damages
                     against prison officials who have violated their [constitutional] rights
10                   by demonstrating deliberate indifference to serious medical needs
                     [because] those who actually control prison budgets are immune
11                   from damage suits . . . and prison officials responsible for
                     substandard care or conditions will be shielded by the newly-
12                   announced "lack of resources" defense.

13   *Peralta*, 744 F.3d at 1092–93 (Christen, J., dissenting in part and concurring in part).  The dissent

14   went on to explain that, "[t]he concern that holding prison officials personally liable would be

15   unfair overlooks the reality that California indemnifies employees for torts committed within the

16   scope of their employment, and pays the cost of their defense."  *Id.* at 1093.  Additionally, as

17   Judge Hurwitz pointed out in his partial dissent in *Peralta*, "injunctive relief provides no comfort

18   to an inmate who loses a limb because of untreated diabetes.  For such constitutional violations,

19   'it is damages or nothing.'"  *Id.* (Hurwitz, J., dissenting in part and concurring in part) (citing

20   *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 410 (1971)).[6]

21          Indeed, other than their argument that they are entitled to summary judgment based upon

22   that cost defense, the court does not find any of the other arguments advanced by defendants in

23   their pending motion to be persuasive.  (Doc. No. 212 at 14.)  Focusing on the elements of a

24   _____

25   [6]  It has been suggested that the concerns regarding the unfairness of the cost defense could be
     addressed by imposing "an affirmative duty on prisoner officials—such as on-the-ground medical
26   staff—to notify their superiors when they become aware of a risk to detainees due to inadequate
     resources."  Rutkowski, *supra* at 853.  "By rethinking what it means to respond reasonably, courts
27   could improve information sharing in detention facilities, while lessening the threat of *Peralta's*
     cost defense."  *Id.*  Nonetheless, the court is obviously bound by the Ninth Circuit's decision in
28   *Peralta* and defendants' motion in this regard will therefore be granted.

1    deliberate indifference claim, the court highlights the following allegations made by plaintiff,

2    which have been supported by plaintiff's evidence presented on summary judgment.  Defendants

3    were aware of the decedent's condition and made an intentional decision not to admit him to NSH

4    (*see* Doc. No. 226 at 21); that decision exposed plaintiff to a "substantial risk of serious harm"

5    (*id.* at 33, 40); defendants did not take reasonable available measures to abate that risk (*id.* at 50);

6    and, by not taking those measures, defendants caused plaintiff's injuries (*id.* at 54).  These are the

7    elements of a deliberate indifference claim brought by or on behalf of one being held in pretrial

8    detention and plaintiff has both alleged and come forward with evidence in support of those

9    allegations in this case.  *See Gordon*, 888 F.3d at 1125.  In other words, if defendants were not

10   protected by the shield of their cost defense under the Ninth Circuit's holding in *Peralta*, the court

11   would not grant summary judgment in their favor.[7]

12             2.        Failure to Provide Timely Restorative Treatment Claim

13             "Incapacitated criminal defendants have liberty interests in freedom from incarceration

14   and in restorative treatment."  *Mink*, 322 F.3d at 1121; *see generally Bell*, 441 U.S. at 535

15   ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of

16   guilt in accordance with due process of law").  In particular, such persons "must be provided with

17   mental health treatment that gives them a realistic opportunity to be cured or improve the mental

18   condition for which they were confined."  *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000)

19   (citations omitted).  In determining whether the failure to provide timely restorative treatment

20   constitutes a violation of the Fourteenth Amendment, courts must balance the detainee's liberty

21   interests in restorative treatment against the legitimate interests of the state.  *Mink*, 322 F.3d at

22

23   [7]  To be clear, the court does acknowledge that had plaintiff come forward with evidence that the
     named defendants *did* have the resources and ability to aid the decedent in this case, *Peralta* and
24   the cost defense would not be applicable.  As defendants themselves recognize, although resource
     availability is highly relevant to a plaintiff's claim for damages, it is not a complete defense as to
25   liability.  (Doc. No. 194 at 23) (citing *Peralta*, 744 F.3d at 1082–83.)  *Peralta* "involved a
     question of fact for the jury on whether, given the constraints facing [defendant], he had acted
26   wantonly in delaying care to Peralta."  *Id.*  Thus, the decision in *Peralta* "does not offer automatic
     immunity nor an absolute defense to those faced with budgetary constraints."  *Willis v.*
27   *Washington State Dep't of Soc. & Health Servs.*, No. 16-cv-5113-RBL, 2017 WL 4180416, at *3
     (W.D. Wash. Sept. 21, 2017) (citing *Peralta*, 744 F.3d at 1082).

28

1    1121 (citing *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)); *see also Clouthier*, 591 F.3d at

2    1243; *Cunningham v. Kramer*, 178 F. Supp. 3d 999, 1007–08 (E.D. Cal. 2016).  The standard

3    applicable in assessing such a claim is "conscious indifference amounting to gross negligence."

4    *Estate of Conners v. O'Connor*, 846 F.2d 1205, 1208 (9th Cir. 1988).

5          The Ninth Circuit has at least implicitly acknowledged that a state may violate the

6    substantive due process rights of pre-trial detainees if it delays admittance of those detainees to a

7    state hospital for competency evaluation and restorative services following receipt of a court's

8    commitment order.  *See, e.g.*, *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 822

9    F.3d 1037, 1042-46 (9th Cir. 2016) (finding that the Fourteenth Amendment provided the proper

10   framework for evaluating § 1983 claims brought against the Washington State Department of

11   Social and Health Services for delays in the conducting of competency evaluations and the

12   provision of restorative services); *Mink*, 322 F.3d at 1122 (upholding an injunction requiring a

13   state hospital to admit criminal defendants within seven days of the order of commitment, in light

14   of the "significant, ongoing" violations of substantive and procedural due process presented by

15   delayed admittance); *see also Willis v. Washington State Dep't of Soc. & Health Servs.*, No. 16-

16   cv-5113-RBL, 2017 WL 1064390, at *6 (W.D. Wash. Mar. 21, 2017) ("Although *Mink* did not

17   establish a bright line rule, it held that 'weeks or months' was too long where the plaintiffs were

18   detained for an average of one month.  The nature and duration of [plaintiff's] ninety-one day

19   detention . . . bears no reasonable relation to the evaluative and restorative purpose for which he

20   was committed.").

21          In *Mink*, the Ninth Circuit concluded that the holding of IST criminal defendants in jail for

22   weeks or months without transferring them to a state hospital for evaluation, treatment, and

23   restoration of their mental health violated their due process rights.  *Mink*, 322 F.3d at 1122.  The

24   court here concludes that—based on the Ninth Circuit's decision in *Mink*—a jury could

25   reasonably find from the evidence presented on summary judgment that the nearly two months

26   the decedent spent in the Merced County Jail—after the Merced County Superior Court issued an

27   order requiring his commitment at NSH for competency restoration—violated his due process

28   rights to restorative treatment.  Nonetheless, under the doctrine of qualified immunity, even if

1   defendants violated the decedent's rights, defendants cannot be held liable for the individual

2   damages plaintiff seeks.

3                       a.      *Qualified Immunity*

4           Qualified immunity is an affirmative defense that "shield[s] an officer from personal

5   liability when an officer reasonably believes that his or her conduct complies with the law."

6   *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).  The doctrine "protects government officials

7   'from liability for civil damages insofar as their conduct does not violate clearly established

8   statutory or constitutional rights of which a reasonable person would have known.'"  *Id.* at 231

9   (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Mullenix v. Luna*, 577 U.S. 7

10  (2015).  To determine whether officers are entitled to qualified immunity requires a two-step

11  inquiry.  "The threshold inquiry in a qualified immunity analysis is whether the plaintiff's

12  allegations, if true, establish a constitutional violation."  *Wilkins v. City of Oakland*, 350 F.3d 949,

13  954 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "Second, if the plaintiff

14  has satisfied this first step, the court must decide whether the right at issue was 'clearly

15  established' at the time of defendant's alleged misconduct."  *Pearson*, 555 U.S. at 232.  Courts

16  need not analyze the two prongs of the analysis announced in *Saucier* in any particular order.  *Id.*

17  at 236–42.  Here, the court will only address whether the decedent's purported constitutional

18  rights were clearly established, as that analysis is dispositive.

19          "A law is clearly established if 'at the time of the officer's conduct, the law was

20  sufficiently clear that every reasonable official would understand that what he is doing is

21  unlawful.'"  *Villanueva v. California*, 986 F.3d 1158, 1165 (9th Cir. 2021) (quoting *District of

22  Columbia v. Wesby*, __U.S.__,138 S. Ct. 577, 589 (2018)).  "[C]ourts must not 'define clearly

23  established law at a high level of generality, since doing so avoids the crucial question whether

24  the official acted reasonably in the particular circumstances that he or she faced.'"  *Wesby*, 138 S.

25  Ct. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).  "While there does not have

26  to be 'a case directly on point,' existing precedent must place the lawfulness of the [conduct]

27  'beyond debate.'"  *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

28  /////

                                              16

1    The case most relevant in determining whether defendants' actions here were in violation

2    of clearly established law is the Ninth Circuit's decision in *Mink*.  As discussed above, the Ninth

3    Circuit in *Mink* confronted facts quite similar to those presented here.  In *Mink*, an Oregon statute

4    required state courts to commit IST defendants to state hospitals (OSH) and those hospitals were

5    taking too long to admit those defendants, resulting in harm to them.  *Mink*, 322 F.3d at 1115.

6    The Ninth Circuit concluded that those harms "together with OSH's statutory mandate to provide

7    timely restorative treatment, support our conclusion [] that OSH's delay in admitting

8    incapacitated criminal defendants violates their substantive due process rights."  *Id.* at 1120.

9    Moreover, the Ninth Circuit in *Mink* noted that "'[l]ack of funds, staff or facilities cannot justify

10   the State's failure to provide [such persons] with [the] treatment necessary for rehabilitation.'"

11   *Id.* at 1121 (quoting *Ohlinger v. Watson*, 652 F.2d 775, 779 (9th Cir. 1980)).  Consistent with

12   these conclusions, the Ninth Circuit affirmed the injunction issued by the district court, which

13   required admission to OSH within seven days of a state court commitment.  *Id.* at 1123.

14        In arguing that they are entitled to summary judgment in their favor on qualified immunity

15   grounds, defendants contend that the Ninth Circuit's decision in *Mink* did not clearly establish

16   that defendants' alleged actions in this case constituted constitutional violations.  (Doc. No. 194 at

17   28.)  In so arguing, defendants contend that *Mink* involved factual circumstances distinct from

18   those at issue here.  (*Id.*)  Specifically, defendants assert that "[u]nlike Oregon's statute,

19   California's statutory scheme contemplates more options beyond placement in the state hospital

20   system . . ., including programs like CONREP and jail-based competency treatment programs."

21   (Doc. No. 194 at 28.)  Defendants also argue that "*Mink* did not test whether an employee could

22   be held individually accountable for an alleged constitutional violation" because the court in *Mink*

23   addressed a claim for injunctive relief.  (*Id.*)

24        This court will turn first to address the differences between the Oregon statute at issue in

25   *Mink* and California's statutory scheme.  The Oregon statute addressed in *Mink* provided that "the

26   court shall commit the defendant to the custody of the superintendent of a state mental hospital . .

27   .."  *Mink*, 322 F.3d at 1115.  Alternatively, California Penal Code § 1370(a)(1)(B)(i) provides that

28   IST criminal defendants shall be committed to a DSH facility "or to any other available public or

17

private treatment facility, including a community-based residential treatment system." (Doc. No. 213 at 18.)  Thus, the distinction between the two statutes is that, in California, IST defendants can be committed to public or private treatment facilities, whereas in Oregon the options are limited solely to commitment to state mental hospitals.  Despite this distinction, the parties agree that in California DSH has never allowed for an IST patient to be committed to any locked acute psychiatric care, skilled nursing, or immediate care facilities.  (*Id.*)  Instead, IST criminal defendants have always only been referred to NSH.  (*Id.*)  Accordingly, for all intents and purposes, DSH and NSH's duty is triggered whenever a state court determines that it is appropriate to commit an IST defendant in California.  *See Mink*, 322 F.3d 1115.  Defendants essentially argue then that they may disregard their statutory duty, behave in the exact same manner as the OSH did in *Mink*, but nonetheless avoid liability because the California statute allows for non-state hospital placements, a choice that is in fact never made.  Defendants' argument in this regard is not compelling.  "[T]he relevant question under the clearly established prong is whether defendants had notice that their *conduct* was unlawful in the situation they confronted."  *Sandoval v. County of San Diego*, 985 F.3d 657, 676 (9th Cir. 2021) (internal quotation and citation omitted).

Nevertheless, despite the similarities between the applicable state statutes in Oregon and California, the constitutional rights that plaintiff alleges defendants violated here have not been sufficiently established as to overcome qualified immunity.  Relying on the qualified immunity doctrine, the district court in *Luong* concluded that the Ninth Circuit in *Mink* "did not give a concrete time frame" as to "the amount of time that an IST defendant may be kept in jail rather than being transferred to a state hospital."  *Luong*, 411 F. Supp. 3d at 649.  Rather, the Ninth Circuit in *Mink* merely held that "weeks or months" was too long to hold a pretrial IST detainee in jail.  *Mink*, 322 F.3d at 1121.  Under this vague standard, it is possible that the 52 days the decedent in this case was detained at the Merced County Jail rises to the level of a constitutional violation.  But, the undersigned is simply unable to conclude that the decedent had a constitutional right to be transferred to NSH before 52 days had passed under the federal law that was "clearly established" at the time. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("[T]he

18

1    *Harlow* Court refashioned the qualified immunity doctrine in such a way as to . . . avoid

2    'subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching

3    discovery' in cases where the legal norms the officials are alleged to have violated were not

4    clearly established at the time.").  For example, here the disjunctive canon of statutory

5    interpretation suggests that the Ninth Circuit's use of "or" (as in weeks *or* months) in *Mink*

6    creates a disjunctive list, denoting alternatives.  *See United States v. Woods*, 571 U.S. 31, 45

7    (2013) (finding that "or" in its ordinary use "is almost always disjunctive, that is, the words it

8    connects are to 'be given separate meanings.'").  Without clearer guidance from case law at the

9    time, the named defendants in this case cannot be found to have known exactly where the line lies

10   between committing a constitutional violation and reasonable detainment.  The variability of the

11   delay in transferring committed criminal defendants to state hospitals considered by courts in the

12   past supports this conclusion.  *See, e.g.*, *Luong*, 411 F. Supp. 3d at 649 (concluding that an 81-day

13   detention in county jail without transfer to NSH was not in violation of clearly established law in

14   light of the Ninth Circuit's decision in *Mink*, which did not state with precision what period of

15   delay was impermissible); *Estate of Vargas v. Binnewies*, No. 1:16-cv-01240-DAD-EPG, 2017

16   WL 2289357, at *8 (E.D. Cal. May 25, 2017) (declining to state in ruling on a motion to dismiss

17   whether a thirty-day delay in transfer to NSH was reasonable delay under the circumstances

18   alleged); *Trueblood*, 822 F.3d at 1045 ("The question then remains: what constitutes a reasonable

19   time in which to conduct the evaluations?"); *In re Mille*, 182 Cal. App. 4th 635, 650 (2010)

20   (concluding that delivery of a pretrial detainee to a state mental hospital eighty-four days after the

21   issuance of a commitment order is untimely and unreasonable).  Because a right is not clearly

22   established unless "existing precedent [has] placed the statutory or constitutional question beyond

23   debate," the court must grant summary judgment in favor of the defendants on qualified immunity

24   grounds here.  *See al-Kidd*, 563 U.S. at 741.

25        It is important to note once again, however, that qualified immunity does not apply to

26   claims for injunctive relief.  *See Clement v. California Dept. of Corrections*, 220 F. Supp. 2d

27   1098, 1114 (N.D. Cal. 2002).  Accordingly, the arguments advanced by defendants here would

28   not be applicable to a claim that mirrored the one considered by the Ninth Circuit in *Mink*, where

19

1    only injunctive relief was sought.  As the district court in *Luong* observed, "*Mink* does not

2    address under what circumstances an individual defendant could be held personally liable for

3    damages; it involved injunctive relief." *Luong*, 411 F. Supp. 3d at 639 (citing *Horton v. City of*

4    *Santa Maria*, 915 F.3d 592, 600 (9th Cir. 2019)) ("the qualified immunity inquiry 'must be

5    undertaken in light of the specific context of the case, not as a broad general proposition'" and so

6    it is "critical whether our case law had, at the time of the events in this case, sufficiently clarified

7    when a detainee's imminent risk of suicide was substantial enough to require immediate

8    attention").[8]

9          For the reasons explained above, defendants' motion for summary judgment will be

10   granted as to plaintiff's restorative treatment claim based upon the doctrine of qualified

11   immunity.  This conclusion, compelled under the current state of the law, is yet another example

12   of why the undersigned has often expressed frustration with the doctrine and its current

13   application.[9]

---

14   [8]  The district court in *Luong* also briefly noted that the feasibility of available resources would

15   likely be relevant to establishing damages in the context of a restorative treatment claim. *Luong*,
     411 F. Supp. 3d at 649.  This reasoning would appear to be based upon an application of the

16   Ninth Circuit's holding in *Peralta*.  However, the undersigned has been unable to identify any
     case which applied the same "cost defense" from *Peralta* to a failure to provide timely restorative

17   treatment claim as opposed to a deliberate indifference claim.  Notably, in *Mink* the Ninth Circuit

18   held that "'lack of funds, staff or facilities cannot justify the State's failure to provide [such
     persons] with [the] treatment necessary for rehabilitation.'" 322 F.3d at 1121 (quoting *Ohlinger*

19   *v. Watson*, 652 F.2s 775, 779 (9th Cir. 1980)).  Given this absence of authority, the court does not
     address whether the holding in *Peralta* would apply here absent qualified immunity.

20

21   [9]  In legal circles and beyond, one of the most debated civil rights litigation issues of our time is
     the appropriate scope and application of the qualified immunity doctrine, particularly in cases of

22   deaths resulting from police shootings. *See, e.g.*, Nicolas Sonnenburg, *Pressure Mounts on*
     *Justices in Qualified Immunity Cases*, SAN FRANCISCO DAILY J., Apr. 12, 2019, at 1; Alan K.

23   Chen, *The Intractability of Qualified Immunity*, 93 NOTRE DAME L. REV. 1937, 1937 (2018) ("[I]t
     is fair to say that the doctrine has now puzzled, intrigued, and frustrated legal academics, federal

24   judges, and litigators for half a century.").  Many legal scholars and others have called for the
     doctrine to be revisited and eliminated, significantly restricted, or at the very least altered. *See,*

25   *e.g.*, Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797
     (2018); William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45 (2018); Cato

26   Institute, *Qualified Immunity: The Supreme Court's Unlawful Assault on Civil Rights and Police*
     *Accountability* (March 1, 2018 policy forum).  For years, justices of the Supreme Court, as well

27   as judges of the lower federal courts, have been critical of the application and expansion of the

28   doctrine. *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J, dissenting)

1  **B.      ADA and RA Claims**

2          Defendants also move for summary judgment on plaintiff's ADA and RA claims, which

3  are now only before the court as brought against defendant NSH.  (Doc. No. 194 at 28.)

4          Title II of the ADA requires public entities to refrain from both discriminating against

5  qualified individuals with a disability, and from excluding such individuals from benefiting from

6  or participating in a public program because of their disability.  42 U.S.C. § 12132.  The ADA

7  also requires public entities to make reasonable accommodation to disabled individuals.  Section

8  504 of the RA extends these protections to "any program or activity receiving Federal financial

9  assistance."  29 U.S.C. § 794; *see also Zukle v. Regents of the Univ. of California*, 166 F.3d 1041,

10  1045 (9th Cir. 1999) (observing that Title II of the ADA was expressly modeled after § 504 of the

11  RA, and that there is "no significant difference in analysis of the rights and obligations created by

12  the ADA and the [RA]").

13  /////

14  _____

("The majority today . . . tells officers that they can shoot first and think later, and it tells the public that palpably unreasonable conduct will go unpunished.  Because there is nothing right or just under the law about this, I respectfully dissent."); *Ziglar v. Abbasi*, ___U.S.___, ___, 137 S. Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence."); *Anderson v. Creighton*, 483 U.S. 635, 647 (1987) (Stevens, J., dissenting) ("The Court stunningly restricts the constitutional accountability of the police by creating a false dichotomy between police entitlement to summary judgment on immunity grounds and damages liability for every police misstep, by responding to this dichotomy with an uncritical application of the precedents of qualified immunity that we have developed for a quite different group of high public office holders, and by displaying remarkably little fidelity to the countervailing principles of individual liberty and privacy that infuse the Fourth Amendment."); *Zadeh v. Robinson*, 928 F.3d 457, (5th Cir. 2019) (Willett, J., concurring) ("Qualified immunity aims to balance competing policy goals. . . . And I concede that the doctrine enjoys special favor at the Supreme Court, which seems untroubled by any one-sidedness. . . . Even in this hyperpartisan age, there is a growing, cross-ideological chorus of jurists and scholars urging recalibration of contemporary immunity jurisprudence."); *Manzanares v. Roosevelt Cnty. Adult Detention Ctr.*, 331 F. Supp. 3d 1260, 1293–94 n.10 (D.N.M. 2018) (critiquing the Supreme Court's application of qualified immunity in many respects, among them the application of the clearly established law requirement, noting: "Factually identical or highly similar factual cases are not, however, the way the real world works.  Cases differ.  Many cases have so many facts that are unlikely to ever occur again in a significantly similar way")  While there is so much more that could, and perhaps should, be said about the current state of this judicially created doctrine, the undersigned will stop here for today. In short, this judge joins with those who have endorsed a complete re-examination of the doctrine which, as it is currently applied, mandates illogical, unjust, and puzzling results in many cases.

"To establish a violation of Title II of the ADA, a plaintiff must show that (1) [he] is a qualified individual with a disability; (2) [he] was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities; and (3) such exclusion or discrimination was by reason of [his] disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). "To establish a violation of § 504 of the RA, a plaintiff must show that (1) [he] is handicapped within the meaning of the RA; (2) [he] is otherwise qualified for the benefit or services sought; (3) [he] was denied the benefit or services solely by reason of [his] handicap; and (4) the program providing the benefit or services receives federal financial assistance." *Id.*

Both the ADA and the RA apply in the context of correctional facilities, and both prohibit disabled inmates from being excluded from participation in inmate services, programs, or activities, including medical programs. *See Pierce v. County of Orange*, 526 F.3d 1190, 1214 (9th Cir. 2008) (explaining that the ADA and RA apply in the context of correctional facilities); *see also Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (acknowledging that the phrase "services, programs, or activities" as used in 42 U.S.C. § 12132 includes medical programs in prison). A plaintiff can allege disability discrimination in the provision of inmate services, programs, or activities under the ADA or the RA by pleading either (i) discrimination based on disparate treatment or impact, or (ii) denial of reasonable modification or accommodations. *See Fortuyne v. Am. Multi–Cinema, Inc.*, 364 F.3d 1075, 1086 (9th Cir. 2004). "[T]he ADA not only protects against disparate treatment, it also creates an affirmative duty in some circumstances to provide special, preferred treatment, or 'reasonable accommodation.'" *Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F. Supp. 962, 965 (N.D. Cal. 1998); *see also McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004) ("A plaintiff need not allege either disparate treatment or disparate impact in order to state a reasonable accommodation claim.").

Plaintiff's ADA and RA claims, as now presented, are based solely on a failure to accommodate theory, as opposed to a disparate treatment or disparate impact theory. (*See* SAC at 148.) In order to succeed on her failure to accommodate claim, plaintiff must allege and show that a correctional facility deliberately refused to accommodate the decedent's disability-related

1    needs.  *See United States v. Georgia*, 546 U.S. 151, 157 (2006) ("[T]he alleged deliberate refusal

2    of prison officials to accommodate [plaintiff's] disability-related needs in such fundamentals as

3    mobility, hygiene, medical care, and virtually all other prison programs constituted [an ADA

4    violation]." (internal quotation omitted)); *see also Pierce*, 526 F.3d at 1221 ("[A]n inmate cannot

5    be categorically excluded from a beneficial prison program.").  However, inadequate or negligent

6    medical treatment alone does not constitute an unlawful failure to accommodate under the ADA

7    or RA.  *Simmons*, 609 F.3d at 1022.

8            In their pending motion for summary judgment, defendants argue that any delay in the

9    decedent's admission to NSH had nothing to do with his disability and therefore the ADA and

10   RA do not apply here at all.  (Doc. No. 194 at 29.)  In response, plaintiff argues that outright

11   denial of medical services can be so unreasonable as to demonstrate discrimination under the

12   ADA.  (Doc. No. 212 at 30.)

13           As the court noted in its prior order addressing defendants' motion to dismiss (Doc. No.

14   98), "[t]here is no clear guidance as to whether a plaintiff may ever state a failure to

15   accommodate claim under the ADA or RA based on a correctional facility's failure to provide

16   medical treatment for a disability."  (*Id.* at 26–27.)  However, "'courts have distinguished

17   between claims asserted under the ADA that allege that the medical treatment that a plaintiff

18   received or had access to was inadequate, versus claims alleging that a plaintiff was

19   discriminatorily precluded from access to medical treatment altogether.'"  (*Id.* at 30) (quoting

20   *Hughes v. Colo. Dept. of Corr.*, 594 F. Supp. 2d 1226, 1241 (D. Colo. 2009)).  Although courts

21   have not clearly articulated the standard applicable to a situation such as the one at issue in this

22   case, where the decedent was completely denied treatment by defendant NSH, courts are in

23   general agreement that an outright denial of medical care—including mental health care—can

24   lead a jury to reasonably infer that the denial was so arbitrary and capricious that there must have

25   been a discriminatory motive.  *See Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 285–

26   87 (1st Cir. 2006) (finding a triable issue of fact as to whether the defendant violated the ADA by

27   failing to provide the plaintiff access to his medications, because this "outright denial of medical

28   services" was "so unreasonable as to demonstrate that they were discriminating against him

                                                  23

1    because of his disability"); *Anderson v. County of Siskiyou*, No. 10-cv-01428-SBA, 2010 WL

2    3619821, at *5 (N.D. Cal. Sept. 13, 2010) (finding that the plaintiff had stated a cognizable ADA

3    claim by alleging "that Defendants failed to provide [plaintiff] with any access to mental health

4    programs and services" because plaintiff had alleged an "outright denial of medical services");

5    *Barnett v. County of Los Angeles*, No. 2:20-cv-02530-ODW-ASx, 2021 WL 826413 (C.D. Cal.

6    Mar. 4, 2021) (finding allegations that the decedent received no mental health evaluation or

7    treatment, despite his known history of suicidal tendencies, to be sufficient to state a cognizable

8    failure to accommodate claim under the ADA "because it is plausible that there was a deliberate

9    refusal to accommodate"); *cf. Estate of Morris v. Jeffreys*, No. 3:20-cv-50320, 2021 WL

10   3187699, at *6 (N.D. Ill. July 28, 2021) (distinguishing *Kiman* because the plaintiff in the case

11   before the court had not alleged that the decedent was denied access to any treatment or

12   medication *that had been prescribed*); *Sweiha v. County of Alameda*, No. 19-cv-03098-LB, 2019

13   WL 4848227, at *8 (N.D. Cal. Oct. 1, 2019) (finding no colorable ADA claim only because the

14   jail transferred plaintiff to a psychiatric facility within a week).

15           An allegation by a detainee that he had merely been denied medical services would likely,

16   though not necessarily, be insufficient to state a cognizable claim under the ADA.  However, the

17   allegation of a *systematic* delay or denial of detainees' medical services—as is the case here with

18   respect to the thousands of committed IST patients who have been denied treatment by NSH—

19   may be found to demonstrate such wanton disregard for IST patients' care that the outright denial

20   can also be found to be based on the patients' IST disabled status.  *Cf. Tardif v. City of New York*,

21   991 F.3d 394, 406–07 (2d Cir. 2021) ("Here, by contrast, there is no evidence that the delay in

22   providing [plaintiff's] medication was more than an isolated and temporary incident; nor is there

23   any indication that the City systematically delays or denies pre-arraignment detainees reasonable

24   medical services for their disabilities.").

25           As discussed above, the undisputed facts on summary judgment in this case establish that

26   defendant was aware that the decedent had been committed to NSH, and yet he was completely

27   denied admission to NSH for nearly two months.  Additionally, it appears that such denials have

28   become systematic within the NSH and DSH systems.  *See, e.g.*, *Stiavetti v. Clendenin*, 65 Cal.

1    App. 5th 691, 716 (2021) ("'[G]iven the many years DSH [and DDS] [ha]ve had to address

2    excessive wait times,' they simply have 'not done enough to warrant continuous excusal from'

3    commencing substantive services for all IST defendants in a timely manner.").  Lastly, it is

4    noteworthy that in 2019 the district court in *Luong* concluded that the plaintiff in that case had not

5    pointed to any evidence showing that defendant "purposefully treated IST defendants less

6    favorably than others needing mental health placement." *Luong*, 411 F. Supp. 3d at 645.  The

7    same cannot be said now in light of the evidence before the court on summary judgment.  A

8    cursory review of the NSH waiting list submitted by plaintiff on summary judgment reflects that

9    nearly every patient appearing on that list was committed by way of California Penal Code

10   § 1370, which applies to IST defendants.  (*See* Doc. No. 215-8.)  However, NSH admits more

11   than just IST patients.  For example, NSH also admits patients who are deemed not guilty by

12   reason of insanity.  (*See* Doc. No. 218–1 at 10.)  These patients are directed to be admitted as

13   soon as a bed is available.  (*Id.*)[10]  Nonetheless, even if the court were to disregard this apparent

14   disproportionate delay for IST patients versus other patients at NSH, the undisputed systemic

15   denial of mental health treatment alone could lead a reasonable jury to conclude that IST patients

16   are denied treatment because of their disability, thus supporting a failure to accommodate claim

17   against NSH.

18           Accordingly, defendants' motion for summary judgment in their favor as to plaintiff's

19   ADA and RA claims will be denied.

20   **C.      Bane Act Claim**

21           Defendants also move for summary judgment on plaintiff's Bane Act (California Civil

22   Code § 52.1) claim.  (Doc. No. 194 at 30.)  To prevail on a Bane Act claim, plaintiff must allege

23   and show that defendants intentionally interfered with the decedent's civil rights via threats,

24   intimidation, or coercion.  *Reese v. County of Sacramento*, 888 F.3d 1030, 1044 (9th Cir. 2018).

---

25   [10]  The DSH website indicates that IST patients make up only 30% of all NSH patients.  *See*
26   California Department of State Hospitals, Napa, available at
     https://www.dsh.ca.gov/Napa/index.html (last visited March 22, 2022).  Although neither party
27   argues this point, the court notes that the NSH waiting list suggests that IST patients are in fact
     subjected to longer delays in their admission than that experienced by other patients who have
28   been committed.

1   "Nothing in the text of the statute requires that the offending 'threat, intimidation or coercion' be

2   'independent' from the constitutional violation alleged."  *Cornell v. City & County of San*

3   *Francisco*, 17 Cal. App. 5th 766, 800 (2017).  Furthermore, "a reckless disregard for a person's

4   constitutional rights is evidence of a specific intent to deprive that person of those rights."  *Reese*,

5   888 F.3d at 1045 (citation omitted).

6          In their pending motion, defendants argue that plaintiff has failed to come forward with

7   evidence on summary judgment that any state defendant exhibited the required specific intent.

8   (Doc. No. 225 at 10.)

9          Deliberate indifference qualifies as reckless disregard when it comes to the violation of

10  constitutional rights.  *See Scalia v. County of Kern*, 493 F. Supp. 3d 890, 903 (E.D. Cal. 2019).

11  As such, if the court were not granting summary judgment in favor of defendants as to plaintiff's

12  deliberate indifference claim, so too could plaintiff's Bane Act claim survive summary judgment.

13  However, as discussed above, here there exists no genuine disputed issue of material fact as to

14  whether the individual state defendants acted with deliberate indifference toward the decedent's

15  due process rights.  As a matter of law under the Ninth Circuit's holding in *Peralta*, they did not.

16  There is therefore also no evidence of "threats, intimidation or coercion" beyond the coercion

17  inherent in the fact that the decedent was detained in the custody of the county jail during the

18  pendency of defendants' process of admitting him to NSH.  *See Luong*, 411 F. Supp. 3d at 647.

19  Accordingly, the court will grant defendants' motion for summary judgment with respect to

20  plaintiff's Bane Act claim.

21  **D.     Punitive Damages**

22         Finally, defendants seek summary judgment in their favor so as to bar plaintiff from

23  seeking punitive damages should she prevail at trial.  (Doc. No. 194 at 31.)  "Under California

24  law, punitive damages require a showing by clear and convincing evidence that a defendant acted

25  with oppression, fraud, or malice."  *Dudgeon v. County of Sonoma*, No. 19-cv-05615-JCS, 2021

26  WL 5407519, at *16 (N.D. Cal. Nov. 18, 2021) (citing Cal. Civ. Code § 3294(a)).  Because the

27  court is granting summary judgment in favor of defendants as to plaintiff's § 1983 and Bane Act

28  claims, plaintiff of course cannot seek punitive damages as to those claims.  Although the court is

denying defendants' motion for summary judgment with regard to plaintiff's ADA and RA claims, punitive damages are not available in connection with those causes of action.  *See Barnes v. Gorman*, 536 U.S. 181, 189 (2002).  The court will therefore grant defendants' motion for summary judgment as to plaintiff's claim for punitive damages.

## CONCLUSION

The systemic failures from which this tragic case stems have been repeatedly recognized by both California and federal courts and yet the unnecessary deaths of IST defendants continue to mount.  Nonetheless, for all of the reasons set forth above:

1.     Defendants' motion for summary judgment (Doc. No. 194) is granted as to plaintiff's claims brought pursuant to 42 U.S.C. § 1983, plaintiff's claim brought pursuant to the Bane Act, and plaintiff's claim for punitive damages;

2.     Plaintiff's claim brough pursuant to California Government Code § 845.6 is dismissed on the agreement of the parties;

3.     Defendants' motion for summary judgment (Doc. No. 194) is denied as to plaintiff's ADA and RA claims brought against defendant NSH;

4.     This action now proceeds solely on plaintiff's ADA and RA claims against defendant NSH;

5.     Defendants Matteucci, Tyler, Black, Mond, and White are terminated as defendants in this case and the Clerk of the Court is directed to update the docket to reflect the same; and

6.     The parties are directed to contact Courtroom Deputy Mamie Hernandez at (559) 499-5652, or MHernandez@caed.uscourts.gov, within ten days of service of this order regarding the rescheduling of the Final Pretrial Conference and Jury Trial dates in this action.

IT IS SO ORDERED.

Dated:   **April 22, 2022**                                    _____

                                                                    UNITED STATES DISTRICT JUDGE